134

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DASSAULT SYSTEMES, S. A.
A CORPORATION OF FRANCE

Plaintiff,

v.

CASE NO. 09-CV-10534
HON. LAWRENCE P. ZATKOFF

KEITH CHILDRESS
d/b/a PRACTICAL CATIA TRAINING

Defendant,
_______________________________/

FILED
MAR 16 2010
CLERK'S OFFICE
DETROIT

**DEFENDANT CHILDRESS' REPLY TO DASSAULT'S BRIEF IN OPPOSITION [DN 53] TO DEFENDANT CHILDRESS' MOTION [DN 49] TO SET ASIDE ORDER [DN 40] GRANTING PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT OR TO SET ASIDE ENTRY OF DEFAULT JUDGMENT**

Dassault, with its Brief in Opposition [DN 53} to my Motion to Set Aside Entry of Default Judgment [DN 40], has once again submitted a pleading to this court that is 100% inaccurate. Because of the five page limit on reply briefs, I will focus on the more glaring errors and misrepresentations.

Dassault has once again changed its story to fit its argument. When Dassault sought this court's permission for leave to serve a subpoena on the FBI, Dassault claimed that, "Dassault informed the FBI about Childress' [alleged] illegal activity." [see DN 12-1 pg 4 par 3] Now, to establish the tolling of the statute of limitations, Dassault has changed it story, contradicting its previous pleading, by stating: "The FBI conducted its raid in October of 2006, giving rise to Dassault's knowledge of the [alleged] infringement, and starting the clock for accrual of an infringement claim." [DN 53 pg 23] Either Dassault misrepresented the facts in its previous pleading, or is misrepresenting the facts now.

To support Dassault's allegation that I purchased the CATIA V5 software in October 2001 under the

d/b/a G. Bailey and Associates, and thus, am not licensed to use the CATIA software, Andrew Clarkson misrepresents that the IBM Customer Agreement attached as Tab 2 to his affidavit is a "true copy of the 2001 IBM Customer Agreement ("2001 Agreement") that was in place at the time of the November 20, 2001, G. Bailey and Associates invoice." [DN 53-3 pg 3 pat 7] This is a completely false statement. The IBM Customer Agreement Mr. Clarkson provides as an attachment to his affidavit contains a blank signature page [DN 53-3 pg 9] and is obviously not the document I signed when I purchased the CATIA V5 software in October 2001. The IBM Customer agreement I signed shows that I purchased the software under my name, Keith Childress, not the d/b/a G. Bailey and Associates. (This topic is fully explored in paragraphs 16 thru 23 of my affidavit [Exhibit A])

With regards to my "meritorious defenses", Dassault misrepresents a case it sites in its response brief [DN 53 pg 2 item 2]. In its brief Dassault states:

> Defendant has not supported each claimed 'meritorious defense' with underlying facts that are sufficient to constitute a complete defense; see *Clarendon Ltd. v. Eddie Foster*, 1993 U.S. App. LEXIS 23059, * 21 (Sept. 2, 1993, 6th Cir.); [AND] Childress has failed to provide underlying facts for each element of each claimed defense and thus his motion must be denied.

The Sixth Circuit's findings in *Clarendon v. Foster* with regards to what constitutes a "meritorious defense clearly state that:

> [I]f any defense relied upon states a defense good at law, then a meritorious defense has been advanced." United Coin at 845. A defense is sufficient if it contains "even a hint of a suggestion which, proven at trial, would constitute a complete defense." INVST Financial Group v. Chem-Nuclear Systems, 815 F.2d 391 (6th Cir.1987). A mere denial of the claims asserted in the complaint, and nothing more, does not amount to even a "hint of a suggestion" that the defendant can dispute the allegations in the complaint. Smith v. Commissioner, 926 F.2d 1470, 1480 (6th Cir.1991).

According to the Sixth Circuit in *Clarendon*, my only obligation in stating my "meritorious defenses" is to provide a "hint of a suggestion which, proven at trial, would constitute a complete

defense." It does not say that I have to try my case in my Motion to Set Aside Entry of Default Judgment.

Dassault's complaint alleges that our company infringed on the copyright and trademark of its CATIA computer aided design (CAD) software. In my motion to set aside entry of default judgment, I state the following "meritorious defenses" to Dassault's allegations: Express and Implicit License, Fair Use, Copyright and Trademark Estoppel, Statute of Limitations, and Trademark Laches. In support of my meritorious defenses, I submitted three corroborating affidavits, including one from an MSC Software employee, which clearly meet and exceed the "hint of a suggestion" of a "complete defense" burden set forth in *Clarendon v. Foster.* However, so there will remain no doubt with regards to my "meritorious defenses", I have updated my affidavit [**Exhibit A**] to include the "underlying facts [and evidence] that are sufficient to constitute a complete defense." Furthermore, I addressed the "meritorious defenses" of "Implied and Express License", "Statute of Limitations" and "Copyright and Trademark Estopell" as well as my "meritorious defenses" to Dassault's state law claims in my response to Dassault's list of damages [DN 50].

With regards to my "meritorious defense" of "Fair Use", 17 U.S.C. § 107 states: "...fair use of a copyrighted work, including... teaching (including multiple copies for classroom use)...is not an infringement of copyright." Furthermore, the Supreme Court states in *Campbell v. Acuff-Rose Music* (92-1292), 510 U.S. 569 (1994) that the applicability of Fair Use "*requires case-by-case analysis, rather than bright-line rules*". Therefore, inasmuch as "fair use" is a complete defense to allegations of copyright infringement, and inasmuch as it is up to a jury to decide the applicability of the fair use doctrine on a "case-by-case" basis, I have satisfied the requirement set forth in *Clarendon* to provide "a hint of a suggestion which, proven at trial, would constitute a complete defense" to Dassault's allegation of copyright infringement.

With regards to culpability, Dassault claims that "Childress has delayed this case for over a year by

filing numerous motions claiming a host of procedural reasons why Childress cannot answer the February 12, 2009, complaint" (emphasis added). This is not true. Every pleading I have filed in this matter is in regards to the fact that Dassault unlawfully acquired secret grand jury information, in violation of Rule 6(e)(2) of the Fed. R. of Crim. P., and used it as the basis of its copyright infringement complaint against me. Furthermore, my Motion to Set Aside [DN 40] as well as in my Response to Dassault's List of Damages [DN 50 pg 9], refute Dassault's allegations that I have filed "numerous motions claiming a host of procedural reasons."

Dassault also claims that, "Childress has further obstructed discovery by refusing to participate in a Rule 26 conference, knowing full well that by preventing the Rule 26 conference from taking place, he can prevent the commencement of discovery." I have refuted this allegation in my Response to Dassault's Request for an Extension of Time [DN 52 pg 8 par 2].

With regards to prejudice, the Sixth Circuit has held that a plaintiff must point to something more than mere delay in order to establish prejudice. *Thompson v. Am. Home Assurance Co.*, 95 F.3d 429, 433 (6th Cir.1996). Rather, "the delay must result in tangible harm such as loss of evidence, increased difficulties of discovery, or greater opportunity for fraud or collusion." *Id.* At 433-34.

Dassault claims that it has been prejudiced because it has been unable to gain access to the computers seized by the FBI during the October 31, 2006 raid. In its brief, Dassault states: "[m]ore than a year after filing suit, Dassault still does not have access to the seized computers all due to Childress' continued obstruction of discovery, and it is unclear if Dassault will ever get access to these computers" (emphasis added). Dassault's allegation that I am responsible for its inability to "get access to these computers" is completely false. In responding to my Motion for a Writ of Mandamus [DN 41], the Sixth Circuit stated: "Although the plaintiff has served a subpoena on the FBI, the government has an independent obligation to assess the validity of the subpoena and can oppose the production of the

material if it deems such action to be justified." The government (Department of Justice) "assessed the validity of [Dassault's November 16, 2009] subpoena" and "oppose[d] the production of the material" due to Fed. R. of Crim. P. Rule 6(e)(2) concerns. I am not responsible for the Department of Justices decision not to honor Dassault's subpoena, nor would this issue cause Dassault any prejudice should the court set aside its entry of default judgment.

Dassault also claims that it "has further been harmed because Childress continues to operate his for-profit training facilities, which teach engineers how to use Dassault's own CATIA software. Thus, Childress continues to willfully infringe Dassault's copyrights thereby diminishing their value, while avoiding payment of royalties that are owed to Dassault." As stated in my affidavit [Exhibit A par 16 thru 23] and supported by corroborating evidence, I, Keith Childress, not G. Bailey and Associates, purchased the CATIA V5 software in 2001 and have paid the Annual Licensing Charge (ALC) every year ever since. I therefore am legally entitled to use the CATIA V5 software to teach my classes and Dassault has not suffered any prejudice as a result.

Finally, Dassault sites Krowtoh II LLC v. Excelsius Int'l Ltd., No. 08-5492 (6th Cir. May 19, 2009), a case in which the Sixth Circuit overturned a District Court order denying a Rule 50(c) motion to set aside Entry of Default Judgment, in part, because the defendant's failure to comply with a court order and discovery were excusable, as the individual responsible for overseeing litigation for the defendant was from Germany and thus unfamiliar with the U.S. Legal system. As as *pro se* litigant, I too am unfamiliar with the U. S. legal system and respectfully request that this court afforded me the same consideration.

Respectfully Submitted,

Keith Childress
2234 Elm St. Algonac, MI 48001

EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DASSAULT SYSTEMES, S. A.
A CORPORATION OF FRANCE

Plaintiff,

v.

CASE NO. 09-CV-10534
HON. LAWRENCE P. ZATKOFF

KEITH CHILDRESS
d/b/a PRACTICAL CATIA TRAINING

Defendant,
______________________________/

**AFFIDAVIT OF KEITH CHILDRESS IN SUPPORT OF DEFENDANT CHILDRESS' MOTION [DN 49] TO SET ASIDE ORDER [DN 40] GRANTING PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT OR TO SET ASIDE ENTRY OF DEFAULT JUDGMENT**

Keith Childress being duly sworn and says as follows:

1. That the information contained in this affidavit is based upon my personal knowledge and experience.

2. That I have been involved in the automotive design and engineering profession for more than 30 years. I am a 1980 graduate of the Batavia School of Drafting and a 1982 graduate of the prestigious Philpot School of Automotive Body Drafting (**see Tab 1**). I am a highly respected design engineer with multiple patents to my credit (**Tabs 2-2b**). I have been asked to write numerous articles that have appeared in worldwide trade publications. I have been invited as an "industry expert" to present guest lectures to high school, college and technical school students. I am a former Batavia/Philpot Schools

instructor and have been teaching people to use the CATIA computer aided design (CAD) software for more than 20 years.

3. That from its inception in 1981, Plaintiff Dassault Systemes (hereafter Dassault) has partnered with IBM in the development, marketing and sale of their CATIA computer aided design (CAD) software. Dassault's primary responsibility has been to develop the CATIA software, while IBM's primary responsibilities have included worldwide marketing, sales, distribution, and <u>licensing</u> of the CATIA software. IBM personally handles large accounts such as Boeing, Honda, Chrysler, etc., while medium and small accounts are the responsibility of IBM's authorized agents, which consist of a network of independent companies IBM refers to as "Business Partners".

4. I am aware that in its response brief, Dassault refers to IBM as "Dassault's distributor" and that IBM "manages the licensing of CATIA software" for Dassault. However, Dassault's relationship with IBM goes much deeper than that. While conducting research into this case, I came across a 2005 interview with Francis Bernard, founder of Dassault Systemes, in which Mr. Bernard explains the nature of Dassault's relationship with its "partner" IBM. Attached as **Tab 3 & 3a** is an excerpt from the interview in which Mr. Bernard states:

> [W]e started to work with IBM in 1981, which is the origin of our success. I consider the foundation of this union was the greatest decision in all DS history. In all countries, <u>***IBM* – our strategic partner**</u>, manages sales. <u>The sales of all *CATIA* licenses are done by *IBM*</u>. To allow this, *IBM* created a *PLM* business organization in almost all countries based on its own technical and sales staff. Furthermore, <u>*IBM* has a network of Business Partners to cover most of the regions and to address various industrial sectors</u>. Usually, *IBM* works more with Large Accounts; the <u>Business</u>

> Partners' targets being to attract and serve small and medium size companies. (emphasis added)

5. That even though I chose "G. Bailey and Associates" as my first d/b/a, the name of our course has always been named **Practical Catia Training** because we specialize in CATIA training that is based on my 20+ years of practical experience using the CATIA software in the automotive design and engineering profession.
6. That the name **Practical Catia Training** made its first appearance on the world stage in 1998 when I was asked to write an article for CATIA Solutions Magazine, a worldwide trade publication devoted entirely to the CATIA Software. Dassault, its partner IBM, and their authorized agents supported the magazine by contributing articles and purchasing ad space. Attached as **Tabs 4 – 4c** is the 1998 article I wrote for CATIA Solutions Magazine. The title of the article was "**Practical CATIA Training**". The byline at the end of the 1998 article reads:

> Keith Childress is the founder of G. Bailey and Assoc., a design/engineering firm and is Founder/Instructor of Keith Childress' Practical CATIA Training in Detroit.

7. That I was again asked to contribute an article to CATIA Solutions Magazine in 1999, and again the name **Practical Catia Training** was prominently displayed in the article.
8. That despite the worldwide exposure these two articles received, no one from Dassault, its partner IBM, or their Business Partners contacted us to question or object to our use of the name **Practical Catia Training**.
9. That in 1999, IBM/Dassault introduced a new version of its CATIA software called CATIA V5. The new version of CATIA was a radical departure from previous versions

and would require users of previous versions to be completely retrained in the use of the new version. Unlike previous versions of CATIA, CATIA V5 could run on the Windows Operating System. Attached as **Tab 5** is Dassault's 1999 copyright registration of CATIA V5 Release 2.

10. That in 2000, I attended a "Ride & Drive" session hosted by IBM and Advanced Enterprise Solutions (AES). The purpose of the "Ride & Drive" session was to introduce the public to IBM/Dassault's new CATIA V5 software. AES was an IBM Business Partner and the largest reseller of IBM/Dassault's CATIA in the Americas. AES merged with MSC Software in 2001. As part of the "Ride & Drive" session AES sent an AES representative (Nathan Haller) to my office following the "Ride & Drive" session to install CATIA V5 on my office computer for a trial period.

11. That while conducting research into this case I discovered a May 2, 2001 press release issued by MSC Software ("MSC") announcing the merger between AES and MSC (see **Tab 6**). In the press release MSC refers to AES as "the largest IBM Product Lifecycle Management (PLM) Business Partner in the Americas, selling Dassault Systemes' PLM software portfolio comprised of CATIA, ENOVIA, DELMIA and SmartSolutions." The press release also states that "[b]y virtue of its equity ownership in AES, **Dassault Systemes [] will become a 9% equity owner in MSC Software**.

12. That in May of 2001, I purchased a CATIA V4 workstation from AES/MSC. Dave Lanfear was the AES/MSC representative that handled the transaction. Later that year I purchased a second CATIA V4 workstation from AES/MSC. Attached as **Tab 7** is the

quote I received from Dave Lanfear (AES/MSC) for the CATIA V4 workstation I purchased in May of 2001.

13. That according to Roger Gudobba's affidavit [DN 53-4 pg 2 par 2], he was AES/MSC's "director of sales and support of CATIA for Eastern USA" in 2001. As such, it is my understanding that Roger Gudobba was Dave Lanfear's supervisor at the time I purchased the CATIA V4 workstations.

14. That in July 2001, Nathan Haller arranged a meeting with Brian Lanfear (Manager, MSC Software) to discuss our renting MSC Software's training facility in Southfield, Michigan to teach our CATIA V4 classes. We also discussed the possibility of my doing training for MSC Software on an as-needed basis. Attached as **Tab 8** is an email I'd sent to Brian Lanfear on August 15, 2001 as a follow-up to said meeting. We began renting MSC Software's Southfield, Michigan, training room (CATIA V4 workstations and software) on September 4, 2001. We also rented MSC Software's training room during the day to teach our week-long CATIA V4 daytime classes. Attached as **Tabs 9 & 9a** is an email exchange I had with Ken Weigan of MSC Software regarding pricing for our use of MSC's training facility for our classes.

15. That in October 2001, sales of the new version of CATIA (V5) were slow and IBM/Dassault were offering ½ priced discounts to anyone that purchased the CATIA V5 software. I took advantage of this offer and purchased the CATIA V5 software on October 31, 2001 and have paid the required Annual Licensing Charge (ALC) every year ever since.

16. That I am aware that Dassault now claims that I am not licensed to use the CATIA V5 software because it alleges that I purchased the CATIA V5 software under the d/b/a G. Bailey and Associates. Andrew Clarkson's affidavit [DN 53-3 pg 2 par 7] states:

> At the bottom of the 2001 invoice [] it states "THIS IS ISSUED PURSUANT TO THE IBM CUSTOMER AGREEMENT OR THE EQUIVALENT AGREEMENT BETWEEN US." <u>Attached [] is a true copy of the 2001 IBM Customer Agreement ("2001 Agreement") that was in place at the time of the November 20, 2001, G. Bailey and Associates invoice</u>. G. Bailey and Associates and IBM are bound by the terms and conditions of the Agreement. According to paragraph 1.5 of the 2001 Agreement, "For a change to the terms of this Agreement to be valid, both of us must sign it." [in paragraph 8 Mr. Clarkson states] I have reviewed our company records and there were no amendments to the 2001 Agreement with G. Bailey and Associates. I searched our company records and did not find any license between IBM or Dassault where either Keith Childress or his d/b/a Practical Catia Training were a party. Prior to this suit, I was not aware that Defendant Keith Childress d/b/a Practical Catia Training claimed privity to any license, as they do not appear on our records as being a licensee and <u>I was not aware that Defendant had licensed software under the assumed name of G. Bailey and Associates</u>. (emphasis added)

17. That Dassault's allegation contained in Mr. Clarkson's affidavit that I purchased the software under the name G. Bailey and Associates is <u>incorrect</u>. Attached as **Tab 10** is the d/b/a for G. Bailey and Associates which clearly indicates the d/b/a expired on November 27, 2000, nearly a year before I purchased the CATIA V5 software.

18. That attached to Mr. Clarkson 's affidavit is an IBM Customer Agreement [DN 53-3 pgs 9-26] which Mr. Clarkson claims is a "a true copy of the 2001 IBM Customer Agreement ("2001 Agreement") that was in place at the time of the November 20, 2001, G. Bailey and Associates invoice." This is a <u>false</u> statement. The IBM Customer Agreement Mr. Clarkson provides as an attachment to his affidavit contains a <u>blank</u> signature page [DN

53-3 pg 9] and is obviously not the document I signed when I purchased the CATIA V5 software in October 2001.

19. That attached as **Tab 11** is a true copy of the signature page of the IBM Customer Agreement that I signed on October 31, 2001. I requested and received a copy of this document from IBM on February 16, 2010. I assume Mr. Clarkson could have done the same but chose not to. The signature page (page 1) of the authentic signed IBM Customer Agreement contains my name, Keith Childress, my signature, and my address, 2234 Elm St. Algonac MI. The "Enterprise Name" section of the signature page was intentionally left blank when I signed the document because I was not purchasing the CATIA V5 software under a company name or an assumed name. I was purchasing the software under my name, Keith Childress. The name "G. Bailey and Associates" does not appear anywhere in the signed 17-page IBM Customer Agreement. As such, the only contract I have with either Dassault Systemes and/or IBM regarding the CATIA licensing is under my name, "Keith Childress", not G. Bailey and Associates. As such, I am, and always have been, the legal license holder of the CATIA V5 software, not G. Bailey and Associates.

20. That the IBM invoice [53-3 pg 7], that Mr. Clarkson refers to in his affidavit [53-3 pg 2 par 7] was dated November 20, 2001, one month after I signed the IBM Customer Agreement under my name, "Keith Childress". The name G. Bailey and Associates appears on the invoice as the result of an error made by Jason Simon, the salesperson at MSC Software that handled the transaction. I paid for the CATIA V5 software with my

American Express card which at that time bore the name G. Bailey and Associates and my name, Keith Childress. Mr. Simon incorrectly assumed G. Bailey and Associates was my company name and included it in the paperwork that was prepared subsequent to my purchasing the CATIA V5 software and subsequent to my signing the IBM Customer Agreement. I was not aware of the error until I received the invoice in the mail more than a month after I'd purchased the CATIA V5 software and after I'd signed the IBM Customer Agreement.

21. That when I received the November 20, 2001 invoice, and realized it was addressed to G. Bailey and Associates, I immediately contacted IBM to inform IBM of the error. IBM said they would correct the error and include my name, Keith Childress, on future invoices. The 2002 and 2003 invoices were still addressed to G. Bailey and Associates, but they also included my name (**Tabs 12 & 12a**), as such, I didn't bother contacting IBM again. As far as I was concerned, as long as the CATIA V5 software updates and invoices came to me, it didn't matter to me who they were addressed to because I am the license holder according to the signed IBM Customer Agreement.

22. That I have paid the Annual Licensing Charge (ALC) every year using an online bill-pay service and the funds are deducted from my personal bank account. Attached as **Tab 13** is the canceled check for my 2009 ALC payment. The canceled check bears my name, Keith Childress, and my address, 2234 Elm St. Algonac MI 48001, and does not contain the name G. Bailey and Associates.

23. That I am aware that Mr. Clarkson states in his affidavit that, "I searched our company

records and did not find any license between IBM or Dassault where either Keith Childress or his d/b/a Practical Catia Training were a party." This is no doubt a true statement based on the aforementioned error made by IBM and MSC Software. However, my address at the time I purchased the CATIA V5 software in October 2001 was, and remains, 2234 Elm St. Algonac, MI 48001. This address appears on the IBM Customer Agreement that I signed on October 31, 2001, has appeared on every invoice I have received from IBM, and is the address Dassault used when it filed its complaint against me in February 2009. Had Mr. Clarkson have taken the logical step of searching IBM and Dassault's records using my street address, he would have discovered the IBM Customer Agreement I signed under my name, Keith Childress, on October 31, 2001 and he would have known that I am the legal license holder of the CATIA V5 software.

24. That in 2000, we officially changed the name of our company to **Practical Catia Training**. We did so because our training had become very popular in the 5 years since we started our company and industry insiders had come to refer to our company as **Practical Catia Training**. As such, when the d/b/a for G. Bailey and Associates expired in 2000, we changed the name.

25. That when we changed the name of our company in 2000, I created our **practicalcatia.com** website. Soon after its inception, our website became one of the most popular websites on the internet with regards to CATIA. During the past ten years our **practicalcatia.com** website has consistently ranked in the top five in Google, Yahoo, Netscape, MSN, etc. Mr. Haller affirms this in his affidavit [DN 49, Exhibit B par 21]

where he states:

> Mr. Childress' website was very popular and consistently ranked at or near the top of all the major internet search engines such as Google, Yahoo, etc.

26. That despite our website's popularity and high visibility, no one from Dassault, its partner IBM, or their Business Partners ever questioned or objected to our company name, **Practical Catia Training**, or to our website's URL, **practicalcatia.com**.

27. That in 2001, Pam Barton, of Dassault's partner IBM, discovered our top-ranked **practicalcatia.com** website and contacted us regarding our website and training. Ms. Barton, IBM/Dassault's "North American Channels Manager for Product Lifecycle Management Solutions"(CATIA), thanked us for promoting IBM/Dassault's new CATIA V5 software and offered to supply our company and our students with the CATIA V5 "hobbled code" CATIA V5 software. The "hobbled code" CATIA V5 software was a stripped-down version of the CATIA V5 software that IBM/Dassault created to help promote sales of the CATIA V5 software. Attached as **Tab 14** is an email communication I received from Ms. Barton, dated June 26, 2001, in which Ms. Barton states:

> Thanks for your response and thanks for demoing V5. There is a new CD coming out that is called hobbled code. You won't be able to print or save drawings, but you can do most other things in CATIA. If you're interested, I can send you one when they're available.

28. That at no time during our communications with IBM/Dassault's Ms. Barton did she question or object to our company name, **Practical Catia Training**, or to our website's URL, **practicalcatia.com**. On the contrary, IBM/Dassault sought to profit from both our good name and our website when Ms. Barton provided us with the "Hobbled Code"

CATIA V5 software as a means of promoting IBM/Dassault's new CATIA V5 software.

29. That by providing our company with the CATIA V5 "hobbled code" software, Dassault's partner IBM enabled us to open our own training facility and set us up in the business of providing CATIA V5 training.

30. That during the fall of 2001 we contacted IBM to inquire about our company joining the IBM/Dassault Higher Education and Training (HEAT) Program[1]. The manager of the HEAT Program, Buz Nowicki, asked that we submit a letter of introduction that he said he would forward to his counterpart at Dassault in France for their approval. We submitted the letter to the Mr. Nowicki, which contained the name **Practical Catia Training** and the URL **practicalcatia.com**, and he confirmed that he forwarded the letter to Dassault in France. Attached as **Tabs 15 & 15a** is the letter of introduction we provided to Mr. Nowicki on August 28, 2001.

31. That in 2003, we received confirmation from the HEAT program manager that our company had been accepted into the IBM/Dassault HEAT program. Attached as **Tabs 16 & 16a** is the email quote we received from the HEAT Program Manager, Buz Nowicki, confirming our acceptance into IBM/Dassault's HEAT Program.

32. That we chose not to join the HEAT Program at that time because we were receiving the CATIA V5 software and licenses from IBM/Dassault's Business Partner, MSC Software, as a result of the business agreement initiated by MSC Software (see paragraph 33 below). Had we not been receiving licenses from MSC Software, we would have taken

1 The HEAT Program was a joint program sponsored by IBM and Dassault which provided CATIA V5 software and licenses to educational organizations at substantial discounts ($350 per license, per year).

IBM/Dassault up on their offer to join the HEAT program and would have received CATIA V5 software and licenses at a cost of $350 per license, per year. However, the fact that we were invited to join the IBM/Dassault HEAT program is an affirmation that Dassault was aware of our company, approved of our company's inclusion into its HEAT program, and approved of our use of its CATIA mark in our company name, **Practical Catia Training**, our website's URL, **practicalcatia.com**.

33. That in October 2001, Nathan Haller contacted us on behalf of MSC Software with an offer to provide our company and our students with "fully functional" CATIA V5 software and licenses in exchange for MSC Software advertising on our website, and in exchange for us providing sales leads and our students' contact information to MSC for marketing purposes.

34. That when I questioned Mr. Haller about MSC Software's authority to offer to provide our company and our students with the CATIA V5 software and licenses, Mr. Haller states in a December 17, 2001 email (**Tab 17**) that:

> ...we're [MSC Software] not doing anything [supplying temp licenses for our use in class and our student's use at home] that IBM doesn't so themself. [A]s an IBM Business Partner, we're [MSC Software] an extension to IBM, we are part of IBM.

35. That attached as **Tab 18** is an email communication dated December 12, 2001 between Mr. Haller and me in which I reiterate the business agreement MSC Software initiated with our company. In the email I state:

> ...you [MSC Software] offered to get 30-day licenses for my students in order to promote your company [MSC Software]. I didn't ask, you offered. [AND] When I found out his [my customer] current Catia supplier was

> Incat, I started to tell him about you and your company and what great people you are to do business with. I made sure he understood that it was you and your company that was supplying the [CATIA V5] license. I thought this was my part of the bargain. You [MSC Software] supply me with temp licenses and I promote your company [MSC Software].

36. That I am aware that Mr. Clarkson, in his affidavit, downplays MSC Software's role by stating "MSC was a sales company that sold software for IBM". However, MSC Software was much more than just "a sales company that sold software for IBM". MSC Software was an IBM Business Partner and, by virtue of its merger with AES, was the largest reseller of the CATIA software in the Americas. MSC Software was also responsible for the marketing, sales, and licensing of the CATIA software to small and mid-sized businesses (such as our clientele) and a company of which Dassault Systemes owned a 9% share.

37. That MSC Software was also the company from which we'd purchased two CATIA V4 workstations in 2001, the company whose training room and CATIA V4 workstations and software we were renting for our day and evening CATIA V4 classes, and the company from which we'd purchased the CATIA V5 software.

38. That we agreed to MSC's terms and MSC began advertising on our website in Nov. 2001, Attached as **Tabs 19 & 19a** are the two MSC Software banner ads and my testimonial exactly as they appeared on our website from November 2001 until mid 2007[2]. **Tab 19** also shows the "Free CATIA V5 Software Offer" webpage I created to advertise the fact that our company was now offering our students Free CATIA V5 software via the

2 The pages are provided courtesy of web.archive.org, a company that archives webpages and makes them available to the public via a search engine on their website.

business agreement initiated by MSC Software.

39. That IBM, via our agreement with MSC Software, began supplying us with fully-functional CATIA V5 licenses for use in our training and for our students' personal educational use at home. Attached as **Tab 20** is the very first license request we submitted to MSC Software and **Tabs 21 - 21c** shows the first license we received from IBM via MSC Software.

40. That on February 21, 2002, Mr. Haller sent an email requesting that we modify the format by which we submitted the license requests to MSC Software. **Tabs 22 & 22a** shows Mr. Haller's email containing the new format. In the email, Mr. Haller states:

> If you are doing a "StudyAtHome" coarse, please let me know so we'll [MSC Software sales staff] contact the customer sooner. We [MSC Software] always have good deals going. I'll keep you posted on those and there time frames.

41. That we provided hundreds of sales leads to MSC Software as a result of the business agreement initiated by MSC Software. Attached as **Tabs 23 - 23f** are 6 pages of a 138-page document containing some of the hundreds of customer referrals we provided to MSC Software as a result of the aforementioned business agreement initiated by MSC Software. NOTE: I will produce all of the customer referrals should this case go to trial, but I do not want to unnecessarily burden the Court with the redundancy at this time.

42. That attached as **Tab 24 – 24d** are 5 pages of a 1,115-page document that contains most, but not all, of the hundreds of CATIA V5 licenses we received from IBM as a result of the aforementioned business agreement initiated by MSC Software in 2001. The licenses were created by IBM's license key center in Boulder, Colorado, and were sent directly to

me (keith@practicalcatia.com) via email by IBM (kmsrl17@dk.ibm.com). (Again, I will produce the entire document if this case goes to trial.)

43. That I am aware Roger Gudobba, MSC's former "Director of Sales and Support of CATIA for Eastern USA", and current Dassault Systemes employee, hypothetically states in his affidavit that, "[a]s the Director of Sales at MSC it would be unthinkable to give away software as opposed to selling it." Although Mr. Gudobba may have viewed it as "unthinkable" to "give away" the CATIA V5 software, IBM apparently did not. As explained in #44 below, as part of its marketing strategy, IBM did give away the CATIA V5 software and licenses on a regular basis to potential customers wishing to demo the software prior to making a purchase.

44. That the licenses referenced above (**Tabs 24 - 24d**) are IBM's "AL2-All-In-One Mrktg 2" license configuration. It is my understanding that the AL2 license configuration was specifically created by IBM to be used as a marketing tool to help IBM Business Partners sell the CATIA V5 software. It is my further understanding that IBM provided the AL2 licenses to their Business Partners to distribute free-of-charge (along with the CATIA V5 software), to potential customers that were interested in demoing CATIA V5.

45. That Roger Gudobba's inference in his affidavit that MSC Software providing our company and our students with CATIA V5 software and licenses would have amounted to a "give away" is incorrect. MSC Software provided the CATIA V5 software and licenses in exchange for advertising on our "top-ranked" website and in exchange for us providing hundreds of sales leads to MSC Software, which may have resulted in

hundreds of thousands, if not millions of dollars worth of business for MSC Software, IBM and Dassault. It was for this purpose that IBM created the AL2 license configuration.

46. That the value of the licenses MSC Software provided to our company for use in our training was very small compared to the gain MSC Software reaped from advertising on our website and for our providing hundreds of sales leads to MSC Software. The cost of HEAT training licenses is only $350 per license, per year **(Tabs 16 & 16a)**. As I stated in a previous pleading, our company has trained on average 14 students per month since we began offering CATIA V5 training in 2001. As such, we would have only required the use of 14 CATIA V5 licenses per year to train our students. If you multiply the cost ($350) of the HEAT licenses we would have purchased had it not been for the agreement initiated by MSC Software, times the number of licenses we would have required per year (14), the cost to us would have been $4900 per year. As such, our business agreement with MSC Software saved us a paltry $4900 per year, while by contrast, MSC Software was allowed to advertise on our top-ranked website and received hundreds of sales leads which may have generated hundreds of thousands, if not millions of dollars in revenue for IBM, Dassault and MSC Software.

47. That I viewed MSC Software's offer to provide us with CATIA V5 licenses in exchange for sales leads and advertising on our website as a fair business relationship. To me, this business arrangement was no different from MSC Software renting their training room, CATIA V4 workstations and CATIA V4 software to us for use in our training.

48. That in January 2002, I received email communications [**Tabs 25 - 25e**] from Nathan Haller regarding MSC Software's Director of Business Development, Daryl Patriskoff's, desire to meet with me to discuss our company's potential role in Mr. Patriskoff's goal of "expand[ing] MSC's training abilities."

49. That my business manager, Donna Paval accompanied me to the meeting with Mr. Haller and Mr. Patriskoff, which took place on Monday January 28, 2002 at Cooker's restaurant near Lakeside Mall [**Tab 25e**]. During the meeting, Mr. Patriskoff discussed MSC Software's business relationship with our company. Mr. Patriskoff was aware that MSC Software was advertising on our website and that MSC Software was providing CATIA V5 licenses and software for use in our training and for our students' educational use at home. Mr. Patriskoff discussed our company becoming an MSC Software training provider utilizing the CATIA V5 software and licenses that MSC was providing, per the aforementioned business agreement initiated by MSC Software three months earlier. The existence of the meeting with Mr. Patriskoff was affirmed by Ms. Paval [DN 49 pg 40 par 17] and Mr. Haller [DN 49 pg 31 par 26] in their respective affidavits.

50. That while Nathan Haller was my primary contact at MSC Software, we also interfaced with Brian Lanfear (MSC Software Regional Manager), Daryl Patriskoff (MSC Software Director of Business Development), Dave Lanfear (MSC Software Account Rep), Jason Simon (MSC Software Account Rep), Ken Wiegand, and Tim Gudobba (Applications Engineer and brother of Roger Gudobba).

51. That Roger Gudobba, <u>a current Dassault employee</u>, was the direct supervisor of most of

the MSC Software personnel listed above, yet, according to his affidavit, he is apparently one of the only people who is "not aware of" my interactions with his employees, is "not aware of" my interactions with other MSC Software personal, is "not aware of" my interactions with his brother, Tim Gudobba, is "not aware of" my interactions with MSC Software upper management, and is "not aware of" the business agreement his employee, Nathan Haller, initiated with our company on behalf of MSC Software in 2001.

52. That Tim Gudobba (Applications Engineer, Nathan Haller peer, and brother of Roger Gudobba) was aware of our business relationship with MSC Software and ordered licenses from IBM on our behalf when Nathan Haller was unavailable. Attached as **Tabs 26 – 26e** & **Tabs 27 - 27c** are two of the licenses we received from IBM based on orders placed by Roger Gudobba's brother, Tim Gudobba.

53. That while MSC Software was our primary source with regards to CATIA V5 licenses, we also, on occasion, interfaced directly with IBM. Attached as **Tabs 28 – 28b** is an email communication with Nichol Michalek (IBM Territory Rep) in which Ms. Michalek offers to order a CATIA V5 license for one of our students when I was unable to get in touch with either Nathan Haller or Tim Gudobba. Attached as **Tabs 29 – 29d** is an email communication with Gary Hilgard of IBM regarding difficulty I was experiencing placing a license request with IBM because of a target ID conflict.

54. That while most of our customer referrals went directly to Nathan Haller, who then passed them on to MSC Software's sales staff (see Haller affidavit DN 49 pg 30 par 24), we occasionally interfaced directly with Emily Najim-Tousignant (MSC Software

Account Executive). Attached as **Tabs 30 – 30c** are just a few of the many customers we referred directly to Ms. Tousignant. Ms. Tousignant also, on occasion, referred MSC Software customers to our company for training (**Tabs 31 & 31a**). Attached as **Tab 32** is an invitation I received from Ms. Tousignant to attend MSC Software's Open House in June of 2003. I was unable to attend because of a prior commitment.

55. That at no time during our numerous dealings with MSC Software did anyone from MSC Software question or object to our company name, **Practical Catia Training**, or to our website's URL, **practicalcatia.com**. On the contrary, MSC Software sought to profit from both by renting MSC Software's training room and CATIA V4 workstations to us, by advertising on our website, and by having us provide MSC Software with hundreds of customer referrals.

56. That CATIA Solutions Magazine approached me again in 2002 and 2003 with requests that I contribute articles to their magazine. I agreed, and again the name **Practical Catia Training** and the URL **practicalcatia.com** were prominently displayed in both articles. Again, no one from Dassault contacted us to question or object to our company name, **Practical Catia Training**, or our website's URL, **practicalcatia.com**. Attached as **Tab 33** is an email I received from Andrea Braverman, Managing Editor of CATIA Solutions Magazine, with the edited version of my 2002 article attached. Attached as **Tabs 34 – 34c** is the edited article as it would later appear in the March/April 2002 edition of CATIA Solutions Magazine.

57. That my first direct contact with Dassault Systemes occurred in July 2003 when I emailed

Michel Rican of Dassault Systemes (France) to inquire about Dassault's new Education Partner Program (EPP). Mr. Rican was the manager of the Education Partner Program at the time. In my email to Mr. Rican **(Tab 35 pg 2)** I specifically state that "[m]y name is Keith Childress of Practical Catia Training." The email also included my return email address, keith@practicalcatia.com. Mr. Rican sent an email reply saying he would have Len Turner of Dassault USA get in touch with me regarding the program. Len Turner contacted me via email and scheduled a time for him to call me **(Tab 35 pg 1)**. During our conversation I provided Mr. Turner with a brief history of our company and my background. Mr. Turner explained that the Education Partner Program did not include CATIA V5 training licenses, but did include Dassault training materials. I informed Mr. Turner that I did not require CATIA V5 licenses because of our business relationship with MSC Software and that I did not require CATIA V5 training materials as I had developed my own training materials based on my 20+ years of automotive design and engineering experience. Inasmuch as we did not need Dassault's training materials, we chose not to pursue joining Dassault's Education Partner Program.

58. That both Michel Rican and Len Turner became aware of our company and our website's URL in July 2003, and that neither Mr. Rican nor Mr. Turner questioned or objected to our use of the CATIA V5 software, or questioned or objected to our company name, **Practical Catia Training**, or our website's URL, **practicalcatia.com**.

59. That in 2003, Nathan Haller suggested he set up a license server in our classroom in place of the "nodelock" (individual) licenses that IBM had been providing for use in our

training. I agreed and Mr. Haller set up the license server and IBM provided a multi-user concurrent license for use with the license server **(Tab 36)**.

60. That shortly after we began using the license server we started having problems with our training computers disconnecting from the license server and CATIA shutting down as a result. As a workaround, I purchased programmable network cards that would allow me to program each network card to have the same MAC Address as the network card used to create the license we had purchased in 2001. This allowed me to install my single (nodelock) license on each of our training computers, thus solving the problem we'd had with the license server.

61. That Nathan Haller was fully aware of the problem we had with the IBM supplied license and license server and approved of our use of the workaround because it solved the problem we'd had with the license server and because we were using the CATIA V5 software with MSC's full knowledge and consent, as we'd been doing since November 2001 [DN 49 pg 33 par 31].

62. That in 2004, Mr. Haller informed me that IBM/Dassault had introduced a new release of the CATIA V5 software (R13) that would allow a user to "extract" a license from the license server, thus eliminating the problem we'd had with CATIA shutting down as a result of our training computers disconnecting from the license server [DN 49 pg 33 par 34].

63. That per Mr. Haller's suggestion, I upgraded our training computers to the new release of CATIA V5 (R13) and once again Mr. Haller set up a license server and installed a multi-

user concurrent license. Shortly after we began using the new extracted licenses feature, we began to experience intermittent problems. When students attempted to open CATIA V5, they would get an error message that read "no license in nodelock file", and when we attempted to extract a new license, we would get an error that read "duplicate license already exists". The license server recognized that the computer already had an extracted license, but CATIA did not, so it would not open.

64. That I contacted Mr. Haller regarding the problem and was told that it was a known issue and that the problem would probably be resolved in a future service pack or in a later release of the CATIA V5 software. In paragraph 40 of his affidavit [DN 49 pg 35], Mr. Haller states:

> [T]he problem Mr. Childress had experienced with the extracted licenses was resolved in a later release of the CATIA V5 software, however, it did not occur to me to inform Mr. Childress of this fact because Mr. Childress was using his workaround.

65. That the problem had become such a nuisance I informed Mr. Haller that I intended to go back to using our workaround in place of the problematic extracted licenses. Again, Mr. Haller did not object to our use of the workaround because it solved the problem we were having with the extracted licenses and because we were using the CATIA V5 software with MSC Software's full knowledge and consent [DN 49 pg 34 par 36].

66. That despite the fact that MSC Software continued to honor our business agreement by offering us access to licenses for use in our training, we continued to use our workaround as it was reliable and we did not need the added functionality that the multi-user concurrent licenses provided [DN 49 pg 35 par 39].

67. That MSC Software was fully aware of our continued use of the workaround and did not object because it was trouble-free and because we had their permission to use the CATIA V5 software in our training as part of our aforementioned business agreement.

68. That I am aware that Andrew Clarkson states in paragraph 15 of his affidavit [DN 53-3 pg 5] that "[t]he reason Childress was having problems with the software was due to the operation of unlicensed copies of our CATIA software." This is an absolute false statement. I am not aware of any technical expertise Mr. Clarkson possesses that qualifies him to make such a determination. As Mr. Haller and I make very clear in our respective affidavits [DN 49 Exhibit A & B], we were using the workaround because of problems we'd experienced with the multi-user concurrent licenses we had received from IBM. These were known issues that were corrected in a later release of the CATIA V5 software. The workaround was a fix for the problem, it was not the cause.

69. That I am aware that Dassault alleges that we are "utilizing the CATIA trademark to misrepresent an affiliation with Plaintiff and to profit from Plaintiff's goodwill". Dassault created this "affiliation" when Cedric Simard, "Dassault's Manager of Worldwide Marketing and Communication for Dassault Systemes Educational Offering" contacted us in 2004 and said "after hearing so much good" about our company, Dassault would like to advertise its Global Certification Program on our website (**Tab 37**). Dassault provided us with banner ads, and chose the specific webpages on which to display them (**Tab 38**). Dassault's banner ads have been displayed on our website since Dassault made its request in November 2004 and Dassault has never asked that their banner ads be

removed from our website. [DN 50-2 pgs 8 & 9] show Dassault's banner ads on our practicalcatia.com website in December 2004, exactly as Dassault asked them to appear (courtesy of web.archive.org).

70. That at no time during my communications with Dassault (France) regarding Dassault advertising on our website, did Dassault question or object to our use of the CATIA V5 software, or question or object to our company name, **Practical Catia Training**, or our website's URL, **practicalcatia.com**. To the contrary, Dassault sought to profit from our use of its CATIA software, sought to profit from our reputation and good name, and sought to profit from our website by creating an affiliation with our company as a means of promoting its Global Certification Program.

71. That when Dassault perused our website to select the webpages on which to display its banner ads, two of our webpages (**Tabs 39 & 39a**) contained animated gif banners with hyperlinks pointing to our "Free CATIA V5 Software" webpage (**Tab 19**). There was also a drop down menu at the top of each page that contained a hyperlink pointing to our "Free CATIA V5 Software" webpage. In addition, two of our webpages state that we offer group CATIA V5 training (see **Tabs 40 & 40a**).

72. That despite the fact that in 2001 we began openly advertising on our top-ranked website that we provided FREE CATIA V5 Software to our students and that we offered group training, and despite the fact that we had direct contact with Dassault in 2003 and again in 2004 when Dassault perused our website to choose the webpages on which to advertise its banner ads, Dassault never questioned how we were able to offer our students FREE

CATIA V5 Software or how we were able to provide group training.

73. That in the years that followed, Dassault and MSC Software continued to display their banner ads on our website, we continued to provide sales leads to MSC Software and we continued to use the CATIA V5 software with MSC Software's full knowledge and consent.

74. That on October 30, 2006, FBI agents raided our office/training facility, confiscated all of our training equipment, and informed me that we were under federal grand jury investigation for allegations that we had infringed on Dassault's CATIA copyright.

75. That I am aware that when Dassault sought this court's permission for leave to serve a subpoena on the FBI, Dassault claimed that, "Dassault informed the FBI about Childress' illegal activity" [see DN 12-1 pg 4 par 3]. Dassault has now contradicted that statement in order to time-stamp the tolling of the "statute of limitations" by claiming that the FBI raid gave "rise to Dassault's knowledge of the [alleged] infringement, and start[ed] the clock for accrual of an infringement claim." [DN 53 pg 26]

76. That at the time of the grand jury authorized FBI raid, Dassault (France) had been advertising on our website for nearly two years, MSC Software had been advertising on our website for nearly five years, we had provided MSC Software with hundreds of sales leads, and had been using the CATIA V5 software with the full knowledge and consent of MSC Software for nearly five years, during which time we had received hundreds of CATIA V5 licenses from Dassault's partner IBM for use in our training and for our students' personal educational use at home.

77. That I provided exculpatory evidence to the Department of Justice (DOJ) and requested an opportunity to testify and present evidence before the federal grand jury. The federal grand jury investigation did not result in any indictments or charges being brought against me or anyone in my family, and I have not heard another word about this matter from anyone in the FBI and/or DOJ since I made my request to testify in September 2008.

78. That on November 4, 2008, Glenn Forbis, the managing partner of Rader, Fishman, & Grauer, the law firm representing Dassault, sent an email to my former attorney (DN 52 Exhibit A) regarding this matter. My former attorney forwarded the email to me and I immediately responded to Mr. Forbis' email informing him that I was no longer represented by my former attorney (DN 52 Exhibit B), and asked that he contact me directly. Mr. Forbis sent an email reply asking that I phone him the following day, which I did and left a message. When Mr. Forbis did not return my call, I sent a follow-up email on November 6, 2008 (DN 52 Exhibit C). Mr. Forbis phoned me from his cell phone (248 568 0232) on Friday November 7, 2008 at 9:01 AM and we had a 24 minute conversation (DN 52 Exhibit D).

79. That during our conversation I provided Mr. Forbis with a brief history of our company's (Practical Catia Training) relationship with IBM and Dassault including the business agreements dating back to 2001 between our company and IBM, Dassault, and MSC Software. I informed Mr. Forbis that we have owned the CATIA V5 software since 2001 and that Dassault has been advertising on our website since 2004, at Dassault's request. I

also told Mr. Forbis that I could not afford an attorney and would be forced to represent myself should Dassault choose to sue me.

80. Mr. Forbis said this was obviously a big misunderstanding and asked if I would be willing to participate in a conference call with Dassault to straighten the matter out. I agreed. Mr. Forbis did not arrange the conference call, as he suggested. Instead, on February 12, 2009, Mr. Forbis' law firm filed its copyright and trademark infringement suit on behalf of Dassault Systemes.

81. After learning Dassault had filed suit against me, I immediately phoned Mr. Forbis (DN 52 Exhibit E), whose name appears on the complaint, to try and straighten this matter out before it went any further. Mr. Forbis was not in so I left a detailed message inquiring as to why he hadn't arranged the conference call, as he said he would do. I asked that he return my call so we could discuss this matter further. Mr. Forbis did not return my call and I have never heard from him again.

82. That based on IBM, Dassault and MSC Software's behavior, we had every reason to believe we were acting as an agent and unofficial partner of IBM, Dassault, and MSC Software. These companies pursued relationships with our company, we did not pursue them. They provided us with CATIA V5 software and licenses and advertised on our website because of our stellar reputation and because they believed that partnering with our company would help them sell more CATIA V5 software and help promote their "Global Certification Program". I believed this was a win-win-win situation for everyone involved. IBM, Dassault, and MSC Software sold more CATIA V5 software as a result of

their affiliation with our company, Dassault was able to promote its Global Certification Program, our students received excellent training at an affordable price and I was able to support my family. There was absolutely no downside or harm to anyone involved.

83. That had Dassault not been negligent in its communications with its partners IBM and MSC Software, and had Mr. Clarkson, Dassault's "World Wide Anti-Piracy and Compliance Program Manager", conducted a proper investigation into this matter prior to Dassault filing its complaint with the FBI, the FBI raid and grand jury investigation could have been avoided, my company and reputation would not have been decimated, my family and I could have been spared the tremendous emotional and financial toll this has taken on all of us over the past three and a half years, and this lawsuit could have been avoided.

Further, Affiant saith not.

Keith Childress

Subscribed and sworn to before me
this 15 day of March, 2010

Notary Public, St. Clair County, Michigan

Acting in St. Clair County, Michigan

My Commission Expires: 9-17-2011

# Index of Tabs

**Tab 1** - Diplomas, Batavia & Philpot Schools, 1980 and1982.

**Tab 2** - Patent for "Cable Mount for Seat Belt Buckle" awarded to Keith Childress.

**Tab 2a** - Patent for "Free Falling Latch Plate Assembly" awarded to Keith Childress.

**Tab 2b** - Patent for "Support Arrangement for a Vehicle Headlamp" awarded to Keith Childress.

**Tabs 3 & 3a** - Excerpt from 2005 interview with Francis Bernard (Founder of Dassault Systemes) from CAD/CAM/CAE Observer #4 (22) 2005.

**Tabs 4 - 4c** - 1998 article Keith Childress wrote for CATIA Solutions Magazine.

**Tab 5** - Dassault's 1999 copyright registration of CATIA V5 Release 2.

**Tab 6** - 2001 press release issued by MSC Software announcing AES merger with MSC Software.

**Tab 7** - Quote from Dave Lanfear (AES/MSC) for the CATIA V4 workstation purchased in May 2001

**Tab 8** - August 15, 2001 email to Brian Lanfear (MSC Software) from Keith Childress.

**Tabs 9 & 9a** – Emails between Ken Weigan (MSC Software) and Keith Childress regarding pricing for MSC Software training room rental.

**Tab 10** - D/B/A for G. Bailey and Associates which indicates expiration on November 27, 2000.

**Tab 11** - IBM Customer Agreement signed by Keith Childress on October 31, 2001.

**Tabs 12 & 12a** - 2002 and 2003 invoices from IBM for CATIA V5 license renewal.

**Tab 13** - Canceled check for Keith Childress' 2009 Annual License Charge payment to IBM.

**Tab 14** - June 26, 2001 email from Pam Barton (IBM/Dassault's "North American Channels Manager for Product Lifecycle Management Solutions"(CATIA) offering CATIA V5 Hobbled Code software.

**Tabs 15 & 15a** - August 28, 2001 letter of introduction provided to Buz Nowicki (HEAT Program Manager) for forwarding to Dassault in France.

**Tab 16 & 16a** – 2003 email from Buz Nowicki (HEAT Program Manager) quoting the HEAT program's license cost of $350 per license per year, and confirming Practical Catia Training's acceptance into IBM/Dassault's HEAT Program.

**Tab 17** - December 17, 2001 email from Nathan Haller (MSC) affirming MSC Software's authority to offer to provide Practical Catia Training and its students with the CATIA V5 software and licenses.

**Tab 18** - December 12, 2001 emails between Nathan Haller (MSC) and Keith Childress affirming business agreement between MSC Software and Practical CATIA Training.

**Tabs 19 & 19a** - MSC Software banner ads and Keith Childress' testimonial as they appeared on practicalcatia.com website from November 2001 until mid-2007, including "Free CATIA V5 Software Offer" webpage created per the business agreement initiated by MSC Software (archival webpages courtesy of web.archive.org).

**Tab 20** - First CATIA V5 license request submitted to MSC Software.

**Tabs 21-21c** - First CATIA V5 license received from IBM via MSC Software.

**Tabs 22 & 22a** - February 21, 2002, email from Nathan Haller (MSC) requesting to modify the format of the license requests form.

**Tabs 23 - 23e** - 6 pages of a 138-page document containing some of the hundreds of customer referrals provided to MSC Software as a result of the business agreement initiated by MSC Software with Practical Catia Training.

**Tabs 24 - 24d** - 5 pages of a 1,115-page document that contains most of the hundreds of CATIA V5 licenses received from IBM as a result of the business agreement that MSC Software initiated in

2001 with Practical Catia Training.

**Tabs 25 - 25e** - January 2002 emails from Nathan Haller (MSC) regarding setting up a meeting with Daryl Patriskoff (MSC Software's Director of Business Development).

**Tabs 26 - 26e**- License received from IBM based on orders placed by Tim Gudobba (Applications Engineer, Nathan Haller peer, and brother of Roger Gudobba) pursuant to the business arrangement with Practical Catia Training.

**Tabs 27 - 27c** - License received from IBM based on orders placed by Tim Gudobba (Applications Engineer, Nathan Haller peer, and brother of Roger Gudobba) pursuant to the business arrangement with Practical Catia Training.

**Tabs 28 - 28b** – Email communication with Nichol Michalek (IBM Territory Rep) regarding license request.

**Tabs 29 - 29d** - Email communication with Gary Hilgard of IBM regarding difficulty with placing a license request with IBM because of a target ID conflict.

**Tabs 30 - 30c** - Customer referrals sent to Emily Najim-Tousignant (MSC Software Account Rep).

**Tabs 31 & 31a** - MSC Software customer referrals from Ms. Tousignant to Practical CATIA Training for training.

**Tab 32** - Invitation from Ms. Tousignant to attend MSC Software's June 2003 Open House.

**Tab 33** - Email from Andrea Braverman, Managing Editor of CATIA Solutions Magazine regarding March/April 2002 article Mr. Childress had submitted.

**Tabs 34 - 34b** - Mr. Childress' edited article that appeared in the March/April 2002 edition of CATIA Solutions Magazine.

**Tab 35** - July 2003 emails communications between Len Turner of Dassault USA, Michel Rican of Dassault Systemes (France) and Keith Childress regarding Dassault's Education Partner Program

(EPP).

**Tab 36** – IBM's multi-user concurrent license provided by IBM in 2003 for use with the Practical Catia Training license server.

**Tab 37** – 2004 email from Cedric Simard, "Dassault's Manager of Worldwide Marketing and Communication for Dassault Systemes Educational Offering" requesting to advertise Dassault's Global Certification Program on the practicalcatia.com website.

**Tab 38** - November 2004 email from Dassault's Cedric Simard specifying placement of banner ads on the practicalcatia.com website.

**Tabs 39 & 39a** - Two (2) of Practical Catia Training's webpages containing animated gif banners with hyperlinks pointing to Practical CATIA Training's "Free CATIA V5 Software" webpage (archival webpages courtesy of web.archive.org).

**Tabs 40 & 40a** - Two (2) of our webpages stating that we offer group CATIA V5 training (archival webpages courtesy of web.archive.org).

TAB 1

Keith Childress'

# Practical Catia

Training

## Batavia & Philpot Certificates



---


BATAVIA SCHOOL OF DRAFTING
KEITH DAVID CHILDRESS
Fall 1980

These tattered "relics" of the past were handed out along with a paper certificate when I graduated from Batavia in 1980, and Philpot in 1982. The paper certificates have long since disappeared, but I've proudly carried these in my wallet since the day they were given to me.



The signature shown to the left is that of Harold Philpot. He was an Englishman who founded The Philpot Schools in the mid 1950's. He was a true "character", and remains a legend in the automotive body drafting business.


PHILPOT SCHOOL
OF AUTOMOTIVE BODY DRAFTING
KEITH D. CHILDRESS
81-82

Completing the Philpot course still stands as one of my most prized accomplishments. It was 9-months of pure HELL. The school was so well respected, that graduates of the ***Philpot School of Automotive Body Drafting*** were guaranteed jobs, even in the toughest of times.

Unfortunately, declining enrollment, brought on by the use of CAD, forced these excellent manual drafting and design schools to close their doors for good several years ago.

---

TAB 2

# United States Patent [19]

Childress et al.

[11] Patent Number: 5,071,193

[45] Date of Patent: Dec. 10, 1991

[54] CABLE MOUNT FOR SEAT BELT BUCKLE

[75] Inventors: Keith D. Childress, Richmond; Thomas J. Corbett, Sterling Heights; Ronald Dickson, Troy; Michele A. Smith, Davisburg, all of Mich.

[73] Assignee: Saturn Corporation, Troy, Mich.

[21] Appl. No.: 255,236

[22] Filed: Oct. 11, 1988

[51] Int. Cl.[5] ..................... A62B 35/00

[52] U.S. Cl. ..................... 297/468; 24/265 AL

[58] Field of Search ............... 297/468, 470, 471, 482; 24/265 A, 115 A, 115 K, 265 AL; 280/801, 802, 805; 403/210

[56] References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,809,142 | 10/1957 | Beeber et al. | 24/265 A X |
| 3,437,349 | 4/1969 | Feles et al. | 297/482 |
| 3,692,361 | 9/1972 | Ivarsson | 297/385 |
| 3,867,046 | 2/1975 | Fox | 403/210 |
| 4,181,359 | 1/1980 | Nard | 297/468 |
| 4,199,190 | 4/1980 | Lindblad | 297/468 |

*Primary Examiner*—Jose V. Chen
*Attorney, Agent, or Firm*—Charles E. Leahy

[57] ABSTRACT

The ends of a cable are attached to the seat belt buckle so that a loop of cable projects from the buckle. A mounting bracket comprised of a stamped metal strap is folded into a U-shape and receives the loop of cable. The ends of the metal strap are attached to the vehicle body. A sleeve of ductile metal is swaged over the cable and interposed between the cable and the bracket. The sleeve has a length greater than the width of the bracket so that the sleeve extends beyond the bracket somewhat to prevent the cable from contact with the bracket. The ductile sleeve yields when a load is imposed upon the cable.

3 Claims, 1 Drawing Sheet



TAB 2a

**United States Patent** [19]

**Childress et al.**

[11] **Patent Number:** 4,893,874

[45] **Date of Patent:** Jan. 16, 1990

[54] **FREE FALLING LATCH PLATE ASSEMBLY**

[75] Inventors: **Keith D. Childress**, Richmond; **Thomas J. Corbett**, Sterling Heights; **Michele A. Smith**, Davisburg, all of Mich.

[73] Assignee: **Saturn Corporation**, Troy, Mich.

[21] Appl. No.: **253,528**

[22] Filed: **Oct. 5, 1988**

**Related U.S. Application Data**

[63] Continuation-in-part of Ser. No. 74,199, Jul. 16, 1987.

[51] **Int. Cl.**⁴ .......... **A62B 35/00**

[52] **U.S. Cl.** .......... **297/483**; 24/196

[58] **Field of Search** .......... 297/483, 476, 468; 24/196

[56] **References Cited**

U.S. PATENT DOCUMENTS

3,941,419 3/1976 Blom .......... 297/483

3,974,546 8/1976 Walker .......... 297/483

*Primary Examiner*—Francis K. Zugel

*Attorney, Agent, or Firm*—Charles E. Leahy

[57] **ABSTRACT**

According to the invention an improved latch plate assembly for a continuous loop single retractor seat belt system includes a housing having a base wall with flanges slotted to slidably mount a lock bar. The housing is oriented with the flanges facing toward the occupant torso and the belt being routed through the space between the base wall and the sliding bar so that when the belt is stored in the generally vertically extending position between the upper and lower anchors, the belt extends in a minimally convoluted path through the latch plate thereby permitting gravity induced sliding movement of the latch plate along the belt toward the lower end of the belt. The housing is further characterized by an abutment structure adapted upon migration of the lock bar along the slot with the occurrence of generally colinear orientation of the lap and shoulder belts upon buckling of the belt to introduce a substantially convoluted path of belt through the latch plate and trap the belt between the sliding bar and the flange structure so that the travel of the belt through the latch plate is effectively prevented at least in the direction which would extend the length of the lap belt portion.

**8 Claims, 4 Drawing Sheets**



TAB 2b


# United States Patent [19]

Van Duyn et al.

[11] Patent Number: 4,742,435

[45] Date of Patent: May 3, 1988


[54] **SUPPORT ARRANGEMENT FOR A VEHICLE HEADLAMP**


[75] Inventors: **Paul D. Van Duyn**, Anderson, Ind.; **Keith D. Childress**, Sterling Heights, Mich.

[73] Assignee: **General Motors Corporation**, Detroit, Mich.



[21] Appl. No.: **77,880**

[22] Filed: **Jul. 27, 1987**

[51] **Int. Cl.**[4] .......... **G03B 17/00;** F21V 3/18; B60Q 1/26

[52] **U.S. Cl.** .......... **362/66;** 362/289; 362/80; 362/372

[58] **Field of Search** .......... 362/66, 372, 80, 275, 362/287, 289, 419



[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,410,365 | 2/1944 | Saver | 362/66 |
| 4,188,655 | 2/1980 | Fallon et al. | 362/80 |
| 4,196,459 | 4/1980 | Dick | 362/372 |
| 4,333,131 | 6/1982 | Hujimoto et al. | 362/80 |
| 4,471,413 | 9/1984 | Dick | 362/80 |
| 4,574,334 | 3/1986 | Igura | 362/66 |
| 4,655,567 | 4/1987 | Morley | 362/66 |
| 4,689,725 | 8/1987 | Saijo et al. | 362/289 |



*Primary Examiner*—Raymond A. Nelli
*Attorney, Agent, or Firm*—Edward J. Biskup



[57] **ABSTRACT**

A support arrangement for a vehicle headlamp assembly that includes a stanchion that supports the lamp body through two pivotal connections and facilitates the installation of the lamp body a support panel located at the front end of a motor vehicle.


**3 Claims, 3 Drawing Sheets**



TAB 3

# Interview with *Francis Bernard*, President of *Dassault Systemes Russia Corp.*

*Aleksandra Soukhanova, Youri Berjoza (Observer)*

***Francis Bernard*** was born in Hanoi. In 1965, he graduated from the *Ecole Nationale Supérieure de l'Aéronautique et de l'Espace*. He entered in *Dassault Aviation* in 1967 as an engineer in *Theoretical Aerodynamics*. He specialized in the theoretical engineering and construction of aircrafts. There, he invented the *CAD/CAM*, from which *CATIA* was brought to light in 1977 – the first *3D* application of its kind. For his invention, Mr. Bernard was prized by the *French Academie Nationale de l'Air et de l'Espace*, by the *Aviation Week & Space Technology* journal, and also by the *US National Air & Space* museum.

To push the development/enhancement of *CATIA*, Francis founded *Dassault Systèmes* (*DS*) (as a sister company of *Dassault Aviation*) and became its first President. Under his leadership *DS* made a *Partnership Agreement with IBM* for the sales and the support of *CATIA* worldwide. In 1995, Mr. Bernard became the Executive Adviser to the new President of *DS*, and Member of the company's Executive Committee. As part of his responsibilities, he is in charge of the marketing and the business development of *DS* in Developing Countries and in *Emerging Markets*, as well as for new technologies.



In 2005, Francis Bernard, amongst other duties, became the President of the newly named company *Dassault Systemes Russia Corp*. To explain the new *DS*'s strategy in Russia, and also clarify other questions of the Edition, Mr. Bernard invited our magazine in Moscow and gave us an extensive interview, which we publish with some shortcuts.

Congratulations Mr. Bernard for your start as President of *Dassault Systemes Russia*! In this respect, our first question: why were you precisely chosen? Weren't there proper local candidates? What is the meaning of this choice for *DS* and for Russia?

– As you know, I am the Founder of *Dassault Systèmes* and I am a member of the Board of Directors. I was also the first *DS*'s *CEO* for 15 years. It is already 10 years we have a new *CEO* – ***Bernard Charlès***, which I believe is a normal step in the Company's development. One of my most important role today is to increase the level of awareness of Developing Countries, amongst which the China, India, South Asian countries and those of the Pacific ocean's region, Central Europe, the Middle East and Russia, and also of developing sectors of the industry and of the markets where *DS* is not enough established. I am helping *DS* performing successfully in here before mentioned countries. Two years ago, I opened two branches of *DS* in China and in India. Of course, we monitor the development of industries in these 2 countries and we see there a big potential for us. *DS* will pay a specific attention to shipbuilding. Our business here is not bad. If we compare the success of *DS* with its competitor in the world of shipbuilding, it appears that we do better in terms of number of customers for instance. But we are not yet considered as the standard, and that's why we have a lot to do, and we will relentlessly continue in all emerging countries. Our largest customer is the US Navy, and as well European navies, commercial shipbuilding companies. In Asia, our share in the shipbuilding market is not yet very significant. In my view, ships are particularly more complex products. Cars design, for instance, require a few thousands parts, aircrafts – hundreds of thousands, and ships more than one million, and on top, there all kind of systems: mechanical, cabling, tank, pipe systems, and so forth. The biggest issue in ship construction is that it is a complex work and a relatively small market. Else, let's come back to *DS Russia* – as you understand, I cannot entirely dedicate my time to our operations in Russia, since it is absolutely necessary to develop our presence as well in those other regions. That is why I work with two directors, reporting to me for the operations of *DS Russia*. ***Didier Martre*** is an experienced manager of *DS France*, who will not stay permanently in Moscow, and will strive to transfer his experience and knowledge, with a focus on Marketing and Technology issues of the *PLM*. The second director of *DS Russia* is a new joiner in our company, ***Laurent Valroff***, who has a business education in Russia, and speaks Russian fluent-

TAB 3a

ly. He will stay and live here permanently, concentrating actively on the development of the company. We have today a team of 12 specialists, and we plan to take on marketing and technical staff.

In general, why this decision of setting up *DS Russia*? Does that mean that *DS* was not satisfied with *IBM* management of this business in Russia?

– Firstly, we are aware that *DS* is not a leader in the *PLM* market in Russia. We recognize that we do not address the market in a proper way. In the mean time, we observe that Russia and CIS are growing very actively, and we see more opportunities for us in this. It is the main reason why we created *DS Russia*.

Now I will explain you how the distribution channel works. Right after *DS Russia* was created, **a strategic partnership agreement with *IBM* was signed by us.** In all countries, *IBM* – our strategic partner, manages sales. The sales of all *CATIA* licenses are done by *IBM*. To allow this, *IBM* created a *PLM* business organization in almost all countries based on its own technical and sales staff. Furthermore, *IBM* has a network of Business Partners to cover most of the regions and to address various industrial sectors. Usually, *IBM* works more with Large Accounts; the Business Partners' targets being to attract and serve small and medium size companies.

Thus, we created *DS Russia* following the decision to have a reinforced and a more active presence in Russia and in the CIS region. We could not leave *IBM* manage everything here as it was short of knowledge and skills. From this comes our main first objective – to transfer our knowledge and experience to *IBM* and its partners. It is necessary that all have a direct access to the local *DS* branch to solve any issue. The *DS* decision of investment and installation in Russia does not mean to substitute to *IBM* and its business partners at all, but more to take the responsibility of and to develop the necessary marketing and technical resources to support them. **This new agreement will allow both [*IBM* and *DS*] to be more successful on the Russian market.**

In any case, we would have set up a *DS* representation because we sense the strong need of our clients to have direct relations with *DS*! The simple factual rapid growth of the industry, which needs to be addressed and supported, makes our presence absolutely relevant.

However, does not it show a contradiction between the role and responsibility of *DS Russia* and *IBM* obligations to co-ordinate the business partners in the sales and support of *CATIA* and other *PLM* applications? How will operations and responsibilities be split?

– In some countries we noticed that *IBM* could not deploy the right level of dedicated resources to secure the support of our business partners. After discussing this, we took the following step: we proposed *IBM* to take this role instead of them. A new agreement with *IBM* was signed just 2 months ago, according to which from July 1, 2005, in the US and in other countries of Western Europe (Germany and the UK), in Northern Europe and in Russia, ***DS*, on behalf of *IBM*, performs the Support and Management of *IBM*'s business partners.**

It is important to understand that all licenses previously sold remain in *IBM*'s hands. However, the split of responsibilities is the following: *IBM* focuses its resources on Large Accounts, and we, on behalf of *IBM* carry out *Channel Management* activities with the business partners. This is *DS Russia*'s main task. In other terms, **in Russia, our business partners are partnering with *IBM* and *DS* at the same time.** Our representative office manages the distribution channel of our *PLM* solutions. That is why it is useless to speak about any conflict with *IBM*: there is none, as there is no contradiction between *DS* and *IBM* responsibilities. *IBM* focuses on Large Accounts, and we manage with our Business Partners the other small and medium business accounts.

Do you experience any need to involve new business partners in Russia and CIS? Is there anyone in your radar screen?

– Since *DS* manages a worldwide network of business partners, of course, we have the full right to take on new partners whenever needed. When we identify a possible business partner, we set a contractual agreement, as well as we ask *IBM* to sign in as sub-licenses agreement. This way, our business partners have an agreement with *IBM* for the delivery of licenses and with us, for business management, marketing and support. Frankly speaking, I cannot say how many new business partners we need to run successfully our company in Russia. For the time being, we have *Bee Pitron*, *Mebius* and *HetNet*. In the future, I think that the number of them can be increased to have a better geographic and market segment coverage.

In China for example, we did this – make an *OEM* partnership deal with the Chinese company ***CAXA***, which developed [solutions] and sold on the design-centric market, closer to *AutoCAD*, for a local usage. The core of the agreement was that *CAXA* integrates some of our solutions from *CATIA V5* and *SMARTEAM* in its applications, and can provide and market local high-end solutions under its own name. **If such a partner-company existed in Russia, we would openly consider sharing some of our technologies.** Generally, *DS* philosophy in Russia is that we do not only see potential customers, we consider globally the country with its full potential of partnership opportunities. As the example, we have a successful and mutually beneficial partnership with a company of Novosibirsk ***LEDAS Group***, under the management of ***David Levin***. This is a group of brilliant mathematicians and professionals, which on *DS* request performs Research and Development in geometrical problem solver for *CATIA*.

Our redaction carefully watches the activity of *CAD* "leaders". We recently heard of a conflict of interest between *DS* and *IBM* in China and in the US… Do you confirm this? If you do, what is the origin of this conflict and how is it being solved?

– As you know, we started to work with *IBM* in 1981, which is the origin of our success. I consider the foundation of this union was the greatest decision in all *DS* history. Why did we do so? At that time, I had a small company with a team of 25 people mostly *R&D*. To become

МАШИНОСТРОЕНИЕ И СМЕЖНЫЕ ОТРАСЛИ

THE INDEPENDENT MAGAZINE FOR THE CATIA® USER

VOLUME 2, NUMBER 5
SEPTEMBER/OCTOBER 1998

## On the cover

The global image represents the ability to share CATIA designs with engineering colleagues located at remote sites around the world (see story, pg. 16).
*Image courtesy Transarc.*



This issue's cover layout designed by Michael Button, Production Artist, *CATIA Solutions Magazine.*

# Departments

3 From the Editor

8 Calendar

36 CATIA Users Update
*COE Fall Conference overview*

## NEWS

6 • *CATIA Version 4.2*
• *ENOVIA VPM*
• *Deneb summer camp*
Joseph J. Patton

## FEATURES

10 *Safework and CATIA expand virtual design capabilities*
Josee St. Aubin, Safework, Inc.

## USERS

12 *Collision-free cooperation*
Jens Fetzer
CENIT AG Systemhaus

14 *PDES helps implement STEP*
Bob Kiggans, PDES, Inc.

## MANAGERS

16 *Design groups share CATIA files with DFS*
Gail Kaemer, Transarc

20 *CATIA HEAT program*
[illegible], IBM

24 *Practical CATIA training*
Keith Childress
Keith Childress Practical CATIA Training, Inc

## SYSTEMS ADMINISTRATORS

28 *Novice CATIA administration*
Bob Garbarino
CASIL Labs

32 *Share NT and UNIX files using DFS Server*
Meredith Richard
Transarc

## Editorial Advisory Board

Bill Abramson - COE
Martine Vesco - Dassault Systèmes
Catherine Bell - Lockheed-Martin
Bill Cleary - IBM
Mark Johnson - Boeing
Sohair Varnhagen - Chrysler

TRDX

CATIA Solutions MAGAZINE
A ConnectPress®, Ltd. Publication

■ Acting Publisher
Dale Bennie
505/474-5135
e-mail: dbennie@hmp.com

Editor
Joseph Patton
505/474-5156
e-mail: jfatton@hmp.com

Director of Production & Manufacturing
Andy Lowenthal
505/474-5183
e-mail: alowenthal@hmp.com

■ Designers
Beverly Nabours, Art Manager
505/474-5185
e-mail: bnabours@hmp.com

Michael Button, Production Artist
505/474-5187
e-mail: mbutton@hmp.com

Cammi Noah, Production Artist
505/474-5133
e-mail: cnoah@hmp.com

■ Advertising/Account Representative
Brad Sauters
505/474-5163
e-mail: bsauters@hmp.com

■ Circulation
Subscription Office: 505/474-5170
e-mail: orders@hmp.com

■ Executive Committee
Founder and Chairman
Dan Raker

President
Dale Bennie

Vice President, Business Development
David Talbott

■ Web Page
http://www.catiasolutions.com

CATIA Solutions Magazine (ISSN 1093-6629) is published by ConnectPress®, Ltd. Entire contents copyright ©1998 ConnectPress® Ltd. All rights reserved. Reproduction in whole or in part without written permission is strictly forbidden. "CATIA®" and "CADAM®" are registered trademarks of Dassault Systèmes. Editorial and Publication office: 2530 Camino Entrada, Santa Fe, NM 87505-4835 USA, 505/474-5150, Fax 505/474-5030. Subscriptions: One year U.S. $90. One year International $140 (Canada $120). Customer Service: Subscription Office: 2530 Camino Entrada, Santa Fe NM 87505-4835 USA, 505/474-5170, Fax 505/474-5030. Advertising Sales Office: 2530 Camino Entrada, Santa Fe, NM 87505-4835 USA, 505/474-5160, Fax 505/474-5060. Postmaster: Please send address changes to ConnectPress®, Ltd., 2530 Camino Entrada, Santa Fe, NM 87505-4835 USA. All material contained in CATIA Solutions Magazine is a copyright of ConnectPress®, Ltd. All other trademarks or registered trademarks are the property of their respective holders. All materials submitted for editorial consideration becomes the property of ConnectPress®, Ltd. and are not returnable.

PRINTED IN THE USA

Managers

TAB 4a

# Practical CATIA Training

Keith Childress

I just concluded a search of several of the Internet's largest employment databases for CATIA jobs. The Internet is fast becoming a very valuable resource for companies with CATIA jobs to offer as well as for individuals seeking employment (this will be the subject of a future article). My search yielded literally thousands of CATIA-related employment opportunities available worldwide.

I'm sure there may exist some redundancies between the various databases that I searched. However, I believe the results of my search represent only a small fraction of the total number of CATIA jobs available (worldwide) at any given time. The actual number, if it were known, would be staggering.

Why are there consistently so many CATIA jobs available? The answer of course is quite obvious: there are not enough qualified people to fill all of the vacancies...but why?

That answer lies in the principals of basic supply and demand. As the worldwide use of CATIA continues to grow, the demand for CATIA operators also continues to grow. However, the supply of qualified CATIA operators can not keep up with the demand, thus creating a shortage of talent. This shortage creates a "feeding frenzy" among companies vying for this very limited human resource.

MANAGERS

## Musical CAD chairs

What do companies do to satisfy their CATIA user needs? They engage in a game of "professional musical chairs." Company A desperately needs a CATIA operator, so it steals a CATIA user from Company B. Company B now must replace that CATIA user, so it steals a CATIA user from Company C. Company C now has to steal a CATIA user from Company D, and so on. Eventually, this comes full circle and someone steals a CATIA user from Company A and the game begins again. Of course, this game of "professional musical chairs" bodes well for the CATIA operators, who benefit financially from this situation.

The answer to this dilemma seems so simple: bring more CATIA operators into the business to fill the need. Easy solution, right? WRONG! That's why the shortage exists in the first place. No one wants to do what is necessary to bring in fresh talent—namely, hire the dreaded *"entry level"* CATIA user.

What does "entry level" mean, anyway? In the Detroit area, it seems to be anyone who has not used CATIA professionally. A person could have 30 years of design experience, 15 years of which were spent working on a 3D CAD system, and if they are only "trained" to use CATIA, they're considered entry level. Sounds ridiculous, but it's true.

## Seasoned professionals

Many of the students who take my "Practical CATIA" course are seasoned design professionals with years of experience behind them. Most have worked with other prominent CAD systems such as AutoCAD, PDGS or CGS. They are familiar with the capabilities of a CAD system, and thus tend to excel at CATIA. I know from my own 20+ years in the automotive design business (12 years using CATIA) that most of these people are capable of doing serious CATIA design work upon completion of my course.

What opportunities await these people? Very little. They send out resume after resume with few, if any, responses. When they make follow-up calls they are told that they are considered "entry level" and thus no openings exist.

How can a person with all of this experience be considered entry level? Most of these people are willing to work well below market value just to get their foot in the CATIA door. Still no luck. A few find CATIA work, but the vast majority do not. What people lose sight of is that CATIA does not design products; designers do. CATIA is merely a tool. A very good tool...but a tool nonetheless.

## Recent grads for basic chores

Another group of people who take my course are recent high-school graduates; they usually have three years of AutoCAD experience and a couple of years of co-op experience to their credit. It has been my experience with these young people that they also tend to excel at CATIA. Many have paid their own way into my class, exhibit maturity beyond their years and would be grateful to be earning $10 to $12 per hour.

Of course, these young people are not going to step in and do heavy-duty design work, but they are fully capable of doing checker changes or creating 2D engineering drawings from 3D data or vice versa. How many companies are paying in excess of $20 per hour to have "experienced" people perform these menial CATIA tasks? Still, the majority of these young people can't find CATIA work.

TAB 46

## Craftsmen and women

Yet another group of people, near and dear to my heart, who take my class, are the people accustomed to earning a living with their hands. I'm referring to general laborers, mechanics, model makers, etc. They take my course hoping to improve their lot in life. I was a welder-mechanic prior to entering the automotive design field in 1980, so I am intimately aware of the value a person with this type of experience can bring to the table.

Many of these people show a very strong aptitude for computers and design. Once they are able to integrate the CATIA education with this aptitude, they tend to progress rapidly.

## A typical student

A former student who exemplifies this is a man who took my class a couple of years ago. He was in his early 50s at the time and had worked in a foundry as a Mold Maker most of his life. He was told that his job was being phased out. Not just at the company he worked for, but industrywide. He was down to working 16 hours per week, he had a son in college, his wife was a homemaker and he provided the sole financial support for his family. Needless to say, he was desperate.

I could tell during the two months I spent with him in class, that he had a strong aptitude, was a hard worker and was very personable as well. Several months after he graduated he phoned me and said he had been trying desperately to find CATIA work with no luck. I had him send me his resume.

After reviewing his resume, I asked him if, as a Mold Maker, he ever provided input back to engineering regarding improvements that could be made to the design of the parts he was creating the molds for. He said that over the years this had become a regular part of his job. He added that for years the designers in the engineering department would consult with him regularly during the design process to help work out design problems.

He didn't realize it, but over the years, he had become a designer. He had never been trained to communicate his thoughts and ideas using drafting tools or with a CAD system, but his experience had taught him to think like a designer.

I can teach a person, with a design mentality, to use CATIA. That's the easy part. It's much more difficult to teach a person to think like a designer. That requires aptitude, and experience. One your born with (or not); the other is only acquired over time.

Anyway, back to the Mold Maker. A contact of mine in the business was looking for someone to do some detailing and light design on CATIA. I convinced him to give the Mold Maker a try.

Well, the Mold Maker "took off" with CATIA. Within a couple of months they sent him for advanced surfacing training and he has become the "go-to guy" in the CATIA room. He now works in a clean environment, he is well respected, he has some job security and he is making more money than he thought was possible. An added bonus is he loves what he is doing.

His employer appreciates him because he is a stable, mature person who brings a wealth of knowledge to the job. He sets a good example, and has become a mentor to the young people around him.

He is also very loyal and is not the type of person who is going to jump from job to job for a 50-cent increase. If someone had not been willing to take a chance by giving him an opportunity, who knows what he might be doing? It would most certainly have been the industry's loss.

## Can't find good help?

What I have heard from recruiters and managers over the years is how difficult it is to find good CATIA people. My theory is that it's not difficult at all if you know where to look and what to look for. I have developed a database of more than 200 companies that hire CATIA people in the metro Detroit area. I send information to these companies on a regular basis offering to refer people to them free of charge.

I've been around this business for quite awhile. During the past 20 years I have held positions as a designer, senior designer, project engineer, design leader, checker, engineering manager, etc.

I've used CATIA for nearly 12 years and have been teaching people to use it nearly as long. I am not saying this to impress anyone with my credentials, but to impress upon you that I know a little something about what to look for in a potential CATIA operator.

I get to spend two months with my students. The class sizes are very small (four per class), so I get to know quite a bit about these people. You would think these 200+ companies would take me up on my offer to help them staff their programs with CATIA people. However, only a few have ever contacted me. I don't understand this at all.

The companies that have hired my referrals have been very pleased with the results. And why shouldn't they be? Not one of my referrals have ever been dismissed. The companies are getting quality work, from dependable people of good character, at a fraction of the money they would normally have to spend.

## Summary

The problem with the shortage of CATIA users is only going to get worse. The solution lies in the following:

- Companies must do a better job of defining their CATIA needs. Many companies that say they require a person with minimum two years' CATIA experience really don't need that level of experience at all. Two years seems to be the blanket requirement when you either don't


**REPRINTS**

IS YOUR COMPANY FEATURED OR MENTIONED IN A CATIA SOLUTIONS MAGAZINE ARTICLE?

- Use reprints to enhance your sales and marketing efforts, and to raise your company's industry profile.
- Order extra copies to include in corporate mailings, media kits, at sales conferences, or as trade show handouts.
- Use reprints as an educational tool. Distribute to your managers, or industry-wide, as a public service.

Minimum order 500 copies

Articles from CATIA Solutions Magazine are available in full-color reprints.

FOR FURTHER INFORMATION CALL BRAD SAUTERS AT 505-474-5183 OR FAX 505-474-5182 E-MAIL BSAUTERS@HMRCOM

CATIA Solutions magazine is an Emmert/Press publication 2538 Cerrillos Road, Santa Fe, New Mexico, USA 87505-4838

TAB 4c

really know what your needs are, or have not taken the time to define the CATIA job responsibilities.

- Recruiters must become more knowledgeable about CATIA and about their customers' needs. If a customer is not knowledgeable about their needs or has not provided an adequate job description, then the recruiter must provide that expertise. I have only dealt with a handful of recruiters in the past 20 years who seemed to know anything about the people they were attempting to hire or the profession they were trying to staff.
- CATIA training must improve. One prominent training company here in Detroit does not teach its students anything about work planes in its 40-hour basic CATIA course. Students graduating from that class can't cut a section. They are unemployable. Another school's curriculum was created by a person who has never used CATIA professionally. How do you know what to teach your students if you've never done this for a living? A local college shochorns 18 people into a class taught by a single instructor. Other companies double their revenue by having two people share a single computer. I could go on and on with the training horror stories I've heard over the years and experienced myself. No wonder the industry is reluctant to hire "entry level" people. For the most part, we as educators have given them no reason to.

If the above changes are implemented and companies become a little more willing to take a chance on so-called "entry level" people (who, in my opinion, are classified incorrectly), I think the shortage of "good" CATIA people will be a thing of the past. I also believe these companies will be pleasantly surprised with the "diamonds in the rough" they discover.

*Keith Childress owns G. Bailey & Assoc., a design/engineering firm and is Founder/Instructor of Keith Childress' Practical CATIA Training in Detroit. He can be reached via email at* keith@cadbiz.com *or at (810) 794-0370. His web address is* www.cadbiz.com.

**Compass means Catia ... throughout the Midwest**



From Western Pennsylvania to Minnesota, to Missouri, we look forward to serving our customers better based on our recent merger with Semcor, Inc. of Chicago. Both our Compass East office in Cleveland and our Compass West office in Chicago are Catia-Cadam Competency Centers which means full service support. This includes installation, education, support and production services (design, analysis, and NC programming). And because our engineers are certified by IBM and Dassault, you know our people are qualified.

IBM Business Partner | Hewlett Packard Channel Partner | Silicon Graphics Computer Systems | Catia Cadam Competency Center | COMPASS TECHNOLOGIES

www.compasstech.com info@compasstech.com

7400 Metro Blvd, Suite 100
Edina, MN 55439
612-893-2030, fax 835-1867

1603 Colonial Parkway
Inverness, IL 60067
847-776-0800, fax 776-9780

28922 Lorain Rd, Suite 100
North Olmsted, OH 44145
440-734-9600, fax 734-3733

10921 Reed Hartman Hwy, Suite 116
Cincinnati, OH 45242
513-794-0072, fax 794-0073

TAB 5

Copyright
United States Copyright Office
Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = dassault
Search Results: Displaying 242 of 272 entries

previous | next

Labeled View

***CATIA P1 : ver. 5.2 for Windows NT-Intel.***

| | |
|---|---|
| **Type of Work:** | Computer File |
| **Registration Number / Date:** | TX0005154366 / 1999-10-22 |
| **Title:** | CATIA P1 : ver. 5.2 for Windows NT-Intel. |
| **Description:** | Computer program. |
| **Notes:** | Printout (2 v.) only deposited. |
| **Copyright Claimant:** | Dassault Systemes |
| **Date of Creation:** | 1999 |
| **Date of Publication:** | 1999-07-22 |
| **Previous Registration:** | Prev. reg. |
| **Basis of Claim:** | New Matter: additions & revisions. |
| **Copyright Note:** | C.O. correspondence. |
| **Variant title:** | CATIA P1 : ver. 5.2 for Windows NT-Intel |
| **Names:** | Dassault Systemes |

TAB 6

**FOR IMMEDIATE RELEASE**

**Press Contacts:**
Richard Bush
Director, Marketing Communications
MSC.Software
(714) 445-3525
richard.bush@mscsoftware.com

Andy Deo
Marketing Manager
Advanced Enterprise Solutions
(949) 756-0588
adeo@aes4e.com

**Investor Contact:**
Joanne Keates
Director, Investor Relations
MSC.Software
(323) 259-4263
joanne.keates@mscsoftware.com

## MSC.Software to Acquire Advanced Enterprise Solutions, Inc.

*MSC.Software Accelerates Strategic Objectives, Expects Revenues to Double in 2002*

**Costa Mesa, CA**, May 2, 2001, MSC.Software Corporation (NYSE: MNS), an information technology software and services provider, today announced the signing of a definitive merger agreement to acquire Advanced Enterprise Solutions, Inc. (AES). AES is a privately-held, systems and software integrator and the largest IBM Product Lifecycle Management (PLM) Business Partner in the Americas, selling Dassault Systemes' PLM software portfolio comprised of CATIA, ENOVIA, DELMIA and SmartSolutions. The net transaction value is $90 million and will include net cash of $6.6 million, discounted notes of $17.6 million and 6 million shares of MSC.Software common stock. By virtue of its equity ownership in AES, Dassault Systemes (NASDAQ: DASTY) will become a 9% equity owner in MSC.Software.

MSC.Software will hold a conference call to discuss the acquisition of AES tomorrow May 3, at 6:00 am Pacific/ 9:00 am Eastern, using the following dial-in numbers: US (800) 374-0151 and International (706) 634-4981, conference name: MSC.Software.

Customers will benefit from the combined global expertise and resources of both companies. AES strengthens MSC.Software's offerings, adding Product Lifecycle Management tools, IT systems and professional services, expanding MSC.Software's available market to over $10 billion. MSC.Software will now support and satisfy customer needs for design, analysis, and Product Data Management (PDM) applications; computer and network systems, including implementation services and turnkey

**Date:** 5/16/01

TAB 7

aes

*28333 Telegraph Road, Suite 220*
*Southfield, MI 48034*
*Phone (248 ) 447-7900 ext. 132*
*Fax (248) 447-7910*

**Customer Contact:** Keith Childress
**Company Name:**
**Address:**

**Phone:**
**Fax:**

**QUOTATION**

| Item | Qty | Part # | Description | Unit Price | Extended Price |
|---|---|---|---|---|---|
| 1 | 1 | IBM/43P/140 | Used IBM RS/6000 43P 140 Workstation<br>-332MHz Processor<br>-P202 Monitor<br>-Spaceball<br>-Keyboard/Mouse<br>-512MB Memory | $4,300.00 | $4,300.00 |

**LEASING OPTION:**
*Allows expensing of equipment in a shorter time frame -vs-purchasing
*Expands line of credit and retains capitol for investments
*Allows easier upgradability within the lease term

LEASE TERM:
*Approximate Monthly Lease Cost:*

| | |
|---|---|
| **Sub-Total:** | $4,300.00 |
| Shipping: | FOB Santa Ana |
| **TOTAL:** | **$4,300.00** |
| Offer Expires: | 6/15/01 |
| Terms: | N-30 |

**Offered By:**

Advanced Enterprise Solutions
David D. Lanfear
Dlanfear@aes4e.com

We appreciate your business and look forward to being of continued service to your organization. Please note that all quotations and sales are subject to AES' Standard Terms and Conditions of Sale in effect at the time the service or product is ordered. A copy of AES' standard Terms & Conditions of Sales is available upon request.



0515 43P 140