58

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

FILED
OCT - 1 2013
CLERK'S OFFICE
DETROIT

DASSAULT SYSTEMES, S. A.
A CORPORATION OF FRANCE

Plaintiff/Counter-Defendant,

v.

KEITH CHILDRESS
d/b/a PRACTICAL CATIA TRAINING

Defendant/Counter-Plaintiff,
_______________________________/

CASE NO. 09-CV-10534
HON. Lawrence P. Zatkoff
Magistrate Judge Michael J. Hluchaniuk

# CHILDRESS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant/Counter-Plaintiff Keith Childress (I, me) pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby respectfully moves this Honorable Court for partial summary judgment against Plaintiff/Counter-Defendant Dassault Systemes ("DS") on the grounds set forth in the accompanying brief in support of this motion.

Pursuant to Local Rule 7.1, I sought concurrence in the relief sought in the motion, and concurrence was denied, thus necessitating this motion.

Respectfully Submitted,
/s/ Keith Childress
Keith Childress

620 Georgia Ave.
Sewanee, TN 37375
(586) 693 2585

FILED
OCT - 1 2013
CLERK'S OFFICE
DETROIT

## TABLE OF CONTENTS


| ITEM | PAGE |
| --- | --- |
| TABLE OF AUTHORITIES | iii |
| QUESTION PRESENTED | vi |
| I. INTRODUCTION | 1 |
| II. FACTS | 1 |
| III. LEGAL STANDARD | 13 |
| IV. ARGUMENT | 14 |
| A) Pursuant to 28 USC 2201 and 15 USC 1119, I am entitled entry of a Declaratory Judgment canceling Dassault's Class 41 CATIA mark (Reg. # 3754953) and granting trademark registration to "Practical CATIA Training" and to "practicalcatia.com" in Class 41 (Count Eleven of my Counterclaim) | 14 |
| B) DS's Claims are barred in their entirety by the Doctrine of Unclean Hands. | |
| 1) As a means of eliminating our school as Dassault's competitor in the CATIA training market, Dassault filed a malicious trademark infringement suit against our school. | 15 |
| 2) Dassault knowingly made false statements as fact in its Complaint to be able to claim statutory damages and attorneys fees under 17 U.S.C. § 504 and 505. | 19 |
| 3) Dassault's Andrew Clarkson made false statements of fact in his December 20, 2009 Declaration as a means of fabricating Dassault's damages. | 21 |
| C) DS's copyright infringement claims are barred because Dassault failed to join a necessary party(ies). | 24 |
| CONCLUSION | 25 |
| CERTIFICATE OF SERVICE | - |


## TABLE OF AUTHORITIES

**CASES:**

*Angel Flight of Ga., Inc. v. Angel Flight Am.*, Inc.,
522 F.3d 1200, 1211 (11th Cir. Ga. 2008).

*Celotex Corp. v. Catrett*,
477 U.S. 317, 326 (1987)

*Durox Co. v. Duron Paint Mfg. Co.*,
320 F.2d 882, 883, 885-86 (4th Cir. 1963)
*Eagles, Ltd. v. American Eagle Foundation*,
356 F. 3d 724, 732 – (6th Circuit 2004)
*Esquire, Inc. v. Esquire Slipper Mfg. Co.*,
243 F.2d 540, 545 (1st Cir.1957)
*Intercom Ventures, LLC v. City Media Plus EX-YU Streaming*,
Case No, No. 12 C 10275 (ND Illinois Aug. 6, 2013)
*Keweenaw Bay Indian Community v. State*,
11 F. 3d 1341 – (6th Circuit 1993)
*Lucky's Detroit, LLC v. Double L Inc.*
Dist. Court, ED Michigan (2012)
*Moore v. Philip Morris Cos., Inc.*,
8 F.3d 335, 339-40 (6th Cir. 1993)
*Nartron Corp. v. ST Microelectronics, Inc.*
305 F. 3d 397 - Court of Appeals, (6th Circuit 2002)
*Nat'l Bus. Dev. Servs., Inc. v. Am. Credit. Educ. And Consulting, Inc.*
299 F. App'x 509, 512 (6th Cir. 2008)
*Massa v. Jiffy Prods. Co.*,
240 F.2d 702, 704, 707 (9th Cir.1957)
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).
*Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.*,
477 F.2d 150, 157 (6th Cir.1973)
*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*
324 U.S. 806, 814 (1945)
*The Football Ass'n Premier League Ltd. v. YouTube, Inc.*,
633 F. Supp. 2d 159, 164 (S.D.N.Y. 2009))
*The Scooter Store, Inc. v. Spinlife.com, LLC*
777 F. Supp. 2d 1102, 1113 (S.D. Ohio 2011)
*Torres v. Cantine Torresella S.r.l.*,
808 F.2d 46, 48 (Fed. Cir. 1986).
*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*,
205 F.3d 1219, 1226-27 (10th Cir. Kan. 2000).

**PLEADINGS:**

Dassault's Complaint ("DSC") [DE:01]

Childress First Amended Answer and Counterclaim ("CC") [DE:101]

Dassault's Answer to my Counterclaim ("DSA") [DE:108]

**AFFIDAVITS/DECLARATIONS**

Nathan Haller ("NH") MSC Software employee assigned to interface with our school [DE:50,34-44]

Donna Janssen ("DJ") Our school's Business Manager [DE:50,pgs:45-49]

Daryl Patrishkoff ("DP") MSC Software's Director of Business Development. [DE:101-1,pgs:28-31]

Adam Childress ("AC") Our school's former instructor [DE:171,pgs:36-39]

Keith Childress Jan 25, 2010 Affidavit ("KC1") [DE:50:pgs:24-33];

Keith Childress March 15, 2010 Affidavit ("KC2") [DE55:,pgs:6-33]

Regina Childress ("RC") May 9, 2013 Affidavit [DE:171,pgs:22-28]

Karen Childress ("KCN") May 2013 Affidavit [DE:171,pgs:29-35]

Andrew Clarkson Dec. 20, 2009 Declaration ("AC1") Filed under seal [DE:42,Ex:B]

Andrew Clarkson March 4, 2010 Declaration ("AC2") [DE:53-3,pgs:2-5]

**PUBLICATIONS:**

Keith Childress' 1998 CATIA Solutions Magazine Article [DE: 55,pgs:44-47]

Keith Childress' 1999 CATIA Solutions Magazine Article [DE: 101-1,pgs:40-45]

Keith Childress' 2002 CATIA Solutions Magazine Article [DE: 53-3,pgs:21-24]

Francis Bernard (Dassault Founder) 2005 Observer Article [DE: DE:101-1,pgs:32-38]

**TREATISES:**

NIMMER ON COPYRIGHT § 10.03[A]

NIMMER ON COPYRIGHT § 13.07

2 NIMMER ON COPYRIGHT § 7.16[C][1], at 7-183 (2008)

**STATUTES AND RULES:**

15 U.S.C. § 1051(a)(3)(D)

15 U.S.C. § 1064(3)

15 USC 1119

17 U.S.C. § 412

17 U.S.C. § 504

17 U.S.C. § 505

28 USC 2201

Fed. R. Civ. P. 19(a)(1)(A)

Fed. R. Civ. P. 56

## QUESTION PRESENTED

Should the Court cancel Dassault's CATIA trademark in Class 41 and Declare Childress is the rightful owner of the CATIA mark in Class 41 (Education and Training) where there is no genuine issue of material fact that Childress is the senior user of the CATIA mark in Class 41?

Answer: Yes

Should the Court dismiss all counts of Dassault's Complaint where there is no genuine issue of material fact that Dassault has acted with "unclean hands" in bringing and prosecuting this lawsuit?

Answer: Yes

Should the Court dismiss Dassault's copyright infringement claim when there is no genuine issue of material fact that Dassault has failed to join a necessary party(ies)?

Answer: Yes

## INDEX OF EXIBITS

**EXHIBIT A:** DS's CATIA Solution Magazine advertisements.

**EXHIBIT B:** DS's CATIA V5 Release 12 copyright registration.

**EXHIBIT C:** DS's CATIA V5 Release 14 copyright registration.

**EXHIBIT D:** Practical Catia Training CATIA V5 FAQ webpage

**EXHIBIT E:** Practical Catia Training CATIA V5 demo webpage

**EXHIBIT F:** Childress June 2001 email to IBM's Pam Barton.

**EXHIBIT G:** Practical Catia Training Homepage with "FREE CATIA V5 Software" banner.

**EXHIBIT H:** Practical Catia Training "FREE CATIA V5 Software" webpage (Hobbled Code).

**EXHIBIT I:** DS's 2008 CATIA trademark application (Class 41).

**EXHIBIT J:** Childress' Aug 2012 email to DS offering to travel to France to meet with DS managers and attorneys to review evidence and discuss settlement.

**EXHIBIT K:** DS's Proposed Settlement Agreement

**EXHIBIT L:** Childress letter objecting to language in DS's Proposed Settlement Agreement.

**EXHIBIT M:** Childress family home sold at sheriff's sale.

# BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

My family and I started our school in 1995 and soon earned an outstanding reputation for providing CATIA training. We were so well known and respected that DS and its partners IBM and MSC Software ("MSC") initiated Business Agreements with our school to help promote their products and services.

Everyone benefited from the Business Agreements DS and its partners IBM and MSC initiated with our school. IBM and MSC provided our school with CATIA software/licenses allowing our school to provide quality CATIA training at an affordable price (offering 50% discounts to unemployed); my family could be of benefit to our community while earning enough to pay our bills; we provided IBM and MSC with hundreds of sales leads; MSC and DS were receiving high visibility by advertising on our school's top-ranked website, and DS more than doubled its revenues (746 million euros in 2001, 1.6 billion euros in 2006).

Then DS got greedy. It ended its 50-50 partnership with IBM and expanded its business operations to include CATIA training. Seeking to eliminate our school as its competitor, DS filed a malicious criminal complaint against our school with the FBI. When our school was exonerated, DS filed this malicious copyright/trademark infringement suit which seeks to close our school, thereby eliminating our school as DS's competitor in the CATIA training market.

## II. FACTS

DS owns a Computer Aided Design (CAD) program called CATIA. [DE:01,¶08] In 1984, DS registered the CATIA mark in Class 09, 16, & 42. [DE:01,¶¶9-10]

According to a 2005 magazine interview with DS's founder Francis Bernard ("FB") [DE: DE:101-1,pgs:32-38], shortly after DS's inception in 1981, DS entered into a 50-50 partnership

with IBM in the development, marketing and sale of the CATIA software. "DS – is engaged in the development of software, IBM – sales, support and marketing." [FB,pg:37] "In all countries, IBM – our strategic partner, manages sales. The sales of all CATIA licenses are done by IBM." [FB,pg:33].

According to Mr. Bernard, the sales, support, marketing, and licensing of the CATIA software to small and medium-sized companies is delegated to a network of independent companies known as "IBM Business Partners" ("*IBM* has a network of Business Partners to cover most of the regions and to address various industrial sectors. Usually, *IBM* works more with Large Accounts; the Business Partners' targets being to attract and serve small and medium size companies.") [FB,pg:33]

In 1995 my family and I started our school which provides in-class CATIA training in metropolitan Detroit, and worldwide CATIA training via the internet. [DE:55,pg:6,¶02] When my family and I started our CATIA training school we chose the d/b/a G. Bailey & Associates after the Jimmy Stewart character George Bailey in the movie "It's a Wonderful Life." We chose this name because the character George Bailey and the movie It's a Wonderful Life symbolize my family's guiding principles and beliefs. [d/b/a, DE:55-2,pg:04]

Even though we chose G. Bailey and Associates as our d/b/a, the name of our school, and CATIA course, has always been **Practical Catia Training** because we specialize in providing CATIA training based on my (and my sons') practical experience using the CATIA software in the automotive design and engineering profession.

Our name/mark "Practical Catia Training" made its first appearance on the world stage in 1998 when I was asked to write an article for CATIA Solutions Magazine ("CSM"), a worldwide trade publication devoted entirely to the CATIA Software. [DE:55,pgs:44-47] My

article was entitled "Practical CATIA Training", and carried the byline "Keith Childress owns G. Bailey & Associates, and is Founder/Instructor of Keith Childress' Practical CATIA Training in Detroit." [DE:55,pg:47] IBM [DE:101-1,pgs:40-42] and DS [**Exhibit A**] ran full-page ads in CSM, and each had representatives on CSM's "Editorial Advisory Board." [DE: DE:55,pg:44 & DE:101-1,pg:46].

I was asked to contribute a second article to CSM in 1999 [DE.101-1,pgs:40-45] and a third in 2002. Both articles included the name of our course, Practical Catia Training, and my 2002 article included our school's website URL, "practicalcatia.com." [DE.53-3,pgs:21-24]

In 2000, I created our school's **practicalcatia.com** website which has displayed the masthead shown below at the top of every page since its inception. [DE:101-1,pg:47]

**Keith Childress'**
**Practical Catia**
**Training**

In 1999, IBM/DS introduced a new version of CATIA called CATIA Version 5 ("V5"). In Sept. 2003, DS published CATIA V5 Release 12 ("R12"), which it registered two months later in Nov. 2003 [**Exhibit B**]. In November 2004, DS published CATIA V5 Release 14 ("R14"), which it registered five years later in November 2009 [**Exhibit C**].

I was so impressed with CATIA V5 that I created a CATIA V5 FAQ webpage on our website [**Exhibit D**]. I also created a CATIA V5 demo webpage [**Exhibit E**] which allowed visitors to our website a virtual hands-on experience using CATIA V5 via simulations.

Our website rapidly became the go-to destination on the internet for information regarding CATIA V5, ranking at or near the top of major search engines such as Yahoo,

Google, and Netscape. [Haller Affidavit ("NH") DE.50,pg:37,¶21 & Janssen Affidavit ("DJ") DE:50,pg:46,¶06]

In 2001 sales of CATIA V5 was still very slow. [NH,¶19] In June 2001 IBM contacted me regarding our school's website and training. IBM's Pam Barton thanked us for promoting CATIA V5 in our classes and on our website. On June 26, 2001, I sent Ms. Barton an email [**Exhibit F**] in which I suggest a way in which IBM/DS could help promote CATIA V5.

> It would sure help out if Dassault and IBM would release a student version of Catia V5. A version that would make it cost effective for small businesses and students to teach and learn this new technology.

Ms. Barton sent an email reply a few hours later [DE:55-2,pg:9] offering to provide our school and students with a new promotional version of CATIA V5 called "hobbled code":

> There is a new CD coming out that is called hobbled code. You won't be able to print or save drawings, but you can do most other things in CATIA.

In their respective affidavits, Mr. Haller [¶21], and Ms. Janssen [¶07] aver that IBM provided our school with the "hobbled code" CATIA V5 software. By providing our school with the Hobbled Code CATIA V5 software, IBM enabled our school to open our own training facility and begin providing CATIA V5 training. This also allowed our school to offer 50% discounts to the unemployed (1/3 less than others charged), thus allowing our school to help retrain much of Michigan's displaced workforce. I created a banner on our school's homepage which read "FREE Catia V5 Software" [**Exhibit G**]. The banner linked to our FREE Catia V5 Software webpage [**Exhibit H**], on which the first paragraph read:

> When you sign up for one of my Catia v5 classes, you will receive, FREE OF CHARGE, a "hobbled code" version of the Catia v5 software for installation on your home or office computer.

In Oct. 2001 our school purchased a CATIA V5 "MD2" license for $7995.00 from a new IBM Business Partner named MSC Software. [DE:50,pg:13; DE:50,pgs:14-22] MSC

Software became an IBM Business Partner in May 2001 when it acquired a company named Advanced Enterprise Solutions ("AES"). DS owned a 19% share of AES and a 9% share of MSC Software ("MSC"). [DE:101-1,pg:49] The duration of our CATIA V5 license is from 11-14-01 through 12-31-2037. [DE:146,pg:27]

In addition to purchasing the CATIA V5 software from MSC, our school rented MSC's Southfield MI training facility and CATIA V4 workstations to teach our larger CATIA V4 classes. [NH:¶18; DJ:¶12]. Additionally, our school purchased two CATIA V4 workstations from AES (prior to the MSC acquisition) [DE:55,pg:50; NH:¶15; DJ¶11]

In November 2001, MSC approached me with an offer to provide our school and our students with "fully-functional" (time restricted) CATIA V5 software (via IBM) in exchange for MSC advertising on our school's website, and in exchange for our school supplying MSC with sales leads and our students' contact information for marketing purposes. [NH,¶¶21-22; DJ,¶¶14-15; Daryl Patrishkoff Affidavit ("DP") DE:101-1,pg:30,¶11]

We agreed to MSC's terms and in November 2001 I uploaded MSC's banner ads to our school's website [DE:55-2,pgs:21-22], and MSC (via IBM) began providing our school and our students with CATIA V5 software/licenses. I also updated our "FREE Catia V5 Software" webpage to reflect that we were now offering our students "fully-functional" CATIA V5 software. [DE:55-2,pg:22] In ¶23 of his affidavit, MSC's Mr. Haller avers that MSC assigned him to manage the Business Agreement MSC initiated with our school.

In a Dec. 2001 email exchange with MSC in which I voice my displeasure over MSC lack of responsiveness to a customer I had referred to them, I informally describe the Business Agreement MSC initiated with our school.

> [M]y understanding is that you offered to get 30-day licenses for my students in order to promote your company. I didn't ask, you offered. [and] You supply me with temp licenses and I promote your company. [DE:55-2,pg:16]

In DE:55-2,pgs:46-50, and DE:55-3,pgs:2-5, I entered into evidence two of the more than 250 CATIA V5 licenses our school received from IBM/MSC. MSC employee Tim Gudobba ordered the licenses from IBM's License Key Center (kmsr17@dk.ibm.com), who in turn created the licenses and emailed them directly to me at keith@practicalcatia.com.

In DE:146, Exhibit B, I entered into evidence a CD containing the remaining 250+ CATIA licenses[1] our school received from IBM/MSC, per the Business Agreements IBM and MSC initiated with our school. The majority of the licenses were sent directly to me (via email) from IBM's Boulder Colorado License Key Center, and list "Dassault Systemes" as the "Vendor." Our school received the first set of CATIA V5 licenses in September 2000, and the last set of multi-user concurrent (extractable) CATIA V5 licenses did not expire until February 2007. DS has not disputed the validity of these licenses in any of its subsequent briefs.

In Jan. 2002 MSC's Director of Business Development, Daryl Patrishkoff, requested a meeting to discuss our school becoming an MSC training provider utilizing the CATIA V5 software/licenses that IBM/MSC were providing under the aforementioned Business Agreement. [NH,¶26; DJ,¶17; DP,¶¶13-14; DE:55-2,pgs:40-45]

In March 2003 MSC set up a license server in our classroom and IBM provided our school with a 15-user CATIA V5 concurrent (network) license [NH,¶28; Adam Childress ("AC") Affidavit, DE:171,pg:37,¶9; DE:55-3,pg:27]. Shortly thereafter our training computers began intermittently disconnecting from the license server, thus causing CATIA to shut down and causing significant disruptions to our classes [NH,¶29; AC,¶9]

---

[1] The licenses on the disc do not represent all of the licenses our school received from IBM/MSC. According to my records, IBM/MSC provided our school with nearly 400 CATIA V5 licenses between 2000 and 2007.

In DE:146,pgs:29-30 I entered into evidence an ongoing email exchange I had with the manufacturer of the wireless hardware we used in our class. During the email exchange I specifically describe the problems we were having with MSC's CATIA license server:

> I purchased one of your WGR614 wireless routers and 15 of your WG511 wireless PC cards. I've upgraded the router to the latest firmware. I'm using this setup to serve licenses from a license server to the 15 laptops. The signal is strong on all of the laptops. However, every 15 or 20 minutes the router drops the connection to the wireless PC cards. As such, the connection to the license server is dropped and the software on the laptops that requires the license to operate quits working. I'm using the software to provide CAD training and having to stop every few minutes because of licensing issues is unacceptable. Any support you could offer would be much appreciated. [DE:146,pg:30] (underline added)

Unable to resolve the issues with the license server, MSC gave us permission to install the CATIA license that we purchased in 2001 on our classroom computers as a temporary workaround to the problem [NH,¶¶29-31; AC,¶9].

In February 2003 our school was invited to join the IBM/DS Higher Education and Training ("HEAT") program [DE:55-2,pgs:12-13], which provided discounted CATIA software ($350 per license) and training materials to educational organizations. Our school had applied for inclusion into the HEAT program in 2001 [DE:55-2,pgs:10-11], however, because we were already using the CATIA software per the Business Agreements IBM/MSC initiated with our school, we did not join the HEAT program [DJ, ¶¶10,18].

In 2003 I had direct communications with two DS managers, Michel Rican (DS France) and Len Turner (DS USA), when I contacted DS to inquire about its new Education Partner Program (EPP). [DE55-3,pgs:25-26]

In March 2003, I passed DS's "Part Design Specialist V5R9" exam [DE:50-2,pg:05]. According to DS's Global Certification website, "any person who passes a CATIA Exam is considered a CATIA Certified Professional." [DE:50-2,pg:06] After I passed DS's CATIA

Certified Professional exam, I posted a picture on our school's homepage with a badge identifying me as a "CATIA Certified Professional." [DE:50-2,pg:08]

In 2004, MSC informed us that CATIA V5 Release 13 had a new license "extract" feature that would resolve the problems we'd had with our training computers disconnecting from the license server. I installed CATIA V5 R13 onto our training computers and MSC provided a multi-user[2] concurrent offline (extricable) license. Shortly thereafter we began experiencing intermittent problems with the license extract feature. When a student tried to open CATIA, CATIA would not recognize that a license had been extracted to the computer. [DE:168,pgs:25-27] When this occurred, the student was without a training computer for the duration of the month-long class. With MSC's permission, we once again employed the use of the aforementioned workaround because it was dependable [NH,¶¶34-36; AC, ¶10].

In October 2004, I received an email from Cedric Simard of DS's Headquarters in France. Mr. Simard said that he was "in charge of worldwide marketing and communication for Dassault Systèmes Education offering." Mr. Simard indicated that DS had heard good things about our school and was happy to have the opportunity to contact me. Mr. Simard said that DS would like to display two banner ads on our school's website promoting DS's new Global Certification Program, to which I agreed. [DE:50-2,pg:7] Mr. Simard perused our school's website before instructing me to place one DS banner on our "Home" page, and the second banner on our "Job Search" page. Mr. Simard instructed me to link DS's banner ads to DS's Global Certification website. I uploaded DS's banner ads to our school's website on November 16, 2004, and DS never asked me to remove them. DS admits to this in ¶¶125-140 of DS's

[2] A multi-user concurrent offline license is a single network license that allows a specific number of users to each extract a CATIA license "concurrently" for a specific period of time.

Answer to my Counterclaim [Doc.108]. Shown immediately below are true copies of the two banner ads DS provided for display on our practicalcatia.com website.







In DE:50-2,pgs:8-9 I entered into evidence true copies of DS's banner ads as they appeared on our school's website on Dec. 15, 2004. When DS's Mr. Simard perused our school's website in October 2004, our website contained ads promoting our "FREE Catia V5 Software" offer, as well as webpages that state that our school provided "group" training. [DE55-3,pgs:30-33]

In 2004 DS expanded its business operations to include CATIA training when it formed a new company named RAND NA[3]. DS became our school's direct competitor when RAND NA opened an office not far from our school and began offering in-class and online CATIA training. [DE:101-2,pg:07] In a DS press release, DS indicates that DS changed the name of RAND NA to "Inceptra" and that Inceptra is a "Dassault Systemes company". [DE:101-2,pg:05] I entered into evidence true copies of two Inceptra webpages which indicate Inceptra (like our school) provides online ("remote") CATIA training, and in-class CATIA training in metropolitan Detroit (MI). [DE.101-2,pgs:8-9]

In July 2005 DS assumed management responsibility for IBM's network of Business

[3] AKA: Rand North America, Inc. & RAND Americas.

Partners, including management responsibility for MSC, the IBM Business Partner that was providing our school with CATIA licenses, as it had been doing since 2001. [DE:108,¶105] DS bought out "IBM's sales and client support operations" "as well as [IBM's] customer contract and related assets", thus ending DS's partnership with IBM. [DE:108,¶205]

When DS took over CATIA licensing responsibilities from IBM, DS created a new End User License Agreement (EULA) which prohibits licensees (like our school) from using their CATIA licenses to provide CATIA training [DE:135,Ex:A]. In Interrogatory No. 4, DS admits that "private non-accredited schools in the USA (like my school)" must join DS's Education Partner Program (EPP) "in order to receive CATIA licenses with which to provide CATIA training to third parties." In ¶238 of its Answer to my Counterclaims [108], DS admits that "to protect investments in specific accounts made by Dassault or other authorized parties", DS publishes a list of prospective customers with whom EPP participants cannot do business ("could not actively market or solicit"):

> …to protect investments in specific accounts made by Dassault or other authorized parties, Dassault began publishing a list of Company Reserved Accounts that EPP participants could not actively market or solicit.

When I purchased the CATIA V5 software from IBM in 2001, IBM's Customer Agreement [DE:53-3,pgs:9-26] did not prohibit licensees from using their CATIA licenses to provide CATIA training. Inasmuch as my license does not expire until 2037, our school is not required to join DS's EPP to be able to provide CATIA training, therefore, DS cannot dictate with whom our school can and cannot do business.

DS filed a criminal complaint against our school that led to an Oct. 30, 2006 FBI raid while my son Adam was teaching a class [DE:108,¶151]. The FBI raid was part of a federal

grand jury investigation into our school's use of DS's CATIA software. The FBI seized our training computers, training materials, and other items. [DE:17,pgs:16-23]

We provided evidence to the grand jury of the Business Agreements DS and its authorized agents IBM and MSC initiated with our school, including the hundreds of CATIA licenses we received from IBM/MSC. In addition, I volunteered to testify before the grand jury [DE:110,pgs:7-23]. No charges were brought against me or my family, nor did we agree to a plea bargain. The training computers seized during the FBI raid were eventually returned to us. In an April 2, 2010 letter [DE:124,pg:07], US Attorney Barbra McQuade confirms my family and I were exonerated of infringing on DS's CATIA copyright:

> This office has declined criminal prosecution of Mr. Childress or Practical CATIA for the matters under investigation. These consisted of potential violations of copyright law and related violations regarding the copying and use of CATIA software in the approximate period of 2003 through October, 2006. There is no pending criminal investigation related to any alleged subsequent uses of the technology by these subjects. Thus, unless circumstances change, this office will not seek or bring criminal charges against Mr. Childress or Practical CATIA for the matters that were investigated.

In November 2008, DS's attorney of record Glenn Forbis contacted me about our school's use of the CATIA software. When I explained the circumstances surrounding our use of the CATIA software, and that we could not afford legal representation, Mr. Forbis said that he would organize a conference call with DS (France) to straighten the matter out. [K. Childress affidavit DE:55,pg,31,¶¶78-80; emails and phone log, DE:52,pgs:10-14]

Mr. Forbis did not organize the conference call with DS as he had promised. Instead, DS filed a lawsuit against me and my family's school in Feb. 2009 alleging we had infringed on DS's CATIA copyright and trademark.

Less than two months before filing its trademark infringement lawsuit, DS filed an application **[Exhibit I]** to register the CATIA mark in the category of "Education and

Training" (Class 41), the category/class in which our school has used the CATIA mark since CATIA Solutions Magazine published my first article in 1998.

In ¶17 of its February 2009 Complaint, DS specifically states:

> In 2003, Defendant Keith Childress, purchased one license for CATIA Version 5, Release 12. On information and belief, Defendant Childress and his company were able to crack and clone the Target IDs on the license and clone the software on twenty machines in order to train students on the software.

As the evidence on the record indicates, we purchased the CATIA software in 2001 (not 2003) and our training computers contained the same license because (with MSC's permission) we had installed our license on our training computers as a workaround to technical difficulties we were experiencing with the multi-user concurrent offline licenses that MSC had provided, and that were not due to expire until February 28, 2007 (four months after the October 2006 FBI raid). As the licenses on the CD confirm, during the time in which DS alleges our school was infringing on DS's CATIA copyright, our school received hundreds of CATIA licenses from DS's authorized agents IBM and MSC.

As the evidence also indicates, at the time DS filed its trademark infringement complaint DS did not own the CATIA mark in the category of "Education and Training" (Class 41), and by DS's own admission, DS had been advertising on our school's website for five years.

In May 2012 I filed a Counterclaim against DS [DE:101] alleging, among other things, that DS is attempting to monopolize the CATIA training market in violation of antirust laws. I further allege that DS filed this malicious lawsuit against our school as a means of eliminating our school as DS's competitor in the CATIA training market.

In its Answer to my Counterclaim, DS denies any knowledge of the Business Agreements DS's authorized agents IBM and MSC initiated with our school [Doc.108, ¶¶57-

58,73]; DS denies any knowledge of the hundreds of CATIA licenses IBM/MSC provided to our school per the Business Agreements [Doc.108, ¶85]; and DS denies IBM and MSC had the authority to provide our school with the CATIA V5 software for use in our training, or to allow our use of the workaround to the technical problems we were experiencing with the IBM/MSC provided licenses. [Doc.108, ¶¶64,91,107,108]

At DS's request [DE:171,pg:40] my sister Karen and I met with DS's investigator Andrew Clarkson in August 2012. According to my sister's affidavit [DE:171,pgs:29-35], after spending 18 hours over two days reviewing the evidence and discussing the case [¶8], Mr. Clarkson said DS's lawsuit has been a mistake [¶13]. Mr. Clarkson said DS thought I'd been lying about the Business Agreements I claimed IBM and MSC initiated with our school, and about the hundreds of CATIA licenses I claimed to have received [¶10]. After conferring with DS's management, Mr. Clarkson specifically said that DS would be dropping its lawsuit [¶13], and that DS is a good company and would do the right thing to compensate me and my family for our injuries [¶15]. Mr. Clarkson indicated he didn't have the latitude to enter into settlement negotiations [¶15], but said DS requested a 90-stay [DE:115] to negotiate a settlement [¶17]. Mr. Clarkson said that IBM/MSC did not have the authority allow us to use the CATIA software to teach our classes, or to provide the software to our students. [¶19]

On August 21, 2012, I sent a letter to DS [**Exhibit J**] in which I offered to travel to France to meet with DS's management and attorneys to go over the evidence Mr. Clarkson reviewed during our August 2012 meeting and to discuss a settlement to the case. DS did not respond to my offer or make any attempt to meet or talk with me during the 90-stay.

DS finally agreed to meet with me on Jan. 9, 2013 (the day before a Scheduling Conference). In their respective affidavits, my son Adam, my sister Karen, and my wife Regina,

each aver that after I spent six hours going through the evidence with DS's Deputy General Counsel Joe Hutcheson, Mr. Hutcheson said DS would drop its lawsuit, but only if we agreed to drop our counterclaims. DS refused to honor Mr. Clarkson's commitment that DS would compensate me and my family for the injuries we have suffered.

Subsequently, DS's counsel Glenn Forbis drafted a proposed settlement agreement [**Exhibit K**] in which I would have to agree to stop using the CATIA mark in our school name (Practical CATIA Training), and our website URL (practicalcatia.com). The proposed settlement agreement would also require that I make the following acknowledgement:

> WHEREAS, Childress acknowledges that Dassault is a moral and conscientious company and that Dassault has pursued the Lawsuit against Childress in good faith to protect its intellectual property.

Because DS's proposed settlement agreement did not reflect the facts of the case, nor did the proposed settlement agreement comport with what the parties had discussed, I refused to sign the agreement [**Exhibit M**].

## III. LEGAL STANDARD

A motion for summary judgment is granted under Fed. R. Civ. P. 56(c) when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1987). Facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). However, the non-moving party must present "specific facts showing that there is a genuine issue for trial" that demonstrate that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339-40 (6th Cir. 1993) (internal citations

omitted).

## IV. ARGUMENT

**A) I am Entitled to Declaratory Judgment Canceling Dassault's Class 41 CATIA mark (Reg. # 3754953) and Granting Trademark Registration to "Practical CATIA Training" and to "practicalcatia.com" (Count Eleven of My Counterclaim).**

In a 2012 decision this Court held:

> Ownership of a trademark is not determined by who has registered it first, but, rather, by who has used it first. Thus, if a non-registrant can show by a preponderance of evidence that he or she is the prior user, then the registration may be invalidated. *Lucky's Detroit, LLC v. Double L Inc.*, Dist. Court, ED Michigan (2012)(internal citations omitted)

Our school has been using the CATIA mark in the category of education and training (Class 41) since at least 1998 when CSM published my first article. While Dassault was granted registration of the CATIA mark in class 09, 16, and 42 in 1984, Dassault did not apply for registration of the CATIA mark in Class 41 (education and training) until December 2008 (granted registration in 2010). Our "first use" of the CATIA mark in education and training predates Dassault's registration by 12 years, making our school the "prior user" of the CATIA mark in education and training. Therefore, Dassault's 2010 registration should be invalidated.

In addition to seeking declaratory judgment canceling Dassault's 2010 registration, I seek declaratory judgment that our school is entitled to registration of the marks "Practical CATIA Training" and "practicalcatia.com" in Class 41 for "educational training." In holding the district court has the authority to cancel *and* award registration of trademark, the Sixth Circuit in *Eagles, Ltd. v. American Eagle Foundation*, 356 F. 3d 724, 732 – (6th Circuit 2004) cites several cases in which the district court exercised such authority:

> *See Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.*, 477 F.2d 150, 157 (6th Cir.1973) (directing the PTO to issue a concurrent registration to the defendant with limitations); *Durox Co. v. Duron Paint Mfg. Co.,* 320 F.2d 882, 883, 885-86 (4th Cir. 1963) (directing the PTO to issue a registration for the plaintiff's mark after the plaintiff properly raised the

> issue of validity in the complaint); *Massa v. Jiffy Prods. Co.*, 240 F.2d 702, 704, 707 (9th Cir.1957) (directing the PTO to cancel the "Jiffy" mark for the plaintiff and award a registration for the same mark to the defendant)

For the reasons contained herein, as well as the evidence on the record, I respectfully request – pursuant to 28 USC 2201 and 15 USC 1119 – that this Court enters a Declaratory Judgment canceling Dassault's Class 41 CATIA mark (Reg. # 3754953) and granting trademark registration to "Practical CATIA Training" and to "practicalcatia.com" in the Class 41.

**B) DS's Claims are Barred in Their Entirety by The Doctrine of Unclean Hands.**

In *Lucky's Detroit, LLC v. Double L Inc.*, Case No. 09-14622., Doc. 62 (E.D. Mich Jan. 25, 2012), this Court held:

> "The doctrine of unclean hands is `a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.'" *The Scooter Store, Inc._v. Spinlife.com, LLC*,_777 F. Supp. 2d 1102, 1113 (S.D. Ohio 2011) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)).

**1) As A Means of Eliminating Our School as DS's Competitor in The CATIA Training Market, DS Filed a Malicious Trademark Infringement Suit Against Our School.**

As this Court held in *Lucky's, supra*, "Ownership of a trademark is not determined by who has registered it first, but, rather, by who has used it first." As the evidence indicates, our school has been using the CATIA mark in trademark category "education and training" (Class 41) since at least 1998 when CATIA Solutions Magazine published my first article.

DS's partner IBM became aware of our school's use of the CATIA mark in our school name (Practical Catia Training) and in our website URL (practicalcatia.com) no later than 2001 when IBM contacted our school to thank us for promoting CATIA V5 on our website and in our training. MSC, an IBM Business Partner and a company in which DS owned a 9% share, became aware of our use of the CATIA mark no later than 2001 when MSC began advertising

on our school's website. DS became aware of our use of the CATIA in 2003 when I had direct contact with DS France and DS USA, but certainly no later than 2004 when, by DS's own admission, DS began displaying two (2) banner ads on our school's website.

DS became our school's direct competitor when DS expanded its business operations in 2004 to include CATIA training when it created RAND North America (later renamed Inceptra) and opened an office not far from our school's Warren Michigan training facility.

Despite the fact that DS had been profiting from our school's use of the CATIA software and mark by advertising on our school's website for nearly five years, DS filed a lawsuit against our school in Feb 2009, <u>falsely</u> accusing our school of "willfully infringing Plaintiff's registered trademark CATIA by the unauthorized use in Defendants' advertising of training services wherein the words PRACTICAL CATIA and CATIA are displayed." [DE:01,¶41]

Our use of the CATIA mark for "advertising of training services" falls under trademark Class 41, in the category of "Education and Training." According to ¶¶9-10 of DS's Complaint [DE:01], in 1984 DS registered the CATIA mark in Classes 9, 16, and 42, but DS did not register the mark in Class 41 (Education and Training), the class/category in which our school has used the CATIA mark since 1998.

In preparation for filing its trademark infringement lawsuit against our school, DS filed an application to register the CATIA mark in Class 41 (Education and Training) in Dec. 2008, ten years <u>after</u> our school's "first use" of the CATIA mark in Class 41 (Education and Training), and less than two months before DS filed its lawsuit <u>falsely</u> alleging our school was infringing on the CATIA mark.

Inasmuch as our school has been continuously using the CATIA mark in Class 41 (Education and Training) since at least 1998, and inasmuch as DS did not apply to register the

CATIA mark in Class 41 until 2008, according to this Court's decision in *Lucky's*, our school is the senior user, and rightful owner of the CATIA mark in Class 41 (Education and Training).

Despite the fact that our school is the senior user of the CATIA mark in Class 41 Education and Training, DS was granted registration (#3,754,593) of the mark in Class 41 on March 2, 2010, more than a year after DS filed its lawsuit against our school.

In the case this Court cited in *Lucky's*, the *Spinlife* Court held:

> If a plaintiff is suing for trademark infringement, fraud in the procurement of the mark may constitute unclean hands. Cf. *Urecal Corp. v. Masters,* 413 F. Supp. 873, 875-76 (N.D. Ill. 1976)

According to 15 U.S.C. § 1051(a)(3)(D), at the time of filing an application for use of a trademark, the applicant must make a verified statement that "to the best of the verifier's knowledge and belief, no other person has the right to use such mark in commerce…"

The only way DS could have been granted registration of the CATIA mark in Class 41 was to conceal the fact that our school "has the right to use such mark in commerce" by virtue of our "first use" of the CATIA mark in Class 41. In ¶82 of my First Request for Production, I requested "All documents and things relating to Dassault's registration of the CATIA mark in Class 41." Despite the fact that this request was made in March 2013, DS has failed to produce its signed application verifying that to DS's "knowledge and belief, no other person has the right to use such mark in commerce…"

Under the Lanham Act, a registration may be cancelled if obtained by fraud. 15 U.S.C. § 1064(3). "The obligation which the Lanham Act imposes on an applicant is that he will not make knowingly inaccurate or knowingly misleading statements in the verified declaration forming a part of the application for registration." *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986). Where, as here, a trademark applicant fails to disclose prior use of

a mark in commerce, courts have found fraud. The Eleventh Circuit held that the district court did not err in ruling that the applicant "committed fraud in connection with its trademark application when Dennis Torres [president of trademark applicant] represented that, to 'the best of his knowledge and belief no other person, firm, corporation, or association ha[d] the right to use' the Angel Flight mark." *Angel Flight of Ga., Inc. v. Angel Flight Am.*, Inc., 522 F.3d 1200, 1211 (11th Cir. Ga. 2008). The Tenth Circuit affirmed a jury verdict of fraud where the applicant signed the oath required under Section 1051 despite knowing that another entity had the right to use a mark in commerce. *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1226-27 (10th Cir. Kan. 2000).

Despite the uncompromising duty of frank and truthful disclosure imposed by the Lanham Act, DS breached that duty by failing to disclose in its trademark application that our school was using, and had a right to use, the "CATIA" mark in Class 41.

Even if this Court were to find that DS did not commit fraud in acquiring registration of the CATIA mark in Class 41, DS's act of filing a trademark infringement suit against our school after DS and its partners had been advertising on our school's website for several years nevertheless constitutes "unclean hands."

In *Spinlife,* the Court held:

> If...a plaintiff brings suit "to browbeat and coerce" defendants allegedly using its mark, this action may also give rise to an affirmative defense of unclean hands. *Cf., Esquire, Inc. v. Esquire Slipper Mfg. Co.,* 243 F.2d 540, 545 (1st Cir.1957)

DS filed its lawsuit knowing that our school was the senior user of the CATIA mark in Class 41 (Education and Training), and knowing that it (DS) was advertising on our school's website, and had been doing so for five years. Dassault's lawsuit was not brought honestly and

in good faith, but was commenced as an anticompetitive weapon to drive our school out of business, thus eliminating our school as DS's competitor in the CATIA training market.

**2) DS Knowingly Made False Statements of Fact in Its Complaint So That DS Could Claim Statutory Damages and Attorneys Fees Under 17 U.S.C. § 504 And 505.**

In ¶17 of its February 2009 Complaint, DS specifically states:

> In 2003, Defendant Keith Childress, purchased one license for CATIA Version 5, Release 12. On information and belief, Defendant Childress and his company were able to crack and clone the Target IDs on the license and clone the software on twenty machines in order to train students on the software.

DS's claim that "In 2003, Defendant Keith Childress, purchased one license for CATIA Version 5, Release 12" is not stated as an allegation ("on information and belief"), it is stated as a fact.

I have entered into evidence a true copy of the Nov. 2001 IBM invoice I received when I purchased the CATIA V5 software, [DE:50,pg:13] which proves I purchased the CATIA V5 software in 2001, not in 2003 as DS's falsely claims. When I brought DS's false claim to the Court's attention, DS responded that its claim that I purchased CATIA V5 R12 in 2003 and began infringing on the CATIA V5 R12 copyright this "was an error" [DE:162,pg:12]. However, the facts prove otherwise.

In ¶(d) of the "Prayer for Relief" section of its Complaint, DS seeks, "statutory damages of $150,000 per act of infringement, costs of this action along with attorney's fees as is permitted under 17 U.S.C. § 504 and 505."

17 U.S.C. § 412 prohibits a party from collecting statutory damages or attorneys fees unless the copyrighted work is registered within three months of publication:

> no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for— (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

412's prohibition applies to domestic and foreign works: "Section 412 has no exception excusing foreign works from its mandate it requires registration to obtain statutory damages for both domestic and foreign works." *The Football Ass'n Premier League Ltd. v. YouTube, Inc.,* 633 F. Supp. 2d 159, 164 (S.D.N.Y. 2009)), *citing* 2 NIMMER ON COPYRIGHT § 7.16[C][1], at 7-183 (2008) ("the loss of remedies under Section 412 due to failure to register is applicable to works of foreign origin as well as to domestic works"); *Intercom Ventures, LLC v. City Media Plus EX-YU Streaming*, Case No, No. 12 C 10275 (ND Illinois Aug. 6, 2013) ("§ 412 provides that a copyright plaintiff seeking statutory damages or attorney fees must complete copyright registration before infringement occurs (or, for published works, within three months of first publication) regardless of the work's place of origin.")

In ¶19 of its Complaint DS alleges that our classroom computers contained CATIA V5 R14 software. Because CATIA V5 R14 was not registered until 5 years <u>after</u> it was published [**Exhibit C**], DS is not entitled to collect statutory damages or attorneys fees for our *alleged* infringement of the CATIA V5 R14 copyright.

CATIA V5 R12, however, <u>was</u> registered within three months of publication. Therefore, in order to claim statutory damages and attorney fees under 17 U.S.C. § 504 and 505 DS simply fabricated its claim that our school purchased CATIA V5 R12 in 2003 and began infringing on DS's CATIA V5 R12 copyright.

DS does not provide any explanation as to how this so-called "error" occurred. Inasmuch as CATIA V5 R12 was published in September 2003, this "error" could not have been the result of a "typo", as it would have been impossible for our school to purchase CATIA V5 R12 in 2001.

DS lied in its Complaint in order to collect statutory damages and attorneys fees, and

then lied in its Response brief [162] to cover its tracks. This was not a harmless *error*, as DS now claims; it was a calculated plan put into motion after my Nov. 2008 phone conversation with Mr. Forbis in which I informed Mr. Forbis that my family and I could not afford legal representation. DS *mistakenly* believed that my family and I were defenseless, thus leaving DS free to *manufacture* a fictitious Complaint that we would be powerless to defend against. DS thought we would agree to stop providing CATIA training and stop using the CATIA mark in order to settle the lawsuit, thereby achieving its goal of eliminating my family's school as DS's competitor in the CATIA training market; a goal DS was still trying to achieve four years later in its nonsensical proposed settlement agreement.

**3) As a Means of Fabricating DS's Damages, DS's Andrew Clarkson Knowing Made False Statements as Fact in his December 20, 2009 Declaration.**

In December 2009 the Court entered a Default Judgment against me and my family's school and ordered DS to submit its list of damages. DS filed its list of damages under seal on December. 21, 2009 [DE:42]. DS's damages were based on the December. 20, 2009 Declaration of DS's Worldwide Anti-Piracy and Compliance Program Manager Andrew Clarkson, also filed under seal with DS's list of damages. [DE:42, Ex. B]

Despite the fact that DS's Feb. 2009 Complaint specifically states that we purchased the CATIA V5 R12 software in 2003, when calculating DS's damages 10 months later, Mr. Clarkson declares under the penalty of perjury that our school does <u>not</u> own a single CATIA license:

> Defendants Childress d/b/a Practical Catia Training have been illegally teaching classes on how to use Dassault's CATIA software. Defendants [sic] does not have a license to use CATIA. Dassault has lost licensing royalties as a result of Defendants' illegal use of CATIA. [¶5]

Despite the fact that DS's Feb. 2009 Complaint specifically alleges that we began infringing on DS's CATIA V5 R12 copyright in <u>2003</u>, when calculating DS's damages 10

months later, Mr. Clarkson declares under the penalty of perjury that we began infringing on DS's CATIA copyright in 2000.

> I understand Defendants have been using illegal copies of CATIA since at least 2000. On information and belief Defendants were operating at least 20 computers with illegal copies of CATIA operating thereon. [¶6]

In calculating DS's damages Mr. Clarkson declares under the penalty of perjury that the CATIA license installed on our classroom computers is worth $8,047 per license, per year. [¶8]

None of Mr. Clarkson's declarations are true. First, as the evidence on the record indicates, our school purchased a CATIA V5 license in 2001 for a onetime price of $7995, and the license is not due to expire until 2037. Therefore, Mr. Clarkson's declaration that our school does not own a CATIA license is false, as is Mr. Clarkson's declaration that the CATIA license installed on our training computers is worth $8,047 per license, per year.

Next, as the evidence on the record indicates, during the time in which Mr. Clarkson declares our school was infringing on DS's copyright (2000-2006), our school received hundreds of CATIA licenses from DS's authorized agents IBM and MSC as part of the Business Agreements each initiated with our school.

Finally, as the evidence on the record indicates, DS's authorized agent MSC gave us permission to install our CATIA license on our training computers as an *authorized* workaround to the technical problem we were having with the MSC supplied licenses. Therefore, Mr. Clarkson's declaration that our school was "operating at least 20 computers with illegal copies of CATIA operating thereon" [¶6] is false.

To fabricate DS's list of damages, DS's Mr. Clarkson committed perjury by:

- falsely declaring that our school does not own a single CATIA license;
- falsely declaring that our school began infringing on DS's CATIA copyright in

2000;

- falsely declaring that the cost of the license installed on our training computers was $8,047 per license per year, and
- falsely declaring that, "for the period 2000-2006" our school "should have paid Dassault a licensing fee of **$965,640**." [¶10]

This Court accepted Mr. Clarkson's false declarations as true, and ordered our school to pay DS **$964,465** plus attorneys fees.

**C) DS's Copyright Infringement Claims are Varred Because DS Failed to Join a Necessary Party(ies).**

Rule 19(a)(1)(A) requires that a party be joined if "in that person's absence, the court cannot accord complete relief among existing parties."

According to Sixth Circuit precedent, if in a party's absence, the court cannot accord complete relief among existing parties "the party is thus one to be joined if feasible." *Keweenaw Bay Indian Community v. State*, 11 F. 3d 1341 – (6th Circuit 1993).

I provided evidence that during the time in which DS alleges our school was infringing on its CATIA copyright (2000-2006), DS's authorized agents IBM and MSC provided our school with hundreds of CATIA V5 licenses beginning in 2000 and ending in Feb. 2007, four months after the Oct. 2006 FBI raid that provides the sole basis for DS's copyright infringement claim [*see* ¶19 of DS's Complaint]

While DS does not deny the authenticity of these licenses, DS does deny that IBM and MSC had the authority to provide our school with the CATIA V5 software/licenses for use in our training, or to allow our use of the workaround to the technical problems we were experiencing with the IBM/MSC provided CATIA licenses. [DE:108, ¶¶64,91,107,108]

Therefore, any liability in this matter rests with IBM and MSC, not with my family's school. DS chose not to pursue claims against IBM and MSC because IBM and MSC have the

means to defend themselves, while DS *believed* my family's little "ma and pa" school did not. However, this lawsuit has never been about DS protecting its intellectual property rights (copyright/trademark); this lawsuit was commenced and prosecuted solely as a means to eliminate my family's school as DS's competitor in the CATIA training market.

When this Court entered final Judgment, the Court ordered me to pay DS **$964,465** in damages plus attorneys fees. In August 2010, this Court granted my request to proceed in forma pauperis on appeal [DE:72], and in January 2013 our family home was sold at sheriff's sale because we could no longer afford to make the payments [**Exhibit M**].

In the unlikely event DS prevails on its copyright infringement claims, there is no way that I can afford to satisfy a damage award in any amount. Therefore, "the court cannot accord complete relief" to DS unless IBM and/or MSC are joined. During the January 10, 2013 Scheduling Conference, this Court held that no other parties are allowed to be joined in this matter; therefore, DS's copyright infringement claim should be dismissed.

## CONCLUSION

For the reasons contained herein, and based on the extensive record in this case, I respectfully request that this Honorable Court cancel DS's Class 41 CATIA trademark registration (#3754953); grant trademark registration to "Practical CATIA Training" and to "practicalcatia.com" in Class 41; dismiss all counts of DS's lawsuit with prejudice; and award the relief sought in my Counterclaims.

Respectfully Submitted,
/s/ Keith Childress
Keith Childress

620 Georgia Ave.
Sewanee, TN 37375
(586) 693 2585

Exhibit A



**Exhibit A1**

THE TECHNOLOGICAL PARTNER FOR YOUR SUCCESS

Dassault Systemes offers industrialists a communication environment to enable them to build their Digital Enterprise by concurrently defining, simulating, managing and optimizing their products, their manufacturing processes and their plants, thus covering the entire product life cycle.



Dassault Systemes' vision of The Digital Enterprise is an information technology infrastructure enabling a company, its partners and customers to create products through simultaneous engineering, to share and coordinate information about these products and to graphically display related data throughout the company.

Dassault Systemes' offering addresses the Design-Centric market with SolidWorks® and the Process-Centric market with global integrated Solutions such as:

***CATIA*® *Solutions*** to manage every stage of the product life, from concept to product in operation. With CATIA® Digital Mock-Up, customers use the computer to create virtual prototypes to replace costly physical mock-ups and reduce time-to-market.

***CATWEB*™ *Extranet/Intranet Solutions*** to provide constant, real-time access to graphical representations of the product for everyone everywhere.

***DENEB*™** to deliver integrated solutions for interactive, physics-based, 3D simulation, validation, off-line programming and process visualization. Customers reach a global productivity to succeed in their ongoing business transformation efforts.

***ENOVIA*™ *PDM II Solutions*** to optimize products at the development stage, to ensure product and process data management and to provide project team members with an unparalleled knowledge. ENOVIA enables customers to create better products and manage products better.

Our Solutions dedicated to five market segments (Aerospace, Automotive, Fabrication & Assembly, Consumer Goods, Plant Design and Shipbuilding) are developed for each "profession", and thus responds to each customers' needs. Dassault Systemes works closely with these customers to help improve their competitiveness in their respective markets – making Dassault Systemes the Technological Partner of their Success.

CATIA SOLUTIONS ENOVIA PDM SOLUTIONS CATWEB Deneb SolidWorks

www.dsweb.com • www.catia.ibm.com • www.enovia.com • www.deneb.com • www.solidworks.com • www.dassault-data-services.fr

CATIA® is a registered trademark of Dassault Systemes • CATWEB™ is a trademark owned by Dassault Systemes and is used under license • ENOVIA™ is a trademark owned by Dassault Systemes and is used under license
DENEB™ is a trademark owned by Deneb Robotics, Inc. and is used under license • SolidWorks® is a registered trademark of SolidWorks Corporation.
Images courtesy of [illegible] – Dassault Systemes Communication Division – July 1998

Copyright United States Copyright Office

Exhibit B

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = TX0005856769
Search Results: Displaying 1 of 1 entries

previous | next

Labeled View

***CATIA V5R12.***

| | |
|---|---|
| **Type of Work:** | Computer File |
| **Registration Number / Date:** | TX0005856769 / 2003-11-21 |
| **Application Title:** | CATIA: version 5, release 12. |
| **Title:** | CATIA V5R12. |
| **Description:** | Computer program. |
| **Notes:** | Printout only deposited. |
| **Copyright Claimant:** | Dassault Systemes |
| **Date of Creation:** | 2003 |
| **Date of Publication:** | 2003-09-19 |
| **Basis of Claim:** | New Matter: revisions & additions. |
| **Names:** | Dassault Systemes |

previous | next

| **Save, Print and Email (Help Page)** | |
|---|---|
| Select Download Format | Full Record — Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright United States Copyright Office

**Exhibit C**

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = TX0007143592
Search Results: Displaying 1 of 1 entries

previous | next

Labeled View

***CATIA Version 5, Release 14 Program.***

**Type of Work:** Computer File
**Registration Number / Date:** TX0007143592 / 2009-11-18
**Application Title:** CATIA Version 5, Release 14 Program.
**Title:** CATIA Version 5, Release 14 Program.
**Description:** Electronic file (eService)
**Copyright Claimant:** DASSAULT SYSTEMES, S.A. Address: 10 rue Marcel Dassault, Veliza Villacoublay, 40501-78946, France.
**Date of Creation:** 2004
**Date of Publication:** 2004-11-05
**Nation of First Publication:** United States
**Authorship on Application:** DASSAULT SYSTEMES, S.A., employer for hire; Domicile: France. Authorship: computer program.
**Rights and Permissions:** Rodolphe Pantanacce, DASSAULT SYSTEMES, S.A., 10 rue Dassault, Velizy Villacoublay, 40501-78946, France, (331) 616-2412 x9, rodolphe.pantanacce@3ds.com
**Names:** DASSAULT SYSTEMES, S.A.

previous | next

| **Save, Print and Email (Help Page)** | |
| --- | --- |
| Select Download Format | Full Record — Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright |

INTERNET ARCHIVE WaybackMachine
http://www.practicalcatia.com/v5.html Go
44 captures
8 Apr 01 - 13 Aug 12
MAR APR JUN
8
2000 2001 2002

Keith Childress'
# Practical Catia
Training

Exhibit D

## CATIA V5 FAQ

Menu



I began using CATIA V5 in February of 2000. At first I was a bit frustrated because V5 didn't look or behave like CATIA V4. The design methodology is different, so that's taken some getting used to.

During the past year, I have really come to appreciate the software. I now enjoy using it more than V4. However, there are still things I could do in V4, that I can not do in V5.

While the CATIA V5 software has been available for more than a year now, it is, in reality, still in development. As of this writing, CATIA V5 R5 is the latest release. It is my understanding that V5 will not reach full maturity until release 8 or 9. More likely beyond.

In recent months, many questions have arisen regarding CATIA V5. As a long time CATIA user and instructor, I thought it might be helpful if I put together this FAQ page to help answer some of the more commonly asked questions regarding CATIA V5. I hope you find it helpful. Please check back, as I will be updating this page as new information becomes available.

Test-drive CATIA V5 from your PC

**What is CATIA V5?**

Here's what IBM has to say about CATIA V5, "CATIA Version 5 (V5) is a completely re-engineered, next-generation family of CAD/CAM/CAE software solutions for product lifecycle management from IBM. It helps you, and companies of all sizes, leverage the benefits of e-business to increase your competitiveness and responsiveness to your customers, and to improve your time to market.

Through its exceptionally easy-to-use state of the art user interface, CATIA Version 5 delivers innovative technologies, for maximum productivity and creativity from product definition through to product in service."

**Why the need for V5?**

One answer is competition. While functionally I think CATIA V4 is still the best overall CAD system in the world, it's user interface has grown tired. CAD systems like ProE, AutoCAD, and Unigraphics have all leapfrogged over CATIA V4 when it comes to the user interface. CATIA V5 provides a very "slick", Windows-type interface. This, however, is an oversimplification of a complex issue. In reality, there are many reasons why the switch to V5 is necessary. **Ulrich**

**Sendler**, a leading authority on 3D CAD, has written a white paper on "state-of-the-art of 3D CAD in an Internet / intranet-based world". This is a must-read for anyone interested in CATIA V5, the evolution of 3D CAD, and where this technology is headed.

**Is CATIA V5 going to replace Catia V4?**

In my opinion, eventually, yes. But not in the foreseeable future. Daimler-Chrysler is undergoing early testing of CATIA V5 in something called the "Powertrain Pilot Project". They have identified a significant number of, what they call, "showstoppers" thus far with the CATIA V5 software. Dassault has indicated that many of these "showstoppers" will be corrected in the next couple of releases. However, a significant number of the "showstoppers" do not have a target "fix" date yet. Also, Daimler-Chrysler has requested that additional functionality be added to CATIA V5. I'm not aware of a target date for this to occur.

In my opinion, Daimler-Chrysler is at least two years away from widespread use of CATIA V5. I'm not sure what Boeing, and some of the other major manufactures' intensions are, but from what I understand, it's going to be quite some time before any major migration to V5 takes place. I don't expect suppliers to make the move to V5 until the OEM's force them to.

**Are my V4 skills going to be obsolete?**

Absolutely not. When I first sat down at a V5 workstation, it seemed like a totally new CAD system to me. V5 was at release two at the time. Since then, CATIA V5 has matured considerably. Much of the V4 functionality has been added to V5. The user interface and design methodology are different, so it will take some getting used to. If you've used the "Dynamic Sketcher" in V4, you have a head start on V5. Unlike CATIA V4, V5 has excellent HTML-based help files. So learning V5 is much easier than trying to learn V4. However, most companies cannot afford the time necessary to allow employees to train themselves, so count on taking some V5 training.

**I'm using another CAD system, but I'd like to learn CATIA. Should I take V4 or V5 training? Or should I wait?**

If you want to get a CATIA job now, or in the foreseeable future, you'll need to learn CATIA V4. There are only a handful of companies worldwide using V5, so V5 jobs are going to be scarce for the next couple of years. Much of what you learn in V4 will be applicable in CATIA V5.

You might consider taking CATIA V4 training now, get a CATIA job, and let whoever you're working for pay for your V5 training in a couple of years.

**Do you offer CATIA V5 training?**

Yes, I've spent the last year developing my CATIA V5 training. I still teach V4 in my evening class, as there is very little demand for V5 at this time. However, I am offering onsite V5 training to my corporate clients. As well as one-on-one day or evening V5 training to individuals or groups who have a need, or desire, to learn V5 now. Please call for details.

Test-drive CATIA V5 from your PC

---

DASSAULT SYSTEMES
CATIA V5
*Unleash creativity and innovation*
IBM

INTERNET ARCHIVE WaybackMachine
http://www.practicalcatia.com/v5_demo.html Go
54 captures
8 Apr 01 - 6 Jun 12
MAR APR AUG
8
2000 2001 2002
Close
Help

Exhibit E

Keith Childress'

**Practical Catia**

Training

## CATIA V5 Demo

Menu

---

# *Want to try CATIA Version 5?*

You are about to get your first experience with CATIA Version 5.

In the following scenario, you will be shown a typical CATIA Version 5 sequence of operations. Screen shots will appear exactly as they would if you were interacting with CATIA itself.

You can either work as in CATIA Version 5 (select in the redlined zone) or navigate with the back & next arrows:







Try now!

**Part Design Demo**

**Drawing Generation Demo**

**Part Analysis Demo**

**Assembly Analysis Demo**

---

The CATIA V5 Demo's appear courtesy of IBM

**Unknown**

**Exhibit F**

**From:** Keith [keith@practicalcatia.com]
**Sent:** Tuesday, June 26, 2001 6:35 AM
**To:** pbarton1@us.ibm.com
**Subject:** FW: good sight

Hi Pam,

I received the following email yesterday evening (see below). It is indicative of the type of response I get to my web site. I'm afraid it's also indicative of the type problems currently facing small businesses such as mine.

It would sure help out if Dassault and IBM would release a student version of Catia V5. A version that would make it cost effective for small businesses and students teach and learn and this new technology. Other major CAD software companies offer student versions of their software. Do you know why Dassault/IBM do not? Also, do you know if there are any plans in the works to reverse this policy?

Thank you for your time.

Cheers,
Keith

-----Original Message-----
From: mark miller [mailto:griffion@mediaone.net]
Sent: Monday, June 25, 2001 4:40 PM
To: info@practicalcatia.com
Subject: good sight

I liked your catia demo i did not realize how close to solidworks catia is in its modeling if i had not just lost my job i would have considered taking your class thank for your web sight :-)

INTERNET ARCHIVE WaybackMachine
http://www.practicalcatia.com/welcome.html Go
18 captures
5 Feb 02 - 6 Feb 05
JAN FEB APR
2001 5 2002 2003

Exhibit G

Keith Childress'
# Practical Catia
Training

## Welcome

Menu

P R A C T I C A L C A T I A

FREE Catia V5 software



Hi, my name is Keith Childress. I am the founder, and primary instructor of the Practical Catia Training course. I'd like to welcome you to my web site, and thank you for taking the time to pay us a visit.

I've recently "re-tooled" my **Practical Catia Training** course. My students now do several (product) design exercises from my 20+ year career as a designer. I've tracked down several of the components I've designed over the years, polished them up, and turned them into **Practical Catia Training** design exercises. We do plastics design, sheet metal design, Body-In-White, etc. We discuss several manufacturing methods as well, including: plastic injection molding, sheet metal stamping, roll-forming, prog-dies, etc.

My intent is to not just teach the Catia v4 and/or v5 software, but to try to pass on to my students some of knowledge I've accumulated over the past twenty years.

While the aforementioned design exercises lean toward product design, the methodology for using the Catia software applies to all other disciplines as well.

Click here for

If you've visited my web site before, welcome back. If this is you first visit, please be sure to take your time and have a good look around. There's plenty of information to be found here.

Please use the pull down menus located near the top of each page to navigate the website, or take the guided tour that starts at the bottom of this page. Soon you will discover all of the benefits that **Practical Catia Training** has to offer. In addition, you'll find an excellent Job Search page, as well as a CATIA V5 FAQ page. You can even test-drive CATIA V5, or checkout the latest Salary Survey from **CATIA Solutions Magazine**.

If, after perusing the **Practical Catia Training** website, you have further questions, please feel free to give me a call at (810) 794-0370, or send an email to keith@practicalcatia.com.

Thank you again for taking the time to visit the **Practical Catia Training** web site. I hope you will find your visit to be informative and beneficial.

I look forward to hearing from you very soon.

Cheers, Keith

PS Don't miss our "Monthly Specials" page for up to 1/2 -off the cost of tuition.

---

Catia On The River
Your Catia training "vacation" awaits you.

---

**Take the Practical Catia Training Tour**
**Next >>**

---

INTERNET ARCHIVE WaybackMachine
http://practicalcatia.com/freecatiav5.htm Go
40 captures
22 Oct 01 - 24 Jun 09
SEP OCT FEB
22
2000 2001 2003

Keith Childress'
# Practical Catia
Training

**Exhibit H**

## FREE Catia V5 Software Offer

Menu

---

When you sign up for one of my **Catia v5** classes, you will receive, **FREE OF CHARGE**, a "hobbled code" version of the **Catia v5** software for installation on your home or office computer ***.

The software is fully functional, with the exception that you can not print, or save your work. However, it is suitable for training purposes.

You will need Microsoft Windows NT Workstation Version 4.0 with Service Pack 4, Service Pack 5, or Service Pack 6a, or Windows 2000 Professional.

You will also need an Ethernet Card ($15 at CompUSA). Click here to download the "target ID" utility. Once downloaded, click on the file (i4tgtid.exe) to determine the target ID of your Ethernet card. You can send the target ID to me in an email, and I will order your license from **IBM**.

Minimum system requirements: 266 MHz (366+ preferred) Pentium or Celeron processor, 128mg ram (256+ preferred), 8mg graphics card (32+ preferred).

*** This is a limited time offer, first come, first serve.

**Exhibit I**

# REQUEST FOR EXTENSION OF PROTECTION

## SERIAL NUMBER: 79069782

## FILING DATE: 12/19/2008

---

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **MARK SECTION** | |
| IMAGE | \\TICRS\EXPORT7\IMAGEOUT7\790\697\79069782\xml1\APP0002.JPG |
| COLLECTIVE, CERTIFICATE OR GUARANTEE MARK | NO |
| MARK IN STANDARD CHARACTERS | YES |
| MARK IN COLOR | NO |
| THREE DIMENSIONAL MARK | NO |
| SOUND MARK | NO |
| THE WORDS CONTAINED IN THE MARK HAVE NO MEANING | YES |
| TM IMAGE: COLOR | NO |
| IMAGE FILE NAME | \\TICRS\EXPORT7\IMAGEOUT7\790\697\79069782\xml1\APP0002.JPG |
| TYPE (IMAGE TYPE) | JPG |
| TEXTUAL ELEMENTS OF MARK | CATIA |
| **HOLDER DETAILS** | |
| CLIENT IDENTIFIER | 405693 |
| NOTIFICATION LANGUAGE | FRENCH |
| NAME | DASSAULT SYSTEMES |
| ADDRESS | 9 Quai Marcel Dassault |
| | F-92150 SURESNES |
| COUNTRY | France |

| | |
|---|---|
| ENTITLEMENT ESTABLISHMENT | France |
| LEGAL NATURE | Société anonyme de droit français |
| LEGAL NATURE: PLACE INCORPORATED | France |
| CORRESPONDENCE INDICATOR | YES |

## LIMITATION DETAILS

| | |
|---|---|
| DESIGNATED CONTRACTING PARTY CODE | United States of America |
| GOODS AND SERVICES (HEADER) | List limited to services in classes 38 and 41. |

## BASIC GOODS AND SERVICES

| | |
|---|---|
| VERSION OF NICE CLASSIFICATION USED | 9 |
| NICE CLASSIFICATION | 09 |
| GOODS AND SERVICES | Software for graphic visualization in two or three dimensions, particularly for computer-aided design, animation, simulation, publication, document searches, defeaturing, remote monitoring and surveillance; imaging software; maintenance software; presentation software for presenting knowledge in the field of industrial products, their manufacture, use, maintenance and documentation; game design software; gaming software; data exchange software; educational software; training software; teaching software; CDs, DVDs, minidisks and floppy disks. |
| NICE CLASSIFICATION | 16 |
| GOODS AND SERVICES | Files, printed matter, newspapers, books, periodicals; programming manuals; users' handbooks for computer programs; photographs, printing blocks; instructional and teaching material (except apparatus). |
| NICE CLASSIFICATION | 38 |
| GOODS AND SERVICES | Telecommunications; message sending; electronic transmission of data, images and documents via computer terminals and any other transmission systems such as waves, cable, satellite or Internet; communications via computer terminals; computer aided message or image transmission services; monitoring, sending and receiving of data, signals and information via data communications, by computer or using telecommunications apparatus and instruments; exchange of computerized data; electronic mail services; electronic messaging services; transmission of information held in data banks and image banks; information on telecommunications; rental of message sending apparatus; routing services for telecommunications; electronic bulletin board services (telecommunications); rental of message sending apparatus; facsimile |

| | |
|---|---|
| | transmission; news and information agencies; transmission of computer programs accessed using access codes via personalized network page interfaces; transmission via computers and communications networks of periodicals and other publications on the subject of the Internet; communication (transmission) services in real time between computer users on the Internet and the world wide web; telecommunication services provided via the Internet. |
| NICE CLASSIFICATION | 41 |
| GOODS AND SERVICES | Training services in respect of software and information technologies; services for online training and courses on software; arranging and conducting of conferences on software and computer program and system development; training in designing products and services using three-dimensional representations in real time. |
| NICE CLASSIFICATION | 42 |
| GOODS AND SERVICES | Computer programming services; rental of computers, computer programs or peripheral equipment for computers; engineering and consultation services in connection with design of goods and means of production or operational sequencing of industrial processes; software design, maintenance and updating services; technical assistance services enabling software to be personalized so as to fit the particular needs arising from a client's activities or working methods; consulting services in the field of computing. |

## PARIS PRIORITY DETAILS

| | |
|---|---|
| PARIS PRIORITY CODE: | France |
| PARIS PRIORITY APPLICATION NUMBER | 08 3 584 516 |
| PARIS PRIORITY APPLICATION DATE | 06/26/2008 |

## BASE REGISTRATION DETAILS

| | |
|---|---|
| BASE REGISTRATION NUMBER | 08 3 584 516 |
| BASE REGISTRATION DATE | 11/28/2008 |

## REPRESENTATIVE DETAILS

| | |
|---|---|
| CLIENT IDENTIFIER | 651619 |
| NAME | CABINET REGIMBEAU |
| ADDRESS | 139 rue Vendôme |
| | F-69477 LYON CEDEX 06 |
| COUNTRY | France |

## INTENT TO USE GROUP

| | |
|---|---|
| CONTRACTING PARTY CODE | United States of America |

## DESIGNATIONS

| | |
|---|---|
| DESIGNATIONS UNDER THE PROTOCOL | United States of America |

## INTERNATIONAL REGISTRATION DETAILS

| | |
|---|---|
| INTERNATIONAL REGISTRATION NUMBER | 1004961 |
| INTERNATIONAL REGISTRATION DATE OF MARK | 12/19/2008 |
| INTERNATIONAL REGISTRATION EXPIRY DATE | 12/19/2018 |
| EFFECTIVE DATE OF MODIFICATION | 12/19/2008 |
| NOTIFICATION DATE | 07/16/2009 |
| DATE OF RECORDAL IN INTERNATIONAL REGISTER | 06/29/2009 |
| IB DOCUMENT ID | 476779101 |
| OFFICE OF ORIGIN CODE | France |
| OFFICE REFERENCE | 79069782 |
| TRANSACTION TYPE VALUES | Initial Designation |
| ORIGINAL LANGUAGE | FRENCH |
| INSTRUMENT UNDER WHICH CONTRACTING PARTY IS DESIGNATED | Protocol |
| HOLDER REFERENCE | M225872 OP/PB |
| DURATION OF MARK (YEARS) | 10 |

# CATIA

**Exhibit J**

**Subject:** Keith Childress and Practical CATIA Training: An Invitation
**From:** Keith <kchildress@comcast.net>
**Date:** 8/21/2012 8:16 AM
**To:** CLARKSON Andrew <Andrew.CLARKSON@3ds.com>
**CC:** charles.edelstenne@3ds.com, rodolphe.pantanacce@3ds.com, Joe.HUTCHESON@3ds.com, David.PENN@3ds.com, gef@raderfishman.com, "Douglas P. LaLone" <dpl@raderfishman.com>, Jennifer Wunsche <mjw@raderfishman.com>

August 21, 2012
Andrew Clarkson
Dassault Systemes
Paris, France

RE: Keith Childress and Practical CATIA Training

Hi Andy,

It's been one week since we sat down to breakfast at the Monteagle Inn. What a day that was. 12 hours sitting on the porch of the Inn talking...well, mostly me talking and you listening. 😊 No lunch and barely taking time to go to the bathroom. The time just flew by.

I want you to know how much I appreciate you taking the time from holiday to travel all the way from France to "Nowheresville" Tennessee to sit and talk to me. That meant a lot to me. Regina said to tell you Hi, and that she is sorry she was busy working and didn't get to see you while you were here.

When you returned home, you sent me an email saying that you thought our time together was productive. While I agree that we accomplished a lot, in my opinion it wasn't nearly enough.

As you know, I have literally compiled a suitcase full of evidence over the past 12 years that I'd hoped to share with you. I've been waiting six years to show this evidence to Dassault, but you and I barely had time to scratch the surface.

I first tried to share this information with Dassault in 2008. When that failed, I tried to do it through Dassault's (USA) attorneys, first via telephone with Glenn Forbis in November 2008, then via letter to Doug LaLone in November 2009 (see attached). Having had no success, I next tried to share this information through affidavits and in several of my legal pleadings. This also proved futile. Finally, having failed in all my attempts, I sent this information directly to Dassault's upper management in February of this year. When that failed, I was forced to file my lawsuit against Dassault, which may be at least partially responsible for your visit to Tennessee to discuss the case.

Unfortunately, two days didn't give us much time to go through evidence that has taken me over 12 years to amass. I know I took a lot of time talking about me and my family and why we started our school - and while you and I agree it was important information for you to know - it also ate into our time to discuss the specifics of the case.

At the conclusion of your visit, you said you were going to take the information you gleaned from our meeting back to France and explain it to the responsible parties at Dassault. While I believe you will do your best to accomplish this, I also believe it is an impossible task.

Inasmuch as you and I only scratched the surface of the evidence I have collected, you only know a portion of what really transpired. In my opinion it is very dangerous for you to try to explain this situation to Dassault's management when you don't have all the facts.

In your last email you said, "'We' [people in general] make many assumptions throughout our lives - the skill is to be able to challenge those assumptions and be prepared to accept that in many cases the assumptions are

wrong." I agree completely with this statement, however, the only way to challenge assumptions is with facts.

I believe the damage done in this matter has been caused by everyone making decisions that were based on assumptions that were based on inaccurate and/or incomplete information. I would like to try to put a stop to this once and for all, and before anyone else gets hurt.

What I propose is that I come to France with my suitcase full of evidence. All the key players can gather in a conference room and I can present my evidence to Dassault. Afterward, Dassault's management can ask me any questions they like. I believe that by the time I leave France, everyone will understand exactly what has transpired in this matter, and that both of our lawsuits will be resolved.

Please let me know your thoughts on this.

Sincerely,
Keith Childress

PS I have copied everyone that I have email addresses for because I am extending an open invitation that I hope everyone will accept.

Attachment

— Attachments: ————————————————

Rule_26(f)_letter_11-09-09.pdf 104 KB

**Exhibit K**

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement"), effective on the last date of execution hereof ("Effective Date"), is made by and between Dassault Systèmes S.A., a corporation of France (hereinafter "Dassault") and Keith Childress dba Practical Catia, an individual (hereinafter "Childress") (each a "Party" and collectively, the "Parties").

WHEREAS, Dassault filed a lawsuit against Childress on February 12, 2009 in the United States Federal Court in the Eastern District of Michigan (the "Court") identified as Case No. 09-CV-10534, alleging that Childress had violated Dassault's copyrights in its CATIA software and infringed upon Dassault's CATIA trademark ("Dassault's Counts");

WHEREAS, Childress denied Dassault's allegations and filed counter-claims against Dassault on various grounds ("Childress' Counterclaims") (collectively, Dassault's Counts and Childress' Counterclaims are referred to herein as the "Lawsuit");

WHEREAS, Childress acknowledges that Dassault is a moral and conscientious company and that Dassault has pursued the Lawsuit against Childress in good faith to protect its intellectual property;

WHEREAS, Dassault acknowledges that Childress did not, through the actions alleged by Dassault in the Lawsuit, intend to harm Dassault and that such actions may have been encouraged by unauthorized actions of various third-parties; and

WHEREAS, the Parties now wish to resolve the Lawsuit.

NOW, THEREFORE, in reliance upon the above recitals and in consideration of the mutual covenants contained herein, the sufficiency of which is hereby acknowledged, the Parties AGREE as follows:

1. The Parties each agree to dismiss their claims and counter-claims against each other by jointly executing the Stipulation of Dismissal with Prejudice that is attached hereto at Exhibit A and approving the form of the proposed Order of Dismissal with Prejudice that is attached hereto at Exhibit B contemporaneously with the execution of this Agreement. Dassault will file the Stipulation of Dismissal with Prejudice (Exhibit A) and the proposed Order of Dismissal with Prejudice (Exhibit B) promptly after execution of this Settlement Agreement by Childress.

2. Each Party on behalf of itself and its present and former members, officers, employees, directors, attorneys, agents, representatives, licensees, direct and indirect parent companies, subsidiaries and affiliates, successors, assigns, heirs and personal and legal representatives hereby releases and forever discharges the other Party and present and former members, officers, employees, directors, attorneys, agents, representatives, licensees, direct and indirect parent companies, subsidiaries and affiliates, successors, assigns, heirs and personal and legal representatives from any and all claims, counterclaims, liabilities, obligations, demands, actions and causes of action of every

kind, nature or description, whether known or unknown, including all costs and attorney fees associated therewith that were alleged or could have been alleged relating to the subject matter of the Lawsuit (including Dassault's Counts and Childress' Counterclaims), the Parties' dispute and this Agreement arising prior to the Effective Date. The foregoing releases shall not extend to any of the Parties' obligations under this Agreement.

3. Childress agrees to immediately and forever cease, desist and refrain from:

a. any and all use, reproduction and/or distribution, for any purpose, of any software made by or sold by Dassault, including but not limited to any version of the CATIA software (including the single copy of CATIA currently licensed to G. Bailey & Associates for use on a single computer only), to the extent that such use or distribution is not specifically permitted by, and in compliance with the terms of, a separate, valid, and written license agreement issued by Dassault (or by IBM in the case of the single copy of CATIA currently licensed to G. Bailey & Associates);

b. taking any actions to cause or assist in causing the ability to use and/or distribute, without a valid and written license to do so, any software made by or sold by Dassault, including but not limited to any version of the CATIA software (including the single copy of CATIA currently licensed to G. Bailey & Associates for use on a single computer only); and

c. using any Dassault trademarks, including but not limited to CATIA, in any way and for any purpose and from participating in any business that uses the trademarks in any way and for any purpose, unless specifically licensed to do so in writing by Dassault and in compliance with Dassault's then-current guidelines concerning the usage of such trademarks, or unless such use is a merely descriptive "fair use" under the applicable trademark laws of the United States and is <u>not</u> part of the name of a business enterprise.

4. This Agreement shall remain confidential and neither Party shall publish or disclose any of the terms and conditions herein for any reason, with the following exceptions: (i) the Parties may disclose this Agreement to their professional advisors, e.g., attorneys, accountants; (ii) the Parties may disclose this Agreement in response to a court order or in response to a formal discovery request from a third-party in a legal proceeding; and (iii) either Party may disclose the terms of this Agreement after receiving the separate, prior written consent of the other Party.

5. This Agreement is the result of a compromise of legal positions by the Parties and shall never at any time for any purpose be considered an admission of any kind. Nor will this Agreement or any of the negotiations that preceded it be used as evidence of liability, or the absence of liability, of the Parties hereto in any subsequent legal proceeding of any kind, except a legal proceeding to enforce the terms of this Agreement.

6. This Agreement supersedes and cancels any and all previous agreements and understandings between the Parties pertaining to the subject matter hereof, and this instrument comprises the complete and final expression of the rights, obligations, duties and undertakings of the Parties and sets forth all consideration, covenants, undertakings and inducements pertaining hereto. The Agreement shall be construed as if the Parties jointly prepared it and any uncertainty or ambiguity shall not be interpreted against any Party.

7. In the event that any portion of this Agreement shall, for any reason, be held invalid or unenforceable, it is agreed that the same shall not affect any other portion of this Agreement, but that the remaining covenants and restrictions or portions thereof shall remain in full force and effect, and that if the invalidity or unenforceability is due to the unreasonableness of the covenants and restrictions, the covenants and restrictions shall nevertheless be effective as may be determined to be reasonable by a court of competent jurisdiction.

8. This Agreement may be modified only in writing, signed by the duly authorized representatives of all Parties.

9. This Agreement and all rights, duties, obligations and undertakings shall be binding upon and shall inure to the benefit of the Parties and their respective members, officers, directors, representatives, agents, employees, affiliates, related companies, successors, assigns, personal and legal representatives and heirs.

10. Each Party shall, without further consideration, execute any and all additional documents and take such further action as may be requested to effectuate the terms of this Agreement.

11. The Parties agree that the Court through, in particular, District Judge Lawrence P. Zatkoff or any successors to District Judge Lawrence P. Zatkoff or whomever else shall be appointed by the Court, shall retain jurisdiction over the enforcement of this Agreement and its terms. This Agreement shall be subject to, governed by and construed and enforced under the laws of the State of Michigan and the United States of America. The courts of the Sixth Circuit Court of Appeals, State of Michigan, and the United States District Court for the Eastern District of Michigan, shall have exclusive jurisdiction over any dispute relating to this Agreement, the Parties hereby irrevocably consenting to such jurisdiction.

12. In the event that either Party believes the other Party to be in breach of this Agreement, the non-breaching Party shall give written notice of the alleged breach to the breaching Party, and the breaching Party shall have thirty (30) days to correct the alleged breach. If the alleged breach continues after the end of the thirty (30) day notice period, and the Court determines that a Party has breached the Agreement, the non-breaching Party shall be entitled to a preliminary injunction, specific performance, an award of its attorneys' fees incurred in enforcing this Agreement and all other civil remedies available to it.

13. This Agreement may be executed in counterparts and as so executed shall constitute one agreement and shall be binding upon all Parties hereto, notwithstanding that all Parties who are signatories do not appear on the same page. Facsimile or PDF signatures on this Agreement shall be treated the same as original signatures.

**ACCEPTED AND AGREED:**

**DASSAULT SYSTÈMES, S.A.**

By: ______________________________

Title: ______________________________

Date: September _____, 2013

**KEITH CHILDRESS**
**dba PRACTICAL CATIA**

______________________________

Date: September _____, 2013

18014639.1

**Exhibit L**

**Subject:** Re: Dassault v. Childress - Draft Settlement Agreement
**From:** Keith <legal@practicalcatia.com>
**Date:** 9/22/2013 8:27 AM
**To:** "Forbis, Glenn" <gforbis@HDP.com>
**CC:** legal@practicalcatia.com

September 22, 2013

Dear Mr. Forbis,

I hope you and your family are enjoying a pleasant weekend.

I was surprised to receive your voicemail informing me that you had emailed a copy of the draft settlement agreement to me on Monday, September 16th. My understanding from the September 12th meeting was that you were going to send the draft settlement agreement to Dassault for its approval before sending it to me (approximately a week and a half later). Based on this timing, my wife and I decided to go on sabbatical.

I have reviewed the draft settlement agreement and find that much of the legal jargon is beyond my understanding. I will therefore seek the advice of a qualified professional regarding the language of the settlement agreement. However, from the language I do understand, it's clear that the draft settlement agreement does not comport with the discussion that took place between the parties on Thursday September 12, 2013.

The problems I see thus far are as follows:

A) I did not agree to the acknowledgement that *"Dassault is a moral and conscientious company and that Dassault has pursued the Lawsuit against Childress in good faith to protect its intellectual property."* If Dassault had followed through on the commitment its representative (Andrew Clarkson) made to me and my sister (*Dassault is a good company and will do the right thing to compensate me and my family for the injuries we have suffered*) then I could acknowledge Dassault is a *"moral and conscientious company"*, but that has not (yet) been demonstrated.

I understand from Mr. Pantanacce's comments during the Sept. 12th meeting that Dassault did not follow through on the commitment Mr. Clarkson made to me and my family because Dassault suspected the documents I presented to Mr. Clarkson during the August 2012 meeting were not genuine. He said Dassault's suspicions were based on my refusal to ship the documents to France after the August 2012 meeting with Mr. Clarkson, and because I have resisted Dassault's requests for discovery. As you know, I explained why I wouldn't ship the documents to France and why I have resisted discovery, neither of which have anything to do with the genuineness of the documents. As you are further aware, during the Sept. 12, 2013 meeting I provided evidence to you and Mr. Pantanacce that the documents I presented to Mr. Clarkson during the August 2012 meeting are 100% genuine. Therefore, there is absolutely no impediment to Dassault following through on the commitment Mr. Clarkson made on Dassault's behalf to compensate me and my family for our injuries. Furthermore, Mr. Pantanacce made a commitment to me during the Sept 12th meeting to explain the

situation to Dassault's management and to try to get Dassault to honor the commitment Dassault's Mr. Clarkson made to me and my sister. Mr. Pantanacce committed to personally contact me with Dassault's response. As of this writing, Mr. Pantanacce has not followed through on his commitment to contact me.

If Dassault honors the commitment its representative Andrew Clarkson made to me and my sister to compensate me and my family for our injuries, then Dassault will have proven that it *"is a moral and conscientious company and that Dassault has pursued the Lawsuit against* [me and my family] *in good faith to protect its intellectual property."* I will therefore be able to truthfully acknowledge this in the settlement agreement, and in public. However, until such time as Dassault honors its commitment(s), I cannot make such an acknowledgment in the settlement agreement, or in public, as it would not be true.

B) The language of the draft settlement agreement infers that I am currently violating Dassault's CATIA copyright ("Childress agrees to immediately and forever cease, desist and refrain from... " the actions listed under items 3a & 3b. Dassault is aware that I have never [intentionally] violated Dassault's CATIA copyright, and therefore, I have absolutely no intention of violating Dassault's CATIA copyright in the future. As such, there is no need for language in the settlement agreement that infers I am currently violating Dassault's copyright, or have ever done so in the past.

C) The language of the draft settlement agreement under item 3(c) would prohibit me from using the CATIA mark in our school name (Practical Catia Training) and website URL (practicalcatia.com). Inasmuch as we have been using the CATIA mark in the category of "Education and Training" (Class 41) since the mid-nineties, we own the rights to the CATIA mark in this category/class (based on "first use"). Furthermore, even if we didn't own the rights to the CATIA mark in Education and Training, Dassault acquiesced to our use of the CATIA mark by advertising on our school's website for several years. Based on these facts I did not agree, nor would I ever agree, to refrain from using the term CATIA in our school name or in our website URL. If Dassault wants us to stop using the CATIA mark in our school name and website URL, Dassault can make an offer to purchase our school.

D) Dassault's acknowledgement *"that Childress did not, through the actions alleged by Dassault in the Lawsuit, intend to harm Dassault and that such actions may have been encouraged by unauthorized actions of various third-parties"* does absolutely nothing to rebuild my damaged reputation (or the damaged reputation of my family's school) when the acknowledgement is buried in a settlement agreement that neither party can disclose. Under the circumstances, I believe a public acknowledgment is appropriate.

E) Dassault's statement that our "*actions may have been encouraged by unauthorized actions of various third-parties*" is wholly inaccurate. Dassault is well aware that Dassault and its authorized agents IBM and MSC Software initiated Business Agreements with our school, and that per these Business Agreements IBM and MSC Software provided our school with hundreds of CATIA licenses for use in our class and for our students to install on their home computers. Additionally, Dassault admits that it advertised on our school's website for several years. The Business Agreements that Dassault and its authorized agents IBM and MSC Software initiated with our school are an established fact. There is no "may" about it.

I will no doubt have more comments regarding the draft settlement agreement once I receive feedback from the qualified professional that will be reviewing the document.

When I returned home I had a letter waiting for me informing me the judge denied our request to modify the scheduling order. I think you may be right about the judge fast-tracking this case for trial. It is obvious that we have some work to do on the terms of the settlement agreement before we reach an agreement that is satisfactory to both parties. Until we are able to accomplish this task, and with deadlines looming, I have no choice but to continue to litigate the case.

I look forward to your reply.

Sincerely,
Keith Childress

+++++++++++++++++

On 9/16/2013 2:50 PM, Forbis, Glenn wrote:

> Mr. Childress:
>
> As discussed, we have prepared a draft Settlement Agreement to memorialize our agreement last Thursday to settle this case. Please review the attached draft Settlement Agreement and associated Exhibits A & B and provide me with any comments that you may have. I look forward to hearing from you and being able to wrap this matter up as soon as possible this week.
>
> In that I note that you have an automatic outgoing email message indicating that you will not be responding to emails until September 30, please confirm receipt of this email and the attached documents.
>
> Thank you.

**Exhibit M**

STATE OF MICHIGAN
St Clair County
February 07, 2013
Receipt # 3373

REAL ESTATE TRANSFER TAX
$136.40 - CO
$0.00 - ST
Stamp # 25285

Jay De Boyer Register Of Deeds
St Clair County, Michigan
Rec $31.00
Remon $4.00
Tax Crt $0.00
Recorded
February 07, 2013 02:15:01 PM
Liber 4356 Page 22-29
Receipt # 3373 SDH #2013003589
Seal
Liber 4356 Page 22

RECEIVED FEB 07 2013

393825F01 Childress - FC X

## SHERIFF'S DEED ON MORTGAGE SALE

This Indenture Made this 31st day of January, A.D. 2013, between, Steve Campau, a Deputy Sheriff in and for Saint Clair County, Michigan, whose address is 1170 Michigan Rd Port Huron, Michigan 48060-4658, party of the first part, and Federal Home Loan Mortgage Corporation, whose address is c/o Trott & Trott 31440 Northwestern Highway, Suite 200, Farmington Hills, Michigan 48334-2525, party of the second part (hereinafter called the grantee).

WITNESSETH, That Whereas a certain mortgage made by Keith D. Childress, an unmarried man, original mortgagor(s), to Mortgage Electronic Registration Systems, Inc., Mortgagee, dated July 21, 2003, and recorded on September 25, 2003 in Liber 2874 on Page 297, and assigned by said Mortgagee to Bank of America, N.A. as assignee as documented by an assignment dated December 14, 2011 recorded on December 21, 2011 in Liber 4210 on Page 93, in Saint Clair county records, Michigan and

WHEREAS, said mortgage contained a power of sale which has become operative by reason of a default in the condition of said mortgage, and

WHEREAS, no suit or proceedings at law or in equity have been instituted to recover the debt secured by said mortgage or any part thereof, and

WHEREAS, by virtue of said power of sale, and pursuant to the statute of the State of Michigan in such case made and provided, a notice was duly published and a copy thereof was duly posted in a conspicuous place upon the premises described in said mortgage, that the said premises, or some part of them, would be sold at 1:00 PM on the 31st day of January, A.D. 2013, at public vendue, that being the place of holding the Circuit Court for Saint Clair County where the premises are situated and

WHEREAS, pursuant to said notice I did, at on the day last aforesaid, expose for sale at public vendue the said lands and tenements hereinafter described, and on such sale did strike off and sell the said lands and tenements to the grantee for the sum of One Hundred Twenty-Three Thousand Eight Hundred Eighty-Nine and 75/100 Dollars ($123,889.75), that being the highest bid therefore and the grantee being the highest bidder, and

WHEREAS, said lands and tenements are situated in the City of Algonac, Saint Clair County, Michigan, more particularly described in exhibit A, attached and commonly known as:
2234 Elm St
Property Tax Parcel ID 74-01-155-0011-000
This property may be located within the vicinity of farmland or a farm operation. Generally, accepted agricultural and management practices, which may generate noise, dust, odors, and other associated conditions, may be used and are protected by the Michigan right to farm act.

Now, this Indenture Witnesseth, That I, the Deputy Sheriff aforesaid, by virtue of and pursuant to the statute in such case made and provided, and in consideration of the sum of money so paid as aforesaid, have granted, conveyed, bargained and sold, and by this deed do grant, convey, bargain and sell unto the grantee, its successors and assigns, forever, all the estate, right, title and interest, which the said Mortgagor(s) had in said land and tenements and every part thereof, on the 21st day of July A.D. 2003, that being the date of said mortgage, or at any time thereafter, to have and to hold the said lands and tenements and every part thereof to the said grantee, its successors and assigns forever, to their sole and only use, benefit and behoof forever, as fully and absolutely as I, the Deputy Sheriff aforesaid, under the authority aforesaid, might, could or ought to sell the same.

IN WITNESS WHEREOF, I have hereunto set my hand and seal, the date and year first above written.

Steve Campau

Deputy Sheriff in and for the County of Saint Clair

STATE OF MICHIGAN
COUNTY OF SAINT CLAIR

On this 31st day of January, A.D. 2013, before me, a Notary Public in and for said County of Saint Clair came Steve Campau, a Deputy Sheriff of said County, known to me to be the individual described in and who executed the above conveyance, and who acknowledged that she/he executed the same to be her/his free act and deed as such Deputy Sheriff.

Denise Hyde

DENISE J. HYDE, Notary Public
State of Michigan, County of St. Clair
My commission expires Oct. 10, 2013
Acting in the County of St. Clair

Notary Public, Saint Clair County, Michigan
My commission expires:
Acting in the county of Saint Clair

THIS INSTRUMENT IS EXEMPT FROM COUNTY TRANSFER TAX PURSUANT TO 12U.SC. 1452(e) and MCL 207.505(c).

THIS INSTRUMENT IS EXEMPT FROM STATE TRANSFER TAX PURSUANT TO 12U.SC. 1452(e); MCL 207.505(c); and MCL 207.526(v).

Freddie Mac (DC) #733260543

**CERTIFICATE OF SERVICE**

I, Keith Childress, hereby certify that on the 1st day of October 2013, I served a copy of the foregoing by electronic mail on Plaintiff's attorney:

GLENN E. FORBIS (P52119)
DOUGLAS P. LALONE (P45741)
RADER, FISHMAN & GRAUER, PLLC
39533 Woodward Ave., Suite 140
Bloomfield Hills, Michigan 48304

Keith Childress
620 Georgia Ave..
Sewanee, TN 37375
586 693 2585
kdchildress@gmail.com