**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DASSAULT SYSTÈMES, S.A.
A CORPORATION OF FRANCE

Plaintiff/Counter-Defendant,

v.

KEITH CHILDRESS
d/b/a PRACTICAL CATIA TRAINING

Defendant/Counter-Plaintiff

Case No. 09-CV-10534
Hon. Lawrence P. Zatkoff
Magistrate Judge Michael J. Hluchaniuk

---

**DASSAULT SYSTÈMES, S.A.'s BRIEF IN OPPOSITION TO CHILDRESS' MOTION FOR PARTIAL SUMMARY JUDGMENT [DN193]**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

I. INTRODUCTION .......... 1

II. STATEMENT OF FACTS .......... 3

A. The CATIA Software and Dassault's Ownership .......... 3

B. The "CATIA" Trademark and Dassault's Ownership .......... 3

C. Childress' "Practical CATIA Training" Business and Infringement of Dassault's "CATIA" Mark .......... 4

D. Childress' Infringement of Dassault's Copyrights in CATIA V5 Software .......... 5

E. Childress' Alleged Justification For Cloning A Single Legitimate Target ID To 18 Unlicensed Computers To Use Unauthorized Copies of CATIA .......... 5

III. ARGUMENT .......... 8

A. Legal Standard For Summary Judgment .......... 8

B. Childress' Counterclaim Eleven to Cancel Dassault's Class 41 Registration for CATIA and To Grant a Registration to Childress .......... 8

C. Childress' Sixth Affirmative Defense – Unclean Hands .......... 10

i. Dassault's Suit is Not Malicious .......... 11

ii. Dassault Did Not File a False Declaration With Its Trademark Application .......... 12

iii. Dassault Did Not Make A False Allegation In Its Complaint To Claim Statutory Damages and Attorneys' Fees .......... 12

iv. Dassault's Andrew Clarkson Did Not Make False Statements In His December 2009 Declaration Concerning Estimated Damages .......... 13

D. Childress' Twenty First Affirmative Defense – Alleged Failure to Join Necessary Parties ........ 14

IV. CONCLUSION ........ 16

# TABLE OF AUTHORITIES

## Cases

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*,
109 F.3d 275 (6th Cir. 1997) .......... 9

*Dahill Management LLC v. Moore et al.*,
2010 U.S. Dist. LEXIS 22889 (E.D. Mich. March 11, 2010) .......... 14,15

*Hensley Mfg., Inc. v. Propride, Inc. et al.*,
579 F.3d 603 (6th Cir. 2009) .......... 9

*Leelanau Wine Cellars, Ltd. v. Black & Red*,
502 F.3d 504 (6th Cir. 2007) .......... 9

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
52 F.3d 1373 (6th Cir. 1995) .......... 11

*School Dist. Of City of Pontiac v. Secretary of U.S. Dept. of Educ.*,
584 F.3d 253 (6th Cir. 2009) .......... 14

## Rules

Fed. R. Civ. P. 19 .......... 2, 14, 16

# I. INTRODUCTION

The Court should deny Childress' motion in its entirety and summarily dismiss Childress' Sixth and Twenty First Affirmative Defenses (unclean hands and insufficient joinder, respectively) and Childress' Eleventh Counterclaim (cancellation of Dassault's trademark registration and granting of registration to Childress). Childress' affirmative defenses and counterclaim all fail as a matter of law.

Childress' request that the Court cancel Dassault's trademark registration for "CATIA" in connection with educational services is based on a misunderstanding of basic trademark law. Specifically, a trademark owner's rights are not strictly limited to its exact goods and services. Rather, the rights extend to protect the trademark owner against similar marks used in connection with related goods and services that are "likely to cause confusion." Dassault is indisputably the senior user of "CATIA," having started using the mark throughout the United States in 1981. Dassault received a United States Trademark Registration for "CATIA" in connection with computers and software in 1984. Childress began using the "Practical CATIA Training" mark many years later. Childress' use of "Practical CATIA Training" was an infringement of Dassault's rights in "CATIA" from the beginning, even though Dassault did not offer training services itself until after Childress, because Childress' use of "Practical CATIA Training" for CATIA training classes would likely cause confusion with Dassault's use of "CATIA" for its software. The Trademark Examiner at the United States Patent and Trademark Office already opined that Childress could not register "Practical CATIA Training" for this very reason. An independent assessment of the traditional "likelihood of confusion" factors compels the same conclusion.

Childress' request that the Court dismiss all of Dassault's claims because Dassault allegedly has "unclean hands" is meritless. Childress spins a fanciful story of alleged bad acts by Dassault, but the reality is that Dassault has not engaged in any

"fraud, deceit, unconscionability, or bad faith," as required for a finding of "unclean hands." Childress' "unclean hands" defense is based on complete fiction.

Childress' request that the case be dismissed for allegedly failing to join IBM and/or MSC Software as "necessary parties" under Fed. R. Civ. P. 19 is also misplaced. Neither IBM nor MSC Software is a "necessary party" under any conceivable assessment under Fed. R. Civ. P. 19. In any event, even if IBM or MSC Software was a "necessary party," (and neither is) the proper course under Fed. R. Civ. P. 19 would be for the Court to add one or both of the entities as a party, not to dismiss the case against Childress.

Finally, Childress' attempt to pass the blame to IBM and MSC Software illustrates Childress' strategy of attempting to obscure the real basis for Dassault's copyright infringement case against Childress. The copyright issue in this case is ultimately simple and undisputed. Childress infringed Dassault's copyrights in CATIA because he cloned a single legitimate Target ID associated with his one legitimate license and installed it on to 18 unlicensed computers in order to use unauthorized copies of the CATIA software on those computers. Childress admits that he did this, even though the IBM Customer Agreement that he executed in 2001 explicitly permits him to use CATIA on only a single computer. Childress' only response is that Nathan Haller – a 20-something year old "technical support" and "trainer" employee of MSC Software, who had no authority to issue licenses for CATIA – gave his permission to Childress to do so. But even Haller refuses to go that far in his declaration. Haller only states that he "was aware" that Childress had cloned the Target ID to unlicensed computers. In any event, Childress' acts – whether or not known to or condoned by a "technical support" and "trainer" employee of MSC Software – indisputably constitute copyright infringement. Haller's practice of serially providing over 400 "temporary" 30-day keys to Childress

– while an abuse the system and well beyond Haller's authority – is simply immaterial to Dassault's copyright claim against Childress.

## II. STATEMENT OF FACTS[1]

### A. The CATIA Software and Dassault's Ownership

1. Plaintiff Dassault created the computer-aided design (CAD) software package commercially-known as CATIA. Ex. 1, ¶5, 6.

2. Dassault owns several United States Copyright Registrations for the various versions of the CATIA software, including Registration Nos. TX 5-856-769 and TX 7-143-592 for CATIA V5, which is the fifth major version of CATIA. Ex. 1, ¶9.

### B. The "CATIA" Trademark and Dassault's Ownership

3. Since at least as early as 1981, Dassault (and IBM on its behalf) has commercially-promoted its CATIA software in the United States using the "CATIA" trademark. Ex. 1, ¶17.

4. Dassault has used "CATIA" in a wide variety of mediums and has spent millions of dollars promoting "CATIA" in the United States since 1981. Ex. 1, ¶18.

5. Providing commercial training services for customers of the CATIA software was a natural and logical expansion of Dassault's primary business of commercializing the CATIA software itself. Ex. 1, ¶19.

6. Indeed, Dassault has offered commercial training services in the United States since 2002 through a program called the "Education Partner Program," under which third-party "partners" pay license fees and/or royalties, and Dassault provides educational materials and educational licenses to authorized partners who may use the CATIA software to conduct commercial training pursuant to a written Education Partner Program Agreement. Ex. 1, ¶20.

7. Dassault owns the following U.S. Trademark Registrations for "CATIA":

---

[1] Dassault incorporates by reference the Statement of Undisputed Facts set forth in Dassault's Motion for Summary Judgment and the supporting evidence [DN 195].

| Reg. No. | Mark | Registration Date | Application Priority Date | Goods and Services |
|---|---|---|---|---|
| 1,274,136 | CATIA | April 17, 1984 | September 25, 1981 (France) | **IC 009**: Computers and Peripheral Devices for Computers-Namely … **IC 016**: Manuals for Use in the Installation and Servicing of Computers **IC 042: Custom Programming Services-Namely, Computer Programming to the Order and Specification of Others, Rental of Computer Programs Recorded on Magnetic Discs, Tapes and Cassettes** |
| 3,754,953 | CATIA | March 2, 2010 | December 19, 2008 (International Registration) | **IC 038:** Telecommunication services, namely …. **IC 041**: **Training services in the form of courses, seminars, workshops dealing with software and information technologies;** services for online training featuring courses of instruction on software technology; arranging and conducting conferences on software and computer program and system development; providing training in the nature of seminars, workshops, courses in designing software products and services using three-dimensional representations in real time. |

Ex. 1, ¶21.

**C. Childress' "Practical CATIA Training" Business and Infringement of Dassault's "CATIA" Mark**

8. Childress began operating a for-profit commercial enterprise under the d/b/a assumed name "G. Bailey & Associates" in 1995 and later changed its name to "Practical CATIA Training" in 2000. Ex. 4, ¶¶3, 9; Ex. 5, ¶24; Ex. 6, ¶¶33-34.

9. The nature of Childress' "Practical CATIA Training" business was providing multi-day training sessions to customers on the CATIA software. Id.; Ex. 6, ¶18.

10. Childress commercially offered the multi-day training sessions for fees ranging from $999 to $1699. Ex. 7, p. 119.

11. As one channel for promoting his "Practical CATIA Training" business, Childress owned and operated a website having the Internet domain name www.practicalcatia.com. Ex. 4, ¶10; Ex. 5, ¶25; Ex. 6, ¶¶35,37; Ex. 7.

12. Dassault never authorized Childress to use its "CATIA" mark in any manner. Ex. 1, ¶31.

13. Childress filed a United States Trademark Application (Application No. 78/215453) for "Practical CATIA Training" in international class 41 for "Computer Software Training using Catia version 4 and Catia version 5..." in 2003. Ex. 8.

14. The United States Patent and Trademark Office rejected Childress' application, stating:

> [t]he applicant's [Childress'] and registrants' [Dassault's] marks are highly similar and they create a similar commercial impression...Because the marks ["CATIA" and "Practical CATIA Training"] are highly similar and they identify closely related goods and/or services, their contemporaneous use is likely to cause confusion. Therefore, the proposed mark ["Practical CATIA Training"] is refused registration pursuant to Section 2(d) of the Trademark Act." Ex. 8, pp. 12-14 (emphasis added).

15. Childress did not respond to the Examiner's rejection and instead abandoned his application. Ex. 8, p.25.

**D. Childress' Infringement of Dassault's Copyrights in CATIA V5 Software**

16. In 2001, Childress (through his "G. Bailey & Associates" d/b/a assumed name) purchased a single "node-lock" license for CATIA V5 from IBM through one of IBM's business partners called MSC Software. Ex. 4, ¶7; Ex. 5, ¶15; Ex. 6, ¶¶69-71.

17. Childress' single "node-lock" license authorized him to use certain modules of the CATIA V5 software on one, and only one, computer. Ex. 1, ¶¶ 22-23.

18. Childress has no other license to use CATIA V5. Ex. 1, ¶24.

**E. Childress' Alleged Justification For Cloning A Single Legitimate Target ID To 18 Unlicensed Computers To Use Unauthorized Copies of CATIA**

19. Childress alleges that MSC Software authorized Childress to clone the Target ID from his one legitimately-licensed computer to 18 unlicensed computers to use unauthorized copies of the CATIA software.

20. MSC Software was a "Business Partner" of IBM for purposes of marketing the CATIA software. Ex. 2, ¶¶4-7.

21. MSC Software acted as a sales agent for IBM. Ex. 2, ¶¶4-7.

22. Customers of MSC Software who wanted to license the CATIA software would execute an IBM Customer Agreement, which granted limited permission to licensees to use the CATIA software and which spelled out the terms and conditions of the license grant. Ex. 2, ¶¶4-7.

23. Nathan Haller ("Haller") was an employee of MSC Software (or its predecessor) from 2000 until 2006. Ex. 2, ¶¶5, 41.

24. Haller expected to graduate from college in 2002 and apparently was in his 20s while working at MSC Software. Ex. 9.

25. Haller's job at MSC Software entailed "technical support" and "training." Ex. 2, ¶8; Ex. 10.

26. As part of his "technical support" and "training" responsibilities, Haller also was authorized to order CATIA keys from IBM's key center in Boulder, Colorado. Ex. 2, ¶8.

27. Haller's job responsibilities did <u>not</u> include issuing licenses to customers to use the CATIA software, and Haller did not have authority to issue licenses for CATIA.[2] Ex. 2.

28. In addition to generating permanent keys for licensed customers, the IBM key center would, upon request, generate 30-day temporary keys to enable IBM and its

---

[2] Throughout his briefing, Childress intentionally blurs the concept of a "license" to use the CATIA software with a "key." A "license" is a legal instrument that grants a customer "permission" to use the CATIA software. The license to use CATIA was embodied in the IBM Customer Agreement document. In contrast, a "key" is an alphanumeric code generated by an IBM key center, which is part of the technical protocol set up by IBM and Dassault to control access to the CATIA software and discourage copyright infringement.

Business Partners, such as MSC Software, to allow prospective customers to temporarily "preview" CATIA prior to entering into an IBM Customer Agreement.

29. Haller provided over 400 temporary (normally 30-day) keys to Childress between 2001 and 2005, which, as a technical matter, permitted Childress to install and use CATIA on multiple computers at the same time, even though Childress' only license permitted him to use CATIA on just a single computer. [DN 193, p. 6, Fn. 1]

30. The temporary keys were delivered to Childress via email. Ex. 11.

31. The emails to Childress that contained the temporary keys included the following advisory message: "BY ENTERING THE KEY(S) TO USES THE PRODUCT(S) YOU ARE AGREEING TO THE LICENSE TERMS." (emphasis in original) Ex. 11.

32. Haller was Childress's primary contact at MSC Software to acquire temporary keys for CATIA. Ex. 5, ¶50.

33. Roger Gudobba ("Gudobba"), Haller's supervisor at MSC Software, was not aware of any alleged "business arrangement" between Childress and Haller (or anyone else at MSC Software) that involved Childress receiving temporary keys to CATIA. Ex. 12, ¶¶6-7.

34. Darryl Patrishkoff ("Patrishkoff"), the director of business development at MSC Software between 2001 and 2002, declares that "Mr. Haller informed me [Patrishkoff] that MSC Software's sales/support department had already entered in to some sort of business arrangement that involved Mr. Childress providing CATIA sales leads to MSC Software," even though Haller's supervisor, Gudobba, was not aware of any such arrangement. Ex. 13, ¶11.

35. However, Patrishkoff was not independently aware of any alleged "business arrangement" between Childress and Haller (or anyone else at MSC Software). Ex. 13, ¶11.

36. Haller did not advise Gudobba or Patrishkoff that Haller was providing a steady stream of "temporary" keys to Childress to use in his commercial training business. Ex. 12; Ex. 13.

37. There is no written agreement between Childress and MSC Software reflecting any alleged "business arrangement."

38. By mid-2004, IBM had discontinued the practice of issuing temporary keys for CATIA. Ex. 2, ¶¶37, 39.

39. After IBM stopped issuing temporary keys, Childress nonetheless continued to use CATIA on multiple computers, even though his 2001 license was limited to a single computer. Ex. 2, ¶39; Ex. 5, ¶¶65-66.

40. Childress was technically able to use unauthorized copies of CATIA on 18 unlicensed computers by cloning the single Target ID associated with his one legitimately-licensed computer and installing it on the unlicensed computers. Ex. 2, ¶39; Ex. 5, ¶¶65-66.

## III. ARGUMENT

### A. Legal Standard For Summary Judgment

Dassault incorporates by reference the "Legal Standards for Summary Judgment" set forth in Dassault's Brief in Support of its Summary Judgment Motion [DN 195].

### B. Childress' Counterclaim Eleven to Cancel Dassault's Class 41 Registration for CATIA and To Grant a Registration to Childress

Childress seeks a summary judgment from this Court canceling Dassault's United States Trademark Registration No. 3.754,953 for "CATIA" in Class 41 for "Training Services…" The premise of Childress' request is that Childress allegedly has superior rights in "CATIA" in connection with training services because he used Dassault's already-registered "CATIA" mark *verbatim* as a dominant portion of his company name before Dassault started offering CATIA training services itself. Childress' position is based on a faulty understanding of basic trademark law.

Childress does not dispute that Dassault is the senior user of the "CATIA" mark generally. Indeed, Dassault has offered uncontroverted evidence that it began using "CATIA" as the name of its software package in 1981. Dassault received United States Trademark Registration No. 1,274,136 for "CATIA" in connection with computers, computer peripherals, manuals for computers, and custom computer programming services (the '136 Registration) on April 17, 1984. Dassault's '136 Registration is *prima facie* evidence of the validity of the mark and Dassault's exclusive right to use the mark throughout the United States in connection with the cited goods and services. *Leelanau Wine Cellars, Ltd. v. Black & Red,* 502 F.3d 504, 513 (6th Cir. 2007). But under well-established trademark law, Dassault's rights in the "CATIA" mark do not stop with the precise goods and services recited in the '136 Registration. Rather, Dassault's rights in "CATIA" extend to any uses of "CATIA" that are likely to cause confusion in the marketplace with Dassault's use of "CATIA" or the '136 Registration. *Hensley Mfg., Inc. v. Propride, Inc. et al.,* 579 F.3d 603, 610 (6th Cir. 2009); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 280 (6th Cir. 1997). In assessing the "likelihood of confusion" question, courts consider the following eight factors: (i) strength of the senior mark; (ii) relatedness of the goods or services; (iii) similarly of the marks; (iv) evidence of actual confusion; (v) marketing channels used; (vi) likely degree of purchaser care; (vii) the intent of defendant in selecting the mark; and (viii) likelihood of expansion of the product lines. *Id.*

The Examiner at the United States Patent and Trademark Office ("USPTO") applied these principles when Childress tried to register "Practical CATIA Training" for himself. The Examiner rejected Childress' application, stating that his use of "Practical CATIA Training" would likely cause mistake or confusion with Dassault's "CATIA" mark:

> [t]he applicant's [Childress'] and registrants' [Dassault's] marks are highly similar and they create a similar commercial impression…Because the marks ["CATIA" and "Practical CATIA Training"] are highly similar and they identify closely related goods and/or services, their contemporaneous use is likely to cause confusion. Therefore, the proposed mark ["Practical CATIA Training"] is refused registration pursuant to Section 2(d) of the Trademark Act." Ex. 8, pp. 13-14 (emphasis added).

An independent assessment of the "likelihood of confusion" factors compels the same conclusion reached by the Trademark Examiner. Dassault has discussed the "likelihood of confusion" factors in detail in Dassault's Motion for Summary Judgment [DN 195, pp. 18-23] and incorporates those arguments by reference here. In short, the "CATIA" mark is an inherently distinctive and strong mark; Childress adopted it *verbatim* as the dominant portion of his company name; Childress' business offers training on the CATIA software, so the parties' goods and services are highly related; and training services are a natural area of expansion for a company that generates and distributes software, as evidenced by the fact that Dassault started providing training classes for CATIA itself in 2002. [DN 195, pp. 18-23]

Because Childress' use of the "Practical CATIA Training" mark is likely to cause confusion with Dassault's use of "CATIA," Childress' use infringes Dassault's '136 Registration and Dassault's common law rights in the "CATIA" mark. Therefore, Childress' claim that he is the "senior user" of "CATIA" in connection with CATIA training services is meritless. The Court should deny Childress' motion and summarily dismiss his Counterclaim Eleven.

**C. Childress' Sixth Affirmative Defense – Unclean Hands**

Childress seeks summary judgment dismissing all of Dassault's claims, relying on the equitable doctrine of unclean hands. Childress alleges that Dassault has unclean hands because (i) Dassault allegedly filed a "malicious" trademark suit to drive Childress out of business; (ii) Dassault allegedly filed a false declaration in connection with its trademark application for "CATIA" for "training services," which

stated that "to the best of the verifier's knowledge and belief, no other person has the right to use such mark in commerce..."; (iii) Dassault allegedly made a false statement of fact in its Complaint in order to claim statutory damages and attorneys' fees; and (iv) Dassault's Andrew Clarkson allegedly submitted false statements in his December 20, 2009 declaration. Childress' arguments are all meritless.

"Unclean hands" is an equitable doctrine that "may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1383 (6th Cir. 1995). The alleged misconduct on the part of the plaintiff "must relate directly to the transaction about which the plaintiff has made a complaint." *Id.* "Unclean hands" is to be applied "only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect to the matter in litigation." *Id.* Finally, the doctrine of "unclean hands" is "not to be used as a loose cannon, depriving a plaintiff of an equitable remedy to which he is otherwise entitled merely because he is guilty of unrelated misconduct." *Id.* Nothing that Childress relies on for his "unclean hands" defense constitutes the necessary "fraud, deceit, unconscionability or bad faith" to support such a finding.

**i. Dassault's Suit is Not Malicious**

Childress' argument that Dassault's trademark infringement counts are "malicious" and designed to drive Childress out of business is completely unfounded and meritless. To the contrary, the facts demonstrate that Dassault's trademark-related counts (Counts II-IV) are well-supported. Indeed, the United States Trademark Examiner has already opined that Childress' mark creates a "likelihood of confusion" with Dassault's registration for "CATIA."

**ii. Dassault Did Not File a False Declaration With Its Trademark Application**

For the same reasons set forth above, Childress' assertion that Dassault filed a false declaration with its application for "CATIA" is meritless. Dassault's declaration that "to the best of the verifier's knowledge and belief, no other person has the right to use [CATIA] in commerce…" is absolutely true.

**iii. Dassault Did Not Make A False Allegation In Its Complaint To Claim Statutory Damages and Attorneys' Fees**

Childress' assertion that Dassault made knowingly false allegations in its Complaint is without merit. Childress spins a tale of deceit and fraudulent intent from Dassault's mere mistaken allegation that Childress purchased his one legitimate copy of CATIA V5 in 2003 instead of 2001. It was an innocent mistake, and Childress offers no evidence that it was anything more.

Childress essentially says that Dassault intentionally mis-alleged Childress' purchase date in order to falsely suggest that Childress had infringed CATIA V5 R12, when, in fact, CATIA V5 R14 was found on Childress' computers when the FBI raided his business in October 2006. Childress speculates that Dassault made this false allegation because infringement of CATIA V5 R12 would carry the potential for statutory damages and attorneys' fees, whereas infringement of CATIA V5 R14 may not, due to the timing of the respective applications for registrations. But Childress' logic does not hold up. Childress himself says that he cloned the Target ID of his one licensed computer as early as 2003. Ex. 4, ¶¶26, 27. Though Childress purchased his one CATIA V5 license in 2001, he paid annual maintenance fees, for which he received periodic upgrades and new releases. CATIA V5 R12 was first published in September 2003, when Childress says that he first cloned his Target ID. Accordingly, it is virtually certain that Childress illegally used unauthorized copies of CATIA V5 R12 on his computers for some period of time after September 2003, until he ultimately upgraded to the next release. The fact that Childress had upgraded to CATIA V5 R14 by the time of the October 2006 FBI raid would have been expected.

The allegation in Dassault's Complaint that Childress purchased a license in 2003 instead of 2001 was an innocent mistake, and Childress' speculative tale of fraud and deceit does not hold water.

**iv. Dassault's Andrew Clarkson Did Not Make False Statements In His December 2009 Declaration Concerning Estimated Damages**

Childress' claim that Dassault's Andrew Clarkson knowingly made false statements in his December 2009 declaration concerning Dassault's damages in this case is simply not true. The purpose of Mr. Clarkson's declaration was to provide the Court with an estimated calculation of the amount of Dassault's damages resulting from Childress' copyright infringement. Mr. Clarkson was tasked with making this calculation without the benefit of any discovery information from Childress, as Childress had refused to even answer the Complaint at that time, let alone provide any discovery documents or testimony. Mr. Clarkson's declaration accurately stated the standard yearly licensing charge for the CATIA configuration that he believed Childress was using, judging from Childress' website. Mr. Clarkson also accurately stated his belief as to when Childress began infringing Dassault's copyrights. Mr. Clarkson mistakenly stated that Childress did not have even a single license to use CATIA, but that mistake was immaterial. The damage calculation of $965,640 was based upon Childress' infringing use of the CATIA software on <u>twenty</u> total computers, whereas Childress' license only permitted him to use CATIA on <u>one</u> computer. With the minor exception of including Childress' one licensed computer, Mr. Clarkson's calculation to estimate Dassault's damages was correct based upon the information that he had at that time.

None of the alleged "bad acts" by Dassault constitute "fraud, deceit, unconscionability, or bad faith related to the matter at issue," which is what is required for a finding of "unclean hands." Childress' motion should be denied and his "unclean hands" defense summarily dismissed.

**D. Childress' Twenty First Affirmative Defense – Alleged Failure to Join Necessary Parties**

Childress asks the Court to dismiss all of Dassault's claims for allegedly failing to join IBM and MSC Software as "necessary parties" under Fed. R. Civ. P. 19. Childress' assertion is meritless. His motion should be denied and his joinder affirmative defense should be summarily dismissed.

The question of joinder under Fed. R. Civ. P. 19 requires the Court to assess: (i) whether the absent parties are "necessary"; and (ii) whether, in their absence, equity and good conscience require the case to be dismissed. *Dahill Management LLC v. Moore et al.,* 2010 U.S. Dist. LEXIS 22889 (E.D. Mich. March 11, 2010), citing *School Dist. Of City of Pontiac v. Secretary of U.S. Dept. of Educ.,* 584 F.3d 253, 265 (6th Cir. 2009). If the answer to either question is "no," then Rule 19 does not foreclose the litigation. *Id.*

Whether potential relief is "complete" is determined on the basis of those persons who are already parties, and not as between a party and the absent person whose joinder is sought." *Id.* Here, Childress has not demonstrated how, in the event of a finding that Childress has infringed Dassault's copyrights and trademark rights, the Court could not accord Dassault complete relief. Dassault seeks injunctive relief and money damages resulting from Childress' infringement, both of which can be ordered against Childress. Childress says that complete relief cannot be accorded because he allegedly could not pay any judgment for money damages. But Childress cites no precedent for his alleged inability to pay a judgment as being a basis for dismissal of the case under Fed. R. Civ. P. 19. Childress' financial state of affairs is simply not a basis under Fed. R. Civ. P. 19 for IBM and/or MSC Software being considered a "necessary party."

Childress also says, without any legal support, that IBM and MSC Software are "necessary parties" because "any liability in this matter rests with [them]." This Court has already rejected this type of argument. In *Dahill,* Chief Judge Rosen

rejected the notion that third parties were "necessary" because the defendant claimed that the third parties were the true responsible parties: "[D]efendants' contention that they are blameless does not meet the standard of a required party under Rule 19(a)(1)(A)." *Dahill,* 2010 U.S. Dist. LEXIS 22889 at *5. This Court should similarly reject Childress' identical argument here.

Aside from the fact that Childress' argument is insufficient as a matter of law to establish IBM and MSC Software as "necessary parties", it illustrates Childress' consistent approach of obscuring the simplicity of Dassault's copyright infringement case with immaterial facts. Though it is true that Haller's distribution of over 400 "temporary" keys to Childress to use in his commercial business exceeded Haller's authority and was an abuse of the system, Dassault's copyright infringement case against Childress does not depend on those facts. Rather, Dassault's copyright infringement case is grounded in the simple, undisputed fact that Childress cloned a single legitimate Target ID to 18 unlicensed computers in order to use unauthorized copies of CATIA for commercial purposes. Childress – a lifelong user of sophisticated software, who had already licensed a copy of CATIA via the IBM Customer Agreement, which clearly authorized use of the CATIA on only one computer – knew that he was not authorized to circumvent Dassault/IBM's Target ID mechanism to use CATIA on 18 unlicensed computers. No reasonable jury could find otherwise. Thus, the fact that Haller provided Childress with over 400 keys for CATIA over several years – while well beyond the outer limits of Haller's authority and which is suspect in and of itself – is not the basis for Dassault's copyright infringement count against Childress. Childress' repetitive recitation of these facts throughout the case is immaterial.

Even if MSC Software or IBM were "necessary" (which they are not), Childress has not met his burden to show that equity and good conscience require the case to be dismissed in their absence. The proper remedy would be for the Court to

join them in this case under Fed. R. Civ. P. 19(a)(2). It would not be to dismiss the entire case, as Childress' requests.

Therefore, Childress' motion should be denied and Childress' Twenty First Affirmative Defense for alleged failure to join necessary parties should be summarily dismissed.

## IV. CONCLUSION

For the reasons set forth herein, Dassault respectfully requests that the Court deny Childress' motion and summarily dismiss Childress' Sixth and Twenty First Affirmative Defenses (unclean hands and joinder) and Childress' counterclaim 11 (cancellation of Dassault's trademark registration and grant of registration to Childress).

Dated: October 25, 2013

/s/Glenn E. Forbis
Glenn E. Forbis (P52119)
HARNESS, DICKEY & PIERCE, PLC
5445 Corporate Drive, Suite 200
Troy, MI 48098
Phone: 248-641-1600 Fax: 248-641-0270
gforbis@hdp.com

Douglas P. LaLone (P45741)
RADER, FISHMAN & GRAUER, PLLC
39533 Woodward Ave., Suite 140
Bloomfield Hills, MI 48304
Phone: 248-594-0600 Fax: 248-594-0610
dpl@raderfishman.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2013, I electronically filed Plaintiff's Motion and Brief In Support of Its Motion for Summary Judgment with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record, and I hereby certify that I have served by electronic mail the foregoing paper to the following non-ECF participants:

Mr. Keith Childress
620 Georgia Avenue
Sewanee, TN 37375
legal@practicalcatia.com

/s/Glenn E. Forbis
Glenn E. Forbis

18117040.1