UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DASSAULT SYSTEMES, S.A.,

       Plaintiff,                           CASE NO. 09-10534
                                             HON. LAWRENCE P. ZATKOFF

v.

KEITH CHILDRESS, d/b/a
PRACTICAL CATIA TRAINING,

       Defendant.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on the 3rd day of December, 2014

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I.  INTRODUCTION**

This matter is before the Court on:

A.       Plaintiff's Motion to Dismiss Defendant's Counterclaims (Docket #127);

B.       Defendant's Motion to Dismiss All Counts of Plaintiff's Complaint (Docket #146);

C.       Defendant's Motion for Partial Summary Judgment (Docket #193);

D.       Defendant's Motion for Summary Judgment (Docket #194);

E.       Plaintiff's Motion for Summary Judgment on its Complaint and Defendant's Counterclaims (Docket #195);

F.       Plaintiff's Motion to Strike Defendant's Motions for Partial Summary Judgment and Summary Judgment (Docket #199);

G.       Defendant's Motion for Leave to File Sur-Reply with respect to Plaintiff's Motion for Summary Judgment (Docket #226);

H.      Plaintiff's Motion to Bifurcate Defendant's Counterclaims 1-8 from Plaintiff's Copyright and Trademark Infringement Counts (Docket #232);

I.      Defendant's Ex Parte Motion for Leave to File a Supplement to Plaintiff's Motion for Summary Judgment (Docket #268);

J.      Defendant's Ex Parte Motion for Leave to File a Supplement to Defendant's Motions for Summary Judgment (Docket #271); and

K.      Defendant's Motion to Seal Docket Entry 193 (Docket #202) and Defendant's Motion to Seal Docket Entry 250 (Docket #254).

All of the motions are fully briefed and/or the period for filing the response or reply has expired. The Court finds that the facts and legal arguments pertinent to the Motions are adequately presented in the parties' papers, and the decision process will not be aided by oral arguments.  Therefore, pursuant to E.D. Mich. Local R. 7.1(f)(2), it is hereby ORDERED that the Motions be resolved on the briefs submitted by the parties, without this Court entertaining oral arguments.

## II.  BACKGROUND

### A.   Factual Background

Plaintiff, a French corporation, is the developer of a computer software design program known as CATIA.  Plaintiff has held a registered trademark with the United States Patent and Trademark Office ("USPTO"), U.S. Reg. No. 1,274,136, on its CATIA software since 1984 in Classes 09, 16 and 42.  Plaintiff did not apply for registration of its CATIA mark in Class 41 (education and training) until 2008, shortly before this lawsuit was filed.  The USPTO approved Plaintiff's application for that mark in 2010 (U.S. Reg. No. 3,754,953)  The USPTO also granted Plaintiff a registered copyright on Plaintiff's CATIA Version 5 ("CATIA V5"), Release 12, Registration No. 5-856-769 on November 21, 2003, and copyright registration for its most recent release, CATIA V5, Release 14 on November 18, 2009.  Until 2005, all sales of CATIA licenses (at

2

least in the United States) were handled by IBM and/or members of IBM's network of "Business Partners."

Defendant, appearing *pro se*, is a design engineer.  Defendant, along with some familial assistance, began operating a school in the Metro Detroit area (hereinafter, "the School") in 1995. At the School, Defendant and his sons provided clients/students with instruction in the use of CATIA software.  They started in 1995 by training students on CATIA Version 4 ("CATIA V4") and then began training students on CATIA V5 soon after it was released.  The School originally operated under the name "G. Bailey & Associates," a d/b/a of Defendant, and "Practical Catia Training."  In 2000, upon the expiration of the d/b/a "G. Bailey & Associates," Defendant changed the d/b/a of the School to "Practical Catia Training" and created a website for the School with the address "www.practicalcatia.com."  In February 2003, Defendant filed an application with the USPTO for trademark registration for "Practical Catia Training."  In August 2003, the USPTO issued an "Office Action," wherein the USPTO refused Defendant's application for the "Practical Catia Training" mark in Class 41 based on the USPTO's determination that there would be a likelihood of confusion with Plaintiff's CATIA mark and the "PRACTICAL" mark that had been granted to a third party.  The Office Action advised that Defendant was required to respond the Office Action within six months if he wanted to contest it, and if Defendant failed to do so, his application for the "Practical Catia Training" mark would be deemed abandoned.  Defendant states that he ultimately concluded that he did not need to register the "Practical Catia Training" mark because: (a) he was the first to use the term "Practical Catia Training," and (b) Plaintiff did not have a registered mark in Class 41 for educational training.  As Defendant never responded to the Office

Action, on March 31, 2004, the USPTO issued a "Notice of Abandonment" regarding the "Practical Catia Training" mark.

CATIA software requires a license and Target ID in order to execute the software on a computer.  In 2001, the School purchased two used IBM RS 6000 workstations from Advanced Enterprise Solutions ("AES"), each of which contained CATIA V4 software with permanent licenses.  AES, which was an IBM Business Partner at the time, was acquired later in 2001 by MSC Software ("MSC").  MSC also was or quickly became an IBM Business Partner.  Plaintiff owned a 19% share in AES and a 9% share in MSC.

At the time the School purchased the IBM RS 6000 workstations, Defendant was teaching students on CATIA V4 but was also promoting Plaintiff's CATIA V5 on the School's website.  As a result of Defendant's promotion of CATIA V5, in June 2001, Pam Barton ("Barton"), IBM's Manager of North American Channels Product Lifecycle Solutions, offered to provide the School with "hobbled code" CATIA V5 software for use in the classroom and for students to install on their home computers.  In October 2001, "G. Bailey & Associates" purchased one CATIA V5 Release 12 license from MSC and was assigned a corresponding Target ID for that license.  Every year since then (at least until 2009), Defendant paid the $2,830 annual licensing charge for that license (each year, the licensing charge was billed to "G. Bailey & Associates").

In November 2001, pursuant to a "business arrangement" (deemed a "Business Agreement" by Defendant),  MSC began supplying Defendant (the School) and the School's students with fully-functional CATIA V5 software and temporary licenses in exchange for: (a) MSC being allowed to display MSC banner ads on two pages of the School's website, (b) Defendant distributing MSC business cards to students, and (c) Defendant providing student contact information to MSC for

marketing purposes.  In 2002, Daryl Patrishkoff ("Patrishkoff"), MSC's Director of Business Development, who knew of the foregoing business arrangement with Defendant, sought to–and did–expand that arrangement by utilizing the School as an MSC training provider.  As a result of the business arrangement(s) between MSC and the School, IBM and/or MSC ultimately provided the School with hundreds of CATIA V5 temporary licenses for use on classroom computers and for students to install on their home computers.

In 2003, MSC set up a license server in the School's classroom, and IBM provided the School with a 6-month, 15-user server license, for use with CATIA V5 Release 12.  When the School experienced connectivity problems, MSC implicitly and/or explicitly allowed Defendant to install the CATIA V5 Release 12 license purchased by G. Bailey & Associates in 2001 onto each of the School's training computers as a temporary "workaround" to the connectivity problems.  According to Nathan Haller, an MSC (and former AES) employee ("Haller"), Defendant "had MSC's permission to use the CATIA V5 software to teach his classes."  With MSC's knowledge, Defendant established the same workaround solution after the installation of the CATIA V5 Release 13 software on the School's training computers again resulted in problems.  According to Haller, "as far as [he] knew, [Defendant] was using the CATIA V5 software to teach his classes with the full knowledge and consent of IBM, [Plaintiff], and MSC."

From time to time between 2001 and 2006, several employees of Plaintiff were in contact with Defendant.  In 2003, IBM invited Defendant/the School to join in its Higher Education and Training ("HEAT") program, which provided discounted CATIA software and training materials to educational organizations.  Defendant applied for admission into the HEAT program (which required approval by Plaintiff).  Plaintiff accepted Defendant into the HEAT program in February

5

2003; however, by that time, Defendant was receiving CATIA V5 licenses from MSC for use at the School.  Therefore, Defendant declined to join the HEAT program.

In 2003, Defendant contacted Michael Recan, the director of Plaintiff's new Education Partner Program ("EPP") in France, from Defendant's email address (keith@practicalcatia.com). As a result, Michael Recan had Len Turner, Plaintiff's Americas Channel Development Manager, contact Defendant.  Len Turner and Defendant then discussed the EPP, including the approximately $40,000 it would cost Defendant to join.  Defendant represents that he told Len Turner that: (1) IBM/MSC were supplying the School with CATIA V5 to use for training students, (2) the School's training program was based on Defendant's "practical" use of the CATIA software, and (3) as such, the School didn't need Plaintiff's training materials.  Pursuant to those communications, Len Turner asked Defendant to provide evidence to Plaintiff (directly to Len Turner) of HEAT program violations in Defendant's "area."  In 2003 and 2004, Defendant provided evidence of such violations to Len Turner and then, pursuant to Len Turner's direction, Defendant started sending evidence to Andrew Clarkson, IBM's "official investigator of illegal software pirates."  Andrew Clarkson subsequently stepped into the same position for Plaintiff and was involved in the investigation of Defendant's alleged conduct that resulted in the grand jury investigation and this lawsuit.

In October 2004, Cedric Simard, an employee of Plaintiff at its France headquarters who represented he was "in charge of worldwide marketing and communication for [Plaintiff's] Education offering," contacted Defendant about entering into an arrangement with the School similar to that of IBM/MSC.  As a result, Defendant and Plaintiff entered into an arrangement whereby Plaintiff would be allowed to display two banner ads on the School's website, www.practicalcatia.com (specifically, ads promoting Plaintiff's "Global Certification Program"),

in exchange for 10 Global Certification exam vouchers.  In November 2004, Plaintiff's two banner ads were uploaded to the School's website, and Defendant continued to display Plaintiff's banner ads on that website until removing them shortly after this lawsuit was filed.

In 2004, Plaintiff expanded its business operations to include CATIA training.  Plaintiff formed a new company, Rand NA (later named Inceptra), that offered in-class and online CATIA training, including classes offered in Detroit, Michigan.  When Plaintiff took over CATIA licensing responsibilities for IBM in 2005, Plaintiff required schools such as the School to join the EPP "in order to receiver CATIA licenses with which to provide CATIA training to third parties."  In furtherance thereof, Plaintiff publishes a list of prospective customers with whom EPP participants cannot "actively market or solicit."

At some point in or after 2005, Plaintiff contacted the United States Department of Justice ("DOJ") regarding Defendant's alleged infringement of Plaintiff's intellectual property rights.[1]  On October 30, 2006, the United States Federal Bureau of Investigation ("FBI") executed a search warrant at the School.  The search warrant indicated that Defendant and the School were under federal grand jury investigation for alleged infringement of Plaintiff's copyright  on CATIA software.  The FBI seized the School's computers, training materials, records and other items.

At the time the FBI executed the search warrant, Defendant also was presented with several grand jury subpoenas.   In filings in this Court, Plaintiff's representatives have stated that Plaintiff informed the FBI (DOJ) of Defendant's alleged illegal activity, but Plaintiff has also represented that

---

[1]Plaintiff does not specify who contacted the DOJ or when it communicated this information to the DOJ.  Plaintiff has also indicated that it communicated this information to the FBI; thus, it is not clear exactly which governmental entity Plaintiff contacted or communicated with at certain points during the grand jury investigation.

it did not know of Defendant's illegal activity until after the FBI raid.  Plaintiff also has stated that,

in January 2005, it received "a tip from an unrelated and previously unknown third-party indicating

his belief that [Defendant/the School] was using unlicensed copies of the CATIA V5 software."  To

the Court's knowledge, Plaintiff has not identified the individual who allegedly provided Plaintiff

with that tip.

After a grand jury investigation, which included Defendant testifying before and presenting

evidence to the grand jury, the DOJ declined to prosecute Defendant for infringing on Plaintiff's

intellectual property rights.  In a letter dated April 2, 2010, the United States Attorneys Office in

Detroit stated:

> This office has declined criminal prosecution of [Defendant] or Practical CATIA for
> the matters under investigation.  These consisted of potential violations of copyright
> law and related violations regarding the copying and use of CATIA software in the
> approximate period of 2003 through October, 2006.  There is no pending criminal
> investigation related to any alleged subsequent uses of the technology by these
> subjects.  Thus, unless circumstances change, this office will not seek or bring
> criminal charges against [Defendant] or Practical CATIA for the matters that were
> investigated.

## B.    Procedural Background

On February 12, 2009, Plaintiff filed a four count Complaint in this Court.  Therein, Plaintiff

alleged that when Defendant cloned the software and Target IDs onto 20 computers, and Defendant

used those computers to operate the School, Defendant: (1) infringed on Plaintiff's copyright on the

CATIA V5 software, in violation of 17 U.S.C. § 101 *et seq.*; (2) engaged in unfair competition, in

violation of 15 U.S.C. § 1125; (3) infringed Plaintiff's federal trademark rights in the "CATIA"

trademark, in violation of 15 U.S.C. § 1114; and (4) violated the Michigan Consumer Protection

Act, M.C.L. § 445.901 ("MCPA").

8

In July 2010, the Court entered default judgment in favor of Plaintiff, granted Plaintiff's motion for leave to subpoena the FBI, and closed the case. Upon Defendant's appeal of the Court's ruling, the Sixth Circuit vacated the default judgment, affirmed the grant of Plaintiff's motion for leave to subpoena the FBI,[2] and remanded the case to this Court in February 2012. On March 12, 2012, Defendant filed an Answer to the Complaint, together with his affirmative defenses and counterclaims. On May 24, 2012, Defendant filed his First Amended Answer, affirmative defenses and eleven counterclaims (the counterclaims were set forth over the course of 65 pages): (1) a Sherman Act violation, (2) unfair competition in violation of Michigan law, (3) tortious interference with business relationship, (4) civil conspiracy, (5) intentional infliction of emotional distress, (6) malicious prosecution, (7) abuse of process, (8) negligence, (9) declaratory judgment based on laches, estoppel or implied license, (10) declaratory judgment based on fair use, and (11) declaratory judgment based on trademark ownership. On June 28, 2012, Defendant filed a petition for a writ of certiorari with the United States Supreme Court regarding the Sixth Circuit's affirmation of this Court's grant of Plaintiff's motion for leave to subpoena the FBI. On August 27, 2012, the Court entered a stipulated order staying the case for 90 days to allow the parties to engage in settlement discussions. On October 1, 2012, the Supreme Court denied Defendant's petition for certiorari. The parties did not reach a settlement during the period the case was stayed.

---

[2]The Court notes that: (a) in Plaintiff's motion for leave to subpoena granted by this Court and affirmed by the Sixth Circuit, Plaintiff represented that it was seeking to gain access only to "All computers, materials and documents that were seized [by the FBI] at [Defendant's] business Practical Catia" and not seeking access to "FBI investigative notes," but (b) Plaintiff's ultimate subpoenas to the FBI sought the production of "interview records, recordings or other documents that refer to or otherwise memorialize any interview of [D]efendant by the FBI, that were prepared by the FBI, or by its agents . . ., regarding the raid."

On January 10, 2013, the Court held a third scheduling conference in this case, and on January 16, 2013, for the first time, the Court issued a scheduling order for the case. On February 6, 2013, Plaintiff filed its motion to dismiss Defendant's 11 counterclaims. Thereafter, the parties filed the balance of the motions addressed in this Opinion and Order.

### III. LEGAL STANDARD

#### A.    Rule 12(b)(6) and Rule 12(c)

A motion brought pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted tests the legal sufficiency of a plaintiff's claims. The Court must accept as true all factual allegations in the pleadings, and any ambiguities must be resolved in the plaintiff's favor. *See Jackson v. Richards Med. Co.*, 961 F.2d 575, 577–78 (6th Cir. 1992). While this standard is decidedly liberal, it requires more than the bare assertion of legal conclusions. *See Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 319 (6th Cir. 1999). A plaintiff must make "a showing, rather than a blanket assertion of entitlement to relief" and "[f]actual allegations must be enough to raise a right to relief above the speculative level" so that the claim is "plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference the defendant is liable for the alleged misconduct." *Id.* at 556. *See also Ashcroft v. Iqbal*, 556 U.S. 662, 696-97 (2009).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), this Court may only consider "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the [Court] may take judicial notice." 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 12.34[2] (3d ed. 2000). If, in deciding the motion, the Court considers

10

matters outside the pleadings, the motion will be treated as one for summary judgment pursuant to Rule 56. *See* Fed. R. Civ. P. 12(d).

In deciding a motion brought under Rule 12(c), the standard is the same as that used in evaluating a motion brought under Fed. R. Civ. P. 12(b)(6). *See, e.g., Stein v U.S. Bancorp*, *et. al*, 2011 U.S. Dist. LEXIS 18357 at *9 (E.D. Mich. February 24, 2011). As such, the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations as true. *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006).

## B.      Rule 56

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323.   The moving party discharges its burden by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV.  ANALYSIS

### A.    Defendant's Counterclaims

Before the Court addresses Plaintiff's arguments for dismissal of each of Defendant's 11 counterclaims (as set forth in Plaintiff's motion to dismiss and Plaintiff's motion for summary judgment),[3] the Court notes that Defendant has argued that:

> [S]everal of [his] counterclaims are based, in part, on allegations that [Plaintiff] filed
> its copyright and trademark infringement lawsuit against [Defendant's] school

---

[3]For each counterclaim, the Court first assesses whether Defendant's counterclaim should be dismissed for failure to state a claim upon which relief can be granted (Rule 12(b)(6)/Rule 12(c)).  For the few counterclaims that survive Plaintiff's Motion to Dismiss, the Court also analyzes whether a genuine dispute of material fact exists such that the counterclaim may be tried to the jury (Rule 56).

knowing full well that its claims were baseless (a "sham").  Therefore, the issue of "sham litigation" is relevant to the matter currently before the Court.

In other words, some of Defendant's counterclaims are based, at least in part, on the fact that Plaintiff filed the instant cause of action; specifically, Count II – violation of Michigan's unfair competition law, Count III – tortious interference with business relationship, Count IV - civil conspiracy, Count V – intentional infliction of emotional distress, Count VI – malicious prosecution, and Count VII – abuse of process. The fact that Plaintiff filed the instant cause of action does not, however, in itself satisfy any element of those counts. *See, e.g., Early Detection Center, P.C. v. New York Life Ins. Co.*, 157 Mich.App. 618, 631 (1986) (stating that "[t]here is nothing illegal, unethical or fraudulent in filing a lawsuit, whether groundless or not" and affirming the dismissal of claims for intentional infliction of emotional distress, malicious prosecution, abuse of process, intentional interference with a business relationship, and civil conspiracy).

In addition, in order to establish that a lawsuit constitutes "sham" litigation, two things must be established.  "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). Second, the Court has to ascertain "whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor,' through the 'use [of] the governmental process – as opposed to the *outcome* of that process – as an anti-competitive weapon." *Id.* at 60-61 (internal citations omitted) (emphasis in original).  As discussed below, the Court concludes that Plaintiff had a reasonable basis for bringing the instant lawsuit.  Thus, Defendant's contention that the filing of the instant lawsuit was baseless or constitutes "sham" litigation cannot succeed.

1.    *Count I - Sherman Act*

13

In order for a plaintiff to bring a successful claim under Section 2 of the Sherman Act, 15 U.S.C. § 2, the plaintiff must prove two elements: "(1) the possession of monopoly power in a relevant market; and (2) the willful acquisition, maintenance or use of that power by anticompetitive or exclusionary means or for anticompetitive or exclusionary purposes." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595-96 (1985). Furthermore, an antitrust claimant: (a) must show that "the alleged violation tended to reduce competition overall and the [claimant's] injury was a consequence of the resulting diminished competition," and (b) bears "the burden of showing that the alleged violation was a material cause of its injury, a substantial factor in the occurrence of damages or that the violation was the proximate cause of the damage." *Ezzos Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 990 (6th Cir. 2001) (citing *Shreve Equip., Inc. v. Clay Equip. Corp.*, 650 F.2d 101, 105 (6th Cir. 1981)). Finally, the alleged actions "must be proved as a matter of fact and with a fair degree of certainty." *Id.* The requisite elements for a claim of attempted monopolization are: "(1) that a [party] has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 457 (1993).

The Court finds that Defendant has failed to satisfy his burden of pleading a Sherman Act violation or attempted violation. He has not alleged that Plaintiff ever had a "specific intent to monopolize" or that Plaintiff has a "dangerous probability of achieving monopoly power" to satisfy an attempted monopolization claim. Likewise, he has failed to allege how Plaintiff engaged in "the willful acquisition, maintenance or use of that power by anticompetitive or exclusionary means or for anticompetitive or exclusionary purposes." For purposes of an alleged Sherman Act violation, Defendant's allegations that Plaintiff filed this lawsuit or that Plaintiff has enforced its CATIA

14

registration with the USPTO are insufficient to support a claim upon which relief can be granted. Simply put, Plaintiff: (a) had a legal right to file this lawsuit, (b) has a legal right to prosecute this lawsuit, and (c) has a legal right to enforce its registered CATIA trademark with the USPTO. Accordingly, as the Court finds that Defendant has not pled the necessary elements for a Sherman Act counterclaim, dismissal of Count I is warranted.

### 2.   Count II - Michigan Unfair Competition Claim

Michigan's common law claim of unfair competition enforces two theories of liability:

[(1)]   palming off, . . . [involving] the simulation by one person, for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival, [o]r the substitution of the goods or wares of one person for those of another, thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to his competitor . . . , or

(2)   a false designation of origin whereby the defendant's alleged use of a plaintiff's trademark is likely to cause consumer confusion as to the source of the product.

See *Wilcom Pty. Ltd. v. Endless Visions*, 128 F. Supp. 2d 1027, 1033 (E.D. Mich. 1998) (elements for a Michigan unfair competition claim are the same as the elements for a Lanham Act claim for false designation of origin and require a finding of a likelihood of confusion). Defendant did not, however, plead—or even argue that he pled—either of those theories of liability.

Instead, Defendant asserts that he has properly and plausibly pled facts "from which the Court can infer" that Plaintiff has violated Michigan's prohibition against "unfair competition" by engaging in "unfair and unethical trade practices that are harmful to a competitor ([the School]) or to the general public." *Federal Mogul World-Wide Inc. v. Mahle GMBH*, No. 11-10675, 2011 U.S. Dist. LEXIS 110013, at *39-40 (E.D. Mich. Sept. 27, 2011) (citations omitted). *See also Atco Industries, Inc. v. Sentek Corp., et al.*, 2003 WL 21582962, at *3-4 (Mich. App., July 20, 2003).

15

Defendant contends that he has pled that Plaintiff's conduct in trying to eliminate the School as a competitor is unfair, unethical and unconscionable.  The Court cannot agree.  Defendant makes conclusory allegations that track the language in a court decision, but he has failed to set forth allegations of conduct by Plaintiff that support a cause of action for violation of Michigan's prohibition against unfair competition.

For the reasons set forth above, the Court dismisses Defendant's counterclaim based on violation of Michigan's prohibition against unfair competition.

3.    *Count III - Tortious Interference with Business Relationship or Expectancy*

Under Michigan law, a [party] must establish the following elements to prevail on a tortious interference with a business relationship claim: (1) the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or business expectancy; (2) knowledge of the relationship or expectancy on the part of the [other party]; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the party whose relationship or expectancy has been disrupted.

*Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 323 F.3d 396, 404 (6th Cir. 2003) (citation omitted).  Most significantly in the context of this case, *Wausau* dictates that a plaintiff must allege that the intentional interference in element three must either be: (a) a *per se* wrongful act, or (b) a lawful act done "with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Id.*  Defendant alleges that Plaintiff intentionally interfered by filing a complaint with the DOJ and filing this lawsuit.  As Defendant acknowledges, however, neither filing constitutes a "*per se* wrongful act."  Moreover, contrary to Defendant's contentions, neither filing can said to be "with malice <u>and</u> unjustified in law" because both filings were justified in law.

16

Therefore, for the reasons set forth above, Defendant's counterclaim for tortious interference with business relationship or expectancy is dismissed.

4.      *Count IV - Civil Conspiracy*

To properly plead a cause of action for civil conspiracy, Defendant must allege: (1) a concerted action (2) by a combination of two or more persons (3) to accomplish (a) an unlawful purpose or (b) a lawful purpose by unlawful means. *Admiral Ins. Co. v. Columbia Casualty Ins. Co.*, 194 Mich. App. 300, 313 (1992). *See also Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012); *Kasey, Inc. v. Alpine Realty Now, Inc.*, 2012 WL 10998, at *4 (Mich.App.).

Defendant's civil conspiracy claim against Plaintiff includes conclusory allegations that Plaintiff "acquired secret Grand Jury information from an as-yet unidentified coconspirator(s) within the FBI and/or Department of Justice." This conclusory allegation does not satisfy the standard required to plausibly allege a conspiracy. *Twombly*, 550 U.S. at 556 (complaint must contain enough factual matter—taken as true—to suggest that an agreement was made). Defendant failed to allege any facts that Plaintiff: (1) engaged in a concerted action, (2) in order "to achieve an unlawful purpose" or "a lawful purpose by unlawful means." In other words, Defendant fails to satisfy the pleading requirements for elements 1 and 3 of a civil conspiracy claim. Moreover, even if Defendant can be said to have sufficiently pled a conspiracy claim, Defendant has offered no evidence to support that there was a concerted action by any persons to provide Plaintiff with "secret grand jury information." Therefore, the Court will dismiss Defendant's conspiracy counterclaim.

5.      *Count V - Intentional Infliction of Emotional Distress*

In Michigan, a claim for intentional infliction of emotional distress requires that a complainant assert the following elements: (1) extreme and outrageous conduct, (2) intent or

17

recklessness, (3) causation, and (4) severe emotional distress. *Lockridge v. State Farm Mutual Automobile Ins. Co.*, 240 Mich. App. 507, 511 (2000). "Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. A defendant is not liable for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Heckmann v. Detroit Police Chief*, 267 Mich. App. 480, 498 (2005) (quoting *Lewis v LeGrow*, 258 Mich. App. 175, 196 (2003)).

Defendant's counterclaim for intentional infliction of emotional distress fails because he has not alleged conduct which the average member of the community would say is outrageous. *Farhoud v. Rosario*, 2013 WL 951096, at *2 (Mich.App.) (citation omitted). Defendant alleges that Plaintiff: (a) filed a complaint with the DOJ, (b) filed the complaint in this case, (c) tried to "coerce" Defendant's school into joining one of Plaintiff's programs under the threat of lawsuit, (d) would not communicate with Defendant's attorney, and (e) didn't listen to its own attorney. The fact that Defendant does not agree with Plaintiff's strategy or tactics, however, does not make any of Plaintiff's actions "outrageous." Again, most significantly, when Plaintiff filed this lawsuit, Plaintiff was exercising one of the permissible and legal rights it had. *See Early Detection Center*, 157 Mich.App. at 626-27. Likewise, all of the other alleged actions fall, objectively speaking, woefully short of outrageous. Accordingly, the Court dismisses Defendant's counterclaim for intentional infliction of emotional distress.

6.    *Count VI - Willful Misconduct/Malicious Prosecution*

With regard to malicious prosecution, the elements a party must establish are: (a) the other party has initiated a criminal prosecution against him, (b) the criminal proceedings terminated in his

18

favor, (c) the private person who instituted or maintained the prosecution lacked probable cause for his action, and (d) the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice. *Matthews v. Blue Cross & Blue Shield of Michigan*, 456 Mich. 365, 378 (1998); *Cox v. Williams*, 233 Mich. App. 388, 391 (1999).

The Court finds that Defendant has failed to allege any facts that Plaintiff "lacked probable cause" for filing a complaint with the DOJ/FBI or filing the instant complaint. Defendant acknowledged in his counterclaim that he has only one CATIA V5 Release 12 license and that he used and copied Plaintiff's CATIA V5 Release 12 software on more than one computer. Therefore, even if he has a viable defense or reasons for such copying, Defendant cannot maintain an action for malicious prosecution because Plaintiff reasonably sued him for copyright infringement in a civil lawsuit. Further, Defendant has failed to allege any facts that support the existence that Plaintiff contacted the DOJ/FBI "with malice or a purpose in instituting the criminal claim other than bringing the offender to justice." In fact, no criminal prosecution was ever initiated against Defendant. For the above reasons, the Court concludes that Defendant insufficiently alleges malicious prosecution by Plaintiff with respect to its filing of this lawsuit or the complaint with the DOJ/FBI.

To the extent Defendant tried to plead a claim for willful misconduct, Defendant's claim fails. Although the Michigan Supreme Court has stated that willful misconduct may be an <u>element</u> of overcoming governmental immunity for an intentional tort, *see Odom v. Wayne County*, 482 Mich. 459 (2008), no court has recognized willful misconduct as an independent cause of action. Therefore, the Court holds that Defendant cannot recover under that theory.

19

For the foregoing reasons, the Court dismisses Defendant's counterclaim for malicious prosecution/willful misconduct.

7.      *Count VII - Abuse of Process*

To properly plead a cause of action for abuse of process, Defendant must allege: (1) an ulterior purpose, and (2) an act in the use of process that is improper in the regular prosecution of the proceeding. *Friedman v. Dozorc*, 412 Mich. 1, 30 (1981); *Bonner v. Chicago Title Ins. Co.*, 194 Mich. App. 462, 472 (1992). A meritorious claim arises when a defendant has used a proper legal procedure for a purpose collateral to the intended use of that procedure. *Bonner*, 194 Mich. App. at 472. For an abuse of process claim, the misconduct "is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings, it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish." *Friedman*, 412 Mich. at 30 n.18 (quoting Restatement of Torts, 2d § 682 comment a). The plaintiff must plead and prove "some corroborating act" demonstrating an ulterior purpose because a "bad motive alone will not establish an abuse of process." *Id.* The Court finds that Defendant has met his burden at both the pleading stage and the summary motion stage.

Defendant has alleged – and offered evidence to support a finding – that Plaintiff had an ulterior purpose to filing the lawsuit and contacting the DOJ/FBI, *i.e.*, putting the School out of business. Defendant has also alleged and offered proof of acts in the use of process that are improper in the regular prosecution of this civil litigation and/or in the filing of a complaint with the U.S. government. Likewise, Defendant has alleged and offered evidence of multiple "corroborating acts" that could demonstrate an ulterior purpose. For example, Defendant has alleged and offered evidence that Plaintiff has made false and misleading statements in filings made in this Court, *e.g.*,

20

(1) the conflicting statements on how/when Plaintiff learned of Defendant's alleged illegal activity/infringement, and (2) Plaintiff's initial stated purpose in seeking leave from the Court to subpoena the FBI as compared to what Plaintiff actually sought from the FBI when Plaintiff served the subpoenas on the FBI.  Defendant has also alleged and offered evidence that Plaintiff (through its employees and/or agents) knew or could be charged with knowing that: (a) the School had an arrangement with MSC to use Plaintiff's copyrighted materials, (b) MSC and/or IBM had granted Defendant many CATIA V5 licenses between 2001-2005 or 2006, (c) Defendant had a CATIA V5 Release 12 license, and (d) Defendant had used CATIA in the School name and the services it provided for years – and did so continuously between 1998 and the time this lawsuit was filed in February 2009.

For the foregoing reasons, the Court finds that the allegations in Defendant's abuse of process claim surpass "the speculative level" and are " plausible on [their] face." *Twombly*, 550 U.S. at 555, 570.  Moreover, as discussed above, the Court finds that Defendant has offered evidence that would support an abuse of process counterclaim such that a genuine dispute of material fact exists regarding the elements of that counterclaim.  Accordingly, the Court denies Plaintiff's motion to dismiss and motion for summary judgment as it relates to Defendant's abuse of process counterclaim in Count Seven.

> 8.    *Count VIII - Negligence/Gross Negligence/Wanton Misconduct*

A claim for negligence requires a party to prove the defendant failed to use ordinary care. Ordinary care means the care a reasonably careful person would use. *Muth v. W P Lahey's, Inc.*, 338 Mich. 513, 523 (1953).  For a claim of gross negligence, a plaintiff must prove the defendant's conduct or a failure to act is so reckless that it demonstrates a substantial lack of concern for whether

21

an injury will result. *Tallman v. Markstrom*, 180 Mich. App. 141, 143 (1989); *Vermilya v. Dunham*, 195 Mich. App. 79, 82 (1992).  For a claim of wanton misconduct, the Plaintiff must show "an intent to harm, or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." *Burnett v. Adrian*, 414 Mich. 448, 456 (1982). Furthermore, "mere negligence cannot be cast as willful misconduct simply for the purposes of bringing a complaint." *Boumelhem v. BIC Corp.*, 211 Mich. App. 175, 187 (1995).  Finally, a plaintiff must show that the defendant owed a duty to plaintiff or that a special relationship existed between the parties. *See, e.g., Kessler v. Visteon Corp.*, 448 F.3d 326, 337 (6th Cir. 2006) ("[I]f there is no duty, then no matter the standard of care, causation or harm, no negligence can lie.").

Defendant has not satisfied his burden with respect to pleading any of these three causes of action.  First, and most significantly, Defendant has failed to allege that Plaintiff had any duty to Defendant or that they had a special relationship. Second, the Court finds that Defendant fails to allege any facts that support the claim that Plaintiff did not use the care a reasonably careful person would use under the circumstances.  Third, the Court finds Defendant did not allege conduct or a failure to act by Plaintiff that was so reckless it demonstrated a substantial lack of concern whether an injury would result or any willingness that an injury would result. Defendant asserts only that Plaintiff "was grossly negligent in filing its complaint without first contacting us to inquire about our use of the CATIA software in our school or to send the customary 'cease and desist' letter." Defendant, however, cites no authority for the proposition that Plaintiff owed Defendant a duty to send him a cease and desist letter because Plaintiff believed Defendant was infringing Plaintiff's rights.  Finally, the Court finds that Defendant fails to allege any facts to support the assertion that Plaintiff had "an intent to harm, or, if not that, such indifference to whether harm will result as to

be the equivalent of willingness that it does." As such, Defendant's wanton misconduct claim also must be dismissed. *See Davis v. Berghuis*, 2012 U.S. Dist. LEXIS 106137, at *30 (W.D. Mich. July 31, 2012) (dismissing wanton misconduct claim where plaintiff failed to allege facts sufficient to meet standard).

For the reasons set forth above, the Court concludes that Defendant's counterclaim for negligence, gross negligence, and wanton misconduct in Count VIII must be dismissed.

9.      *Count IX - Declaratory Judgment of Laches/Estoppel/Implied License*

In Count IX, Defendant claims he is seeking declaratory judgment based on laches, estoppel, and implied license. As the parties' filings reflect, however, each of these three concepts constitutes a defense, not a cause of action. Accordingly, the Court dismisses Defendant's Count IX, a "counterclaim" based on the defenses of laches, estoppel, and implied license.

To be clear, the Court is not "dismissing" Defendant's laches, estoppel and implied license defenses. Although Plaintiff seeks to dismiss and/or be granted "summary judgment" on Defendant's "counterclaims" which are, as noted above, actually affirmative defenses, to the extent that Plaintiff is actually seeking to strike Defendant's responsive pleadings, the Court will treat Plaintiff's motions to dismiss and for summary judgment as motions to strike. *See Dynasty Apparel Indus. Inc. v. Rentz*, 206 F.R.D. 603, 606 (S.D. Ohio 2002) ("A motion for summary judgment is not the proper vehicle with which to test the legal sufficiency of a pleading."). As established by the Sixth Circuit, "the action of striking a pleading should be sparingly used by the courts. It is a drastic remedy to be resorted to only when required for the purposes of justice. The motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819 (6th Cir. 1953). Additionally, Plaintiff's

23

request to strike Defendant's responsive pleadings came nearly 11 months after Defendant originally filed its answer and more than 8 months after Defendant filed his amended answer, well outside the time line provided by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 12(f)(2) (stating motions seeking to strike an insufficient defense from a pleading must be filed within 21 days after being served with the pleading).

Accordingly, and for the reasons set forth above, Defendant's laches, estoppel, and implied license "counterclaim" is dismissed, but Defendant's laches, estoppel, and implied license affirmative defenses remain.

###### 10.    *Count X - Fair Use*

According to 17 U.S.C. § 107:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use, the factors to be considered shall include–
>
> 1.    The purpose and character of the use, including whether such use is of commercial nature or is for nonprofit educational purposes;
>
> 2.    the nature of the copyrighted work;
>
> 3.    the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> 4.    the effect of the use upon the potential market for or value of the copyrighted work.

*Campbell v. Acuff-Rose Music*, 510 U.S. 569, 578 (1994) (noting that "the four statutory factors [may not] be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright.").

24

Fair use, however, is an affirmative defense. *See, e.g., Balsley v. LFP, Inc.*, 691 F.3d 747, 758 (6th Cir. 2012). Accordingly, for the reasons stated in Section IV.A.9 above (regarding laches, estoppel, and implied license), the Court: (a) dismisses Defendant's "counterclaim" for fair use because it is a defense, not a claim, (b) denies any motion to dismiss and/or strike Defendant's fair use affirmative defense, and (c) clarifies that Defendant's fair use affirmative defense remains.

### 11.   *Count XI - Cancel Plaintiff's Registered Trademark/Grant Defendant a Trademark Registration for "Practical Catia Training"*

In Count XI, Defendant alleges two separate causes of action. First, Defendant seeks a declaratory judgment cancelling Plaintiff's CATIA mark in Class 41 for educational training, a mark that was approved for registration by the USPTO in 2010. Second, Defendant seeks declaratory judgment that he is "entitled to registration of the marks Practical Catia Training and practicalcatia.com in Class 41 for educational training."

Citing 15 U.S.C. § 1501, Plaintiff argues that this Court does not have jurisdiction to register a federal trademark, stating that registration of a mark is solely within the province of the USPTO. Section 1501 provides that applications for trademark registration <u>may</u> be made to the Director at the USPTO, but Plaintiff contends that the plain language of 15 U.S.C. § 1501 specifies that the <u>only</u> way to obtain a trademark registration is to file an application with the USPTO. Plaintiff's argument ignores the language of 15 U.S.C. § 1119, which provides that:

> In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director [of the USPTO], who shall make appropriate entry upon the records of the [USPTO], and shall be controlled thereby.

Thus, contrary to Plaintiff's argument, the Court has the power to order the Director of the USPTO to register a mark or cancel a mark, as Defendant seeks to do here.

For purposes of this Opinion, the Court will assume, without deciding, that Defendant met his burden of sufficiently pleading his claims for cancellation of Plaintiff's mark in Class 41 for educational training and registration of Defendant's marks "Practical Catia Training" and "practicalcatia.com" in Class 41 for educational training. Even assuming Defendant met his pleading burden, however, the Court finds that the undisputed facts establish that Defendant's claims are unsupportable as a matter of law. It is undisputed that: (a) Plaintiff registered the CATIA mark in 1984, (b) Plaintiff first used "Practical Catia Training" in 1998, (c) the USPTO did not approve Defendant's 2003 application for trademark registration in Class 41 based on a likelihood of confusion with Plaintiff's CATIA mark and a mark for "PRACTICAL" that had been granted to a third party, and (d) Defendant abandoned his application in 2004.

To be granted declaratory judgment for either of his claims in Count XI, Defendant would have to show priority over Plaintiff's prior CATIA registration. Defendant cannot do so given Plaintiff's prior registration of CATIA in 1984 (registration number 1,274,136). *See* 15 U.S.C. § 1051(a)(3)(D) (stating that registration may be requested only if "to the best of the verifier's knowledge and belief, no other person has the right to use such mark in commerce. . . ."). Even if the prior user is entitled to registration of a mark (as Defendant argues), the earliest use of "Practical Catia Training" alleged by Defendant was in 1998. It is undisputed, however, that Plaintiff was using and issued a mark for "CATIA" in 1984 (making Plaintiff the prior user of that term). Therefore, the USPTO was correct in finding that Defendant's proposed mark would likely cause confusion. As the Court finds that Defendant has produced no evidence that he is the prior user of

26

CATIA, nor any other evidence that would justify cancellation of any of Plaintiff's marks (including the mark for Class 41) or registration of the marks Defendant desires ("Practical Catia Training" and "practicalcatia.com"), Defendant's claims in Count XI are not viable.

For the foregoing reasons, the Court concludes as a matter of law that Defendant fails to establish a genuine dispute of material fact with respect to the counterclaim(s) he alleges at Count XI seeking to: (a) cancel Plaintiff's Class 41 CATIA mark (Reg. #3754953), and (b) register to Defendant the marks "Practical Catia Training" and "practicalcatia.com" in Class 41 for educational training. Accordingly, the Court dismisses Count XI of Defendant's counterclaims.

> 12. *Conclusion Regarding Defendant's Counterclaims*

For the reasons set forth above, Counts I-VI and VIII-XI of Defendant's Counter-complaint are dismissed, and Count VII of Defendant's Counter-complaint shall survive Plaintiff's motions to dismiss and for summary judgment.

## B.   Plaintiff's Complaint

Plaintiff alleges four claims in its Complaint.  The elements of each claim are as follows.

The *prima facie* elements of Count I, a copyright infringement cause of action, are: (i) ownership of a valid copyright, and (ii) copying of a protected interest in the work by the defendant. *Design Basic, LLC v. DeShano Co.*, No. 10-14419, 2012 U.S. Dist. LEXIS, 135387 at *18-20 (E.D. Mich. Sept. 21, 2012) (denying defendant's motion to dismiss because plaintiff satisfied *prima facie* elements).

The *prima facie* elements of Count III, federal trademark infringement, are: (i) plaintiff's ownership of a protectable trademark; (ii) defendant used the mark in commerce and without the owner's consent; and (iii) there was a likelihood of consumer confusion. *Hensley Mfg., Inc. v.*

*Propride, Inc. et al.,* 579 F.3d 603, 609 (6th Cir. 2009); *Tovey v. Nike, Inc.*, 2012 U.S. Dist. LEXIS

185715, at *15-17 (E.D. Mich. July 3, 2012) (denying defendant's motion to dismiss where plaintiff

satisfied *prima facie* elements).

Plaintiff's claims in Count II and IV for federal unfair competition and for violation of the

MCPA, respectively, are based on the same set of *prima facie* elements as Plaintiff's trademark

infringement count (Count III). *See Empire Home Serv., LLC v. Empire Iron Works, Inc.,* No. 05-

CV-72584-DT, 2006 U.S. Dist. LEXIS 55176, at *11-13 (E.D. Mich. Aug. 8, 2006) (factors for

federal unfair competition claim are the same as federal trademark infringement); *Microsoft Corp.*

*v. Compusource Distribs., Inc.,* 115 F. Supp. 2d 800, 807 (E.D. Mich. 2000) ("standard under the

MCPA . . . is the same as the tests for federal trademark infringement and federal unfair competition

. . . : whether confusion is likely.").

The Court now turns to the parties' motions regarding Plaintiff's Complaint.

### 1.    *Defendant's Motion to Dismiss Plaintiff's Complaint*

Defendant's motion to dismiss Plaintiff's Complaint, which Defendant premised on Rule

12(c), was filed prior to the close of the discovery period.  Despite the Court-ordered discovery

period still being open at the time, Defendant asserted that the undisputed facts conclusively

established one or more of his affirmative defense as a matter of law.  After reviewing the Plaintiff's

Complaint and Plaintiff's response to Defendant's motion to dismiss, however, it is clear that many

relevant facts regarding each of Plaintiff's claims were then—and remain—in dispute.  As will be

discussed in detail below, this is especially true when the Court views all factual issues in a light

most favorable to the non-moving party, *i.e.*, for purposes of Defendant's motions, Plaintiff.  More

significantly, for purposes of evaluating Plaintiff's Complaint under *Twombly*, as is appropriate

when analyzing a motion filed under Rule 12(c), the Court finds that Plaintiff more than adequately alleged each of the elements required for the four claims set forth in its Complaint.  In fact, Defendant generally failed to even contest the sufficiency of Plaintiff's pleadings.  Accordingly, the Court denies Defendant's motion to dismiss Plaintiff's Complaint.

>    2.    *Defendant's Motions for Summary Judgment on Plaintiff's Claims*

>        a.    **Statute of Limitations**

The Court first addresses the issue of whether Plaintiff's claims are time-barred by the statute of limitations.  The established law is that each of Plaintiff's four claims is governed by a three-year statute of limitations. *See Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004) ("A civil action under the Copyright Act must be 'commenced within three years after the claim accrued.' 17 U.S.C. § 507(b). A cause of action accrues when a plaintiff knows of the infringement or is chargeable with such knowledge.'"); *General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 421 (6th Cir. 2006) ("In evaluating whether a party has been diligent in protecting its trademark, we look to the state-law statute of limitations for injury to personal property. Here, under Michigan law, that period is three years." Citing M.C.L. § 600.5805(10)).

Plaintiff filed its Complaint on February 12, 2009.  Therefore, if there is any evidence that Defendant engaged in conduct that would support each of Plaintiff's claims on or after February 12, 2006 (three years prior to filing of this cause of action), Defendant's statute of limitations argument must fail, at least in part.  As it is uncontested that Defendant continued to operate the School and train students while owning only one CATIA V5 Release 12 license between February 12, 2006, and October 30, 2006, the Court finds that there is evidence that could support a finding that Defendant engaged in conduct that would support each of Plaintiff's claims after February 12, 2006.  Therefore,

the Court must deny Defendant's argument that Plaintiff's claims stemming from conduct on or after February 12, 2006, are barred by the statute of limitations.

As to Plaintiff's claims for Defendant's conduct prior to February 12, 2006, the Court concludes that their viability requires that certain determinations be made by the fact finder (in this case the jury), not the Court as a matter of law. Although it is well-established that it is a question of law whether a claim is barred by the statute of limitations, *see, e.g., Tolbert v. State of Ohio Dept. of Trans.*, 172 F.3d 934, 938 (6th Cir. 1999), this case presents a situation where the fact finder will have to determine <u>when</u> Plaintiff "kn[ew] of the infringement or [wa]s chargeable with such knowledge." *General Motors Corp.*, 468 F.3d at 421. Once a factual determination has been made regarding when Plaintiff knew or was chargeable with knowledge of the alleged infringement, the Court can determine the date from which to apply the statute of limitations and how far back Plaintiff can seek damages for Defendant's infringement of Plaintiff's rights, if any such infringement is found.

Several situations exemplify why there is a genuine dispute of material fact as to when Plaintiff knew or was chargeable with knowing about the alleged infringement. First, Plaintiff now contends that it did not know that Defendant was infringing on its copyright and trademarks until after the FBI raid on October 30, 2006, but it also has acknowledged that it had received a tip in January 2005 that Defendant might be infringing on Plaintiff's intellectual property rights–and attempted to investigate the alleged violations itself. In addition, in an earlier filing with the Court, Plaintiff represented to the Court that Plaintiff had "informed the FBI about [Defendant's] illegal activity." That statement is inconsistent with Plaintiff's current contention that it learned of the alleged infringement from the FBI. Second, Defendant argues that Plaintiff knew or should have

known that Defendant was using the single CATIA V5 Release 12 license to conduct CATIA training classes for many years prior to 2005. As set forth above, evidence in the record demonstrates that several persons employed by Plaintiff knew that Defendant was operating a school that trained persons on CATIA programs:

A.    As early as 2003, when Defendant was offered the opportunity to participate in Plaintiff's HEAT program.

B.    In 2003, when Defendant contacted and communicated with Michael Recan, the director of Plaintiff's EPP in France, and Len Turner, Plaintiff's Americas Channel Development Manager, regarding possible participation by Defendant in the EPP, and Defendant informed at least Len Turner that he was using CATIA software to train students and that IBM/MSC were supplying the School with CATIA V5 to use for training students.

C.    In 2004, when Cedric Simard, Plaintiff's director of worldwide marketing and communication for Plaintiff's educational offerings, contacted Defendant about advertising banners on Defendant's school website promoting Plaintiff's Global Certification Program. Plaintiff ultimately uploaded advertising banners to at least two pages of the school website (which had been reviewed and chosen by Plaintiff), and those banners remained on Defendant's website until this lawsuit was filed.

Third, other evidence in the record demonstrates that: (1) employees of IBM (the seller of Plaintiff's CATIA license in the United States) and MSC (one of IBM's Business Partners and an entity owned in part by Plaintiff) knew Defendant used, and in some cases did not object to Defendant using (and may even have assisted Defendant in using) his single CATIA V5 Release 12 license on up to 20 computers (as early as in 2003), and (2) Len Turner actually asked Defendant to provide Plaintiff (through Len Turner) and IBM (through Andrew Clarkson) with any information Defendant might know regarding persons in southeast Michigan who were engaged in the unauthorized use of Plaintiff's CATIA software (in 2003-04 and perhaps into 2005).

As the foregoing contested evidence demonstrates, there is a genuine dispute of material fact about when Plaintiff knew (or should be charged with knowing) that Defendant was allegedly

31

infringing Plaintiff's intellectual property rights, such that the statute of limitations would start to run on Plaintiff's claims. Accordingly, at this time, the Court cannot hold, as a matter of law, that any of Plaintiff's claims are barred by the statute of limitations.

> **b.    Estoppel and Implied License**

Defendant also argues that he is entitled to summary judgment on his defenses of laches, acquiescence, estoppel and implied license. The Court addresses these arguments together.

Laches is an affirmative defense that applies when there has been: (a) an unexcused or unexplained delay in commencing an action, and (b) a corresponding change of material condition that results in prejudice to a party. *Dep't of Pub. Health v. Rivergate Manor*, 452 Mich. 495, 507 (1996); *Wayne Co. v. Wayne Co. Retirement Comm.*, 267 Mich. App. 230, 252 (2005). The defendant bears the burden of proving this resultant prejudice. *Twp. of Yankee Springs v. Fox*, 264 Mich. App. 604, 612 (Mich. Ct. App. 2004).

With respect to acquiescence, the Sixth Circuit has stated:

> Acquiescence, like laches, requires a "finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant." *Elvis Presley Enter., Inc., v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir.1991) (quoting *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir.1984)). Although both laches and acquiescence require proof that the party seeking to enforce its trademark rights has unreasonably delayed pursuing litigation and, as a result, materially prejudiced the alleged infringer, acquiescence requires more. *See Elvis*, 936 F.2d at 894 (holding that with acquiescence, "more is necessary than the ordinary requirement of showing unreasonable delay and prejudice to the defendant"); *Tandy* [*Corp. v. Malone & Hyde, Inc.*], 769 F.2d [362,] 366 n. 2 [6th Cir. 1985] ("To deny injunctive relief in trademark litigation, ... some affirmative conduct in the nature of an estoppel, or conduct amounting to 'virtual abandonment,' is necessary.") (internal citations omitted); *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 462 (4th Cir.1996) ("Although the doctrines of acquiescence and laches, in the context of trademark law, both connote consent by the owner to an infringing use of his mark, acquiescence implies active consent, while laches implies a merely passive

32

consent."); *SCI Sys., Inc. v. Solidstate Controls, Inc.*, 748 F.Supp. 1257, 1262 (S.D.Ohio 1990) (same).

*Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569 (6th Cir. 2000).

There are two general defenses of estoppel: equitable estoppel and promissory estoppel. There is no need to address promissory estoppel in this case, as there is no suggestion that Plaintiff ever promised Defendant anything. Equitable estoppel requires a showing of three elements: "(1) a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those facts." *Lakeside Oakland Dev., L.C. v. H & J Beef Co.*, 249 Mich. App. 517, 527 (2002).

Implied license is a defense that requires Defendant to demonstrate intent on behalf of the copyright holder (Plaintiff) to grant an implied license to Defendant. *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998). To that end, an implied license has been found when a party can "demonstrate that the copyright owners intended that their copyrighted works be used in the manner in which they were eventually used." *Id.*

Based on the same facts and reasoning discussed by the Court with respect to Defendant's statute of limitations argument, the Court also must deny Defendant's contention that he is entitled to summary judgment on the basis of laches, acquiescence, estoppel and/or implied license, though those defenses remain viable and Defendant may argue them at trial. There are simply too many material facts in dispute critical to each of those defenses that must be evaluated by the fact finder, including, without limitation: (1) what Plaintiff knew, (2) if Plaintiff's knowledge included awareness that Defendant was utilizing the CATIA V5 Release 12 license on multiple computers, (3) if Plaintiff knew that Defendant was utilizing the CATIA V5 Release 12 license on multiple

33

computers, when Plaintiff had such knowledge, (4) whether Plaintiff intended to grant a license to Defendant, (5) whether Plaintiff induced Defendant to believe certain facts that Defendant relied on, (6) whether Plaintiff made any "assurance to the [D]efendant, express or implied, that [P]laintiff would not assert his trademark rights against" Defendant, and (7) whether Plaintiff's delay in bringing the lawsuit was excusable or explainable. Absent some or all of those determinations, the Court cannot find, as a matter of law, that Plaintiff failed to enforce its intellectual property rights such that the elements of laches, acquiescence, estoppel and/or implied license have been satisfied.

### c.      Doctrine of Unclean Hands

Defendant also argues that Plaintiff's claims are barred in their entirety by the doctrine of unclean hands. "Unclean hands" is an equitable doctrine that "may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995). In essence, Defendant asserts that Plaintiff: (a) acted maliciously in filing the instant lawsuit, (b) knowingly made false statements as fact in its Complaint, and (c) had one of its employees knowingly make false statements of fact in other filings in this action. As noted above, however, the simple filing of a lawsuit does not demonstrate bad faith or malice. More significantly, there is no question of fact that Plaintiff owns the copyright for CATIA software products and trademark for Release 12, though there is a genuine dispute of material fact as to: (1) whether Defendant had any right to make multiple copies of the single CATIA V5 Release 12 license, and (2) whether Plaintiff knew or had reason to know, prior to the filing of this lawsuit, of any arrangement that Defendant had with IBM and/or MSC regarding utilization of the single CATIA V5 Release 12

34

license that was sold to, and the annual license payments were billed to, "G. Bailey & Associates" (not Defendant or the School).  In addition, at a minimum, there is a genuine dispute as to many other material facts, including, without limitation, those set forth by the Court in its discussion of the Defendant's arguments regarding the statute of limitations, laches, acquiescence, estoppel, and implied license.  Accordingly, the Court concludes that summary judgment on the basis of the doctrine of unclean hands is not warranted.

### d.   Necessary Parties

Defendant also asks the Court to dismiss all of Plaintiff's claims for allegedly failing to join IBM and MSC as "necessary parties" pursuant to Rule 19 of the Federal Rules of Civil Procedure. Rule 19(a)(1)(A) requires that a party be joined if "in that person's absence, the court cannot accord complete relief among existing parties." *See also School Dist. of City of Pontiac v. Secretary of U.S. Dept. of Educ.*, 584 F.3d 253, 265 (6th Cir. 2009).  The Court finds no basis for Defendant's conclusory allegations that IBM and/or MSC is a necessary party.  As: (1) the intellectual property rights at issue are allegedly owned by Plaintiff (and not IBM nor MSC), and (2) neither IBM nor MSC is alleged to have violated any of Plaintiff's alleged intellectual property rights, the Court finds that neither IBM nor MSC is a "necessary" party such that the Court "cannot accord complete relief among the existing parties."  The Court also notes that Defendant fails to cite any authority that affords the Court the power to dismiss Plaintiff's cause of action simply for failing to join necessary parties.  Therefore, the Court denies Defendant's argument that he is entitled to summary judgment on the basis of failure to join allegedly necessary parties.

### e.   Declaratory Judgment

35

As discussed above in Section IV.A.11., Defendant's assertions that he is entitled to entry of a declaratory judgment canceling Plaintiff's Class 41 CATIA mark and granting Defendant trademark registration in Class 41 are unfounded.  For the same reasons Defendant's counterclaims for declaratory judgment were dismissed, Defendant's reliance on such assertions as the basis for dismissal of Plaintiff's Complaint lacks merit.

### f.    Conclusion

For all of the reasons set forth above, Defendant's motions for summary judgment on Plaintiff's Complaint are denied.

### 3.    *Plaintiff's Motion for Summary Judgment*

Plaintiff's motion for summary judgment on its four claims is primarily based on the undisputed fact that Defendant owns only one CATIA V5 Release 12 license.  As Plaintiff did not consent to Defendant cloning the software and Target IDs onto the 20 computers Defendant used to operate the School, Plaintiff asserts it is entitled to summary judgment on all four claims.

Although there is no direct evidence that Plaintiff consented to Defendant cloning the CATIA V5 Release 12 license to operate the School, there is evidence that, at a minimum, Defendant had reason to believe that he had been granted permission to clone the CATIA V5 Release 12 license onto the training computers at the School.  First, notwithstanding Plaintiff's contentions to the contrary in some of its briefs, there is evidence that IBM and MSC acted as agents of Plaintiff with respect to the marketing and sales of CATIA software produced by Plaintiff.  In fact, Plaintiff's founder and initial CEO, Francis Bernard, has stated "[O]ur business model within the IBM/Dassault alliance . . . is [that while] DS [] is engaged in the development of software, IBM [is responsible for] sales, support and marketing."  Mr. Bernard further stated:

> The sales of all CATIA licenses are done by IBM . . . Furthermore, IBM has a network of Business Partners [including MSC] to cover most of the regions and to address various industrial sectors.  Usually, IBM works more with Large Accounts; the Business Partners' targets being to attract and serve small and medium size companies.

Haller also averred that he had the same understanding regarding MSC's role as a Business Partner of IBM.  In addition, there is also evidence that Plaintiff owned, during the period relevant to this lawsuit, 9% of MSC (and 19% of AES, MSC's predecessor and the entity from which Defendant originally purchased CATIA software).

Second, as early as 2001, Barton, an IBM Manager, knew that Defendant was utilizing CATIA V5 to teach his students, and she initiated contact with Defendant to thank Defendant for promoting CATIA V5 on the School's website and in classes at the School.  In response, Defendant (not "G. Bailey & Associates" or "Practical Catia Training") asked Barton "if [Plaintiff] and IBM would release a student version of Catia V5."  Barton responded that, "There is a new CD coming out that is called hobbled code.  You won't be able to print or save drawings, but you can do most other things in CATIA."  Each of Haller, Donna Janssen (Defendant's former partner and business manager in the early 2000s) and Defendant's son, Adam Childress (who also taught classes at the School), has also averred that IBM/Plaintiff provided Defendant/the School and its students with the CATIA V5 "Hobbled Code" software.

Third, Defendant interacted with Haller for a number of years regarding the purchase of CATIA V4 and CATIA V5 equipment and software for use at the School.  Haller also approached his sales manager at MSC, Roger Gudobba, about having MSC advertise on Defendant's website with banner advertisements on two of the school's webpages.  In exchange, MSC would provide Defendant and students at the School "with fully-functional CATIA V5 software and temp licenses,

as MSC was already providing to its students." Defendant also would provide sales leads (referrals) to MSC in conjunction with that agreement. Eventually, MSC and Defendant entered into an agreement to provide each other with all of the services set forth in this paragraph via what Defendant has termed a "Business Agreement" and Haller and Patrishkoff (MSC's Director of Business Development) have termed a "business arrangement." As evidence of the "Business Agreement," Defendant has filed on the docket a CD allegedly containing approximately 250 CATIA V5 licenses Defendant/the School received from IBM and/or MSC between September 2000 and February 2007. The validity of those licenses has not been challenged. Defendant has also filed on the docket a CD that allegedly contains approximately 400 sales leads that Defendant/the School provided to MSC pursuant to the "Business Agreement." Such leads were usually sent to Haller, though a number of leads were directed to MSC Account Representative Emily Tousignant.

Fourth, in October 2001, Defendant (through G. Bailey & Associates) purchased and received from MSC a "permanent" CATIA V5 Release 12 license. In March 2003, Haller ordered and set-up in the School's classroom a 6-month multi-user network license from IBM and a CATIA license server. Defendant states that, in conjunction with those transactions, he purchased at least $1,000 worth of wireless network equipment so that the classroom computers could be set up together. Subsequently, as a result of connection issues related to the use of 15 computers using the CATIA V5 Release 12 license purchased from MSC in October 2001, Defendant purchased programmable network cards that allowed each computer to have the same address as the single CATIA V5 Release 12 license purchased from MSC in October 2001. Haller and Defendant have labeled Defendant's use of the programmable network cards to circumvent the connection issues as a "workaround." Haller has filed an affidavit stating that he: (1) was aware of Defendant's

38

"workaround" solution, and (2) "did not object to its use because [Defendant] had MSC's permission to use the CATIA V5 software." In fact, in 2004, with MSC's knowledge—and possibly MSC's permission, Defendant again utilized the "workaround" solution for purposes of the School's training computers when CATIA V5 Release 13 was issued.

Fifth, there is evidence that numerous persons who worked for Plaintiff, including some executives, knew (or could have or should have known) Defendant was using "Practical Catia Training" as early as 1998 and some of Plaintiff's employees knew that he was by 2003. In 1998, Defendant wrote an article for "CATIA Solutions Magazine," a worldwide trade publication devoted entirely to CATIA software. In that publication, Defendant's article was titled "Practical Catia Training" and carried the byline "Keith Childress owns G. Bailey & Associates, and is Founder/Instructor of Keith Childress' <u>Practical Catia Training</u> in Detroit" (emphasis added). In addition, Plaintiff ran a full-page advertisement in the publication (IBM also ran a full-page ad in that publication), and Plaintiff (and IBM) had a representative on the CATIA Solutions Magazine "Editorial Advisory Board." Defendant also wrote articles in CATIA Solutions Magazine in 1999 and 2002, each of which included the name of the School – "Practical Catia Training."

In addition, as noted above, in 2003, Defendant contacted Michael Recan, Plaintiff's EPP Director, from Defendant's email address (keith@practicalcatia.com). As a result, Len Turner, Plaintiff's Americas Channel Development Manager, and Defendant discussed the EPP. Len Turner, like Michael Recan, communicated with Defendant at his email address, which included the term "practicalcatia.com" and a link to the School's website. Further, in late 2004, Simard, an employee of Plaintiff at its France headquarters who represented he was "in charge of worldwide marketing and communication for [Plaintiff's] Education offering," entered into an arrangement

whereby Plaintiff would be allowed to display two banner ads on the School's www.practicalcatia.com website and those banner ads were uploaded to the School's www.practicalcatia.com website. There is also evidence that Defendant ran a banner that stated "Free CATIA V5 Software" on two of the School's website pages beginning in 2001 (when the relationships with MSC and IBM began). As such, those banner ads were present when Simard reviewed the School's website to ascertain the webpages on which Plaintiff would place its banner ads (and when any of Plaintiff's other employees viewed the School's website in the early 2000s).

For the foregoing reasons, the Court finds there is a genuine dispute of material fact as to whether Defendant's use of the CATIA V5 Release 12 license violated Plaintiff's intellectual property rights. Accordingly, the Court denies Plaintiff's motion for summary judgment on all four of its claims.

## C.     Motion to Strike

The Court denies Plaintiff's motion to strike. First, as discussed above, the Court denied Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(c). Thus, Defendant's Motion to Dismiss does not count as Defendant's first motion for summary judgment. Second, although Defendant did file two motions for summary judgment at the dispositive motion deadline, the Court finds that such filings were not in bad faith. Third, Plaintiff has already filed responses to the motions for summary judgment filed by Defendant, wherein Plaintiff addressed the arguments made by Defendant. Finally, even if the Court were to strike the summary judgment motions today, the Court would grant Defendant a short period within which to file a single motion for summary judgment. In doing so, the protracted and document-laden litigation between the parties would be extended only to allow the parties to refile the same issues presently before the

Court. Therefore, the Court concludes striking Defendant's summary judgment motions would only add to the costs incurred by Plaintiff because it would have to streamline its arguments and refile a brief in opposition to the new motion for summary judgment filed by Defendant. Therefore, for the reasons set forth above, the Court finds that deciding the summary motions, as briefed, best serves the interests of justice, reduces the time and expense of the parties, and promotes judicial economy. Accordingly, Plaintiff's motion to strike is denied.

### D.      Motion for Leave to File Sur-Reply

Defendant has filed a motion to file a sur-reply with respect to Defendant's motion for summary judgment because Plaintiff allegedly set forth new arguments in its reply brief regarding: (1) whether MSC was an agent of Plaintiff, and (2) the ability of MSC's employee(s) to act on behalf of Plaintiff with respect to transacting with Defendant in certain situations. In the event the sheer number of motions addressed in this Opinion fails to demonstrate the breadth of the filings before the Court  (to say nothing of the multitude of discovery motions filed by the parties), the Court expressly notes that the parties have inundated the Court with arguments, facts, allegations, innuendos, affidavits, etc. In addition, (a) the parties have been granted leave to file excess pages, and (b) Defendant, in particular, has filed lengthy brief after lengthy brief. As a result, the Court is well aware of the parties' arguments, positions, allegations, facts, innuendos, and affidavits with respect to each and every issue and claim before the Court.

The Court also notes that Defendant has filed two motions for summary judgment (plus a motion to dismiss) and filed a response brief to Plaintiff's motion to dismiss Defendant's counterclaims. In other words, anything that can be argued relative to Plaintiff's motion for summary judgment has been — or should have been — argued previously. In fact, the argument

41

Defendant seeks to address in his sur-reply is one that Plaintiff timely raised in a brief filed over two weeks prior to filing its reply regarding Plaintiff's motion for summary judgment (specifically, Plaintiff raised the argument when responding to Defendant's motion for partial summary judgment).

Therefore, for the reasons set forth in this section, the Court finds that Defendant's motion to file a sur-reply with respect to Plaintiff's motion for summary judgment is neither justified nor necessary for the Court to rule on the issues in Plaintiff's motion for summary judgment. Therefore, Defendant's motion to file a sur-reply with respect to Plaintiff's motion for summary judgment is denied.

**E.      Bifurcation of Counterclaims in Counts I-VIII**

As the Court has dismissed Defendant's counterclaims set forth in Counts I-VI and VIII, the Court need only address Plaintiff's motion to bifurcate Defendant's counterclaims as it relates to Count VII. The Court finds that the facts at issue with respect to Defendant's abuse of process claim set forth at Count VII are inextricably intertwined with the facts necessary to determine the merits of Plaintiff's four claims. Accordingly, the Court denies Plaintiff's motion to birfurcate Defendant's counterclaim at Count VII (the abuse of process claim).

**F.      Defendant's Motion to File Supplement to Defendant's Opposition
to Plaintiff's Motion for Summary Judgment**

As set forth above, the Court denied Plaintiff's motion for summary judgment.  As such,
Defendant's ex parte motion for leave to file a supplement to his opposition to Plaintiff's motion for
summary judgment will be denied as moot.  As the Court has denied Defendant leave to file the
supplemental brief, the Court will order the Clerk of the Court to strike the supplemental brief filed
at Docket Entry 269.

**G.      Defendant's Motion for Leave to File a Supplement to Defendant's
Motions for Summary Judgment**

Defendant's motion for leave to file a supplement to his motions for summary judgment,
filed more than a year after his motions for summary judgment, only conclusorily states that: (1)
"[g]ood cause exists for this Court to grant" his motion, and (2) "what little discovery [Plaintiff] did
produce [subsequent to the time Defendant's summary judgment motions were filed] provides
additional evidence in support of" Defendant's summary judgment motions.  Defendant does not,
however, identify any evidence that would do so – or how such evidence would support granting
all, or any portion, of Defendant's summary judgment motions.  Defendant also fails to explain why
the motion for leave was not filed until October 31, 2014.  Finally, for the many reasons set forth
above, the Court is not persuaded that summary judgment would be warranted regarding the issues
raised by Defendant in his proposed supplement.  Accordingly, the Court denies Defendant's motion
for leave to file a supplement to his motions for summary judgment.

**H.      Defendant's Motions to Seal**

For the reasons set forth in Defendant's motions to seal at Docket Entries 202 and 254,
neither of which were opposed by Plaintiff, the Court will grant Defendant's motions to seal.

## V.  CONCLUSION

Accordingly, and for the reasons set forth above, IT IS HEREBY ORDERED that:

1.      Plaintiff's Motion to Dismiss Defendant's Counterclaims (Docket #127) is GRANTED IN PART and DENIED IN PART;

2.      Defendant's Motion to Dismiss All Counts of Plaintiff's Complaint (Docket #146) is DENIED;

3.      Defendant's Motion for Partial Summary Judgment (Docket #193) is DENIED;

4.      Defendant's Motion for Summary Judgment (Docket #194) is DENIED;

5.      Plaintiff's Motion for Summary Judgment on its Complaint and Defendant's Counterclaims (Docket #195) is GRANTED IN PART AND DENIED IN PART;

6.      Plaintiff's Motion to Strike Defendant's Motions for Partial Summary Judgment and Summary Judgment (Docket #199) is DENIED;

7.      Defendant's Motion for Leave to File Sur-Reply with respect to Plaintiff's Motion for Summary Judgment (Docket #226) is DENIED; and

8.      Plaintiff's Motion to Bifurcate Defendant's Counterclaims 1-8 from Plaintiff's Copyright and Trademark Infringement Counts (Docket #232) is DENIED.

9.      Defendant's Ex Parte Motion for Leave to File a Supplement to Plaintiff's Motion for Summary Judgment (Docket #268) is DENIED.

10.     The Clerk of the Court shall STRIKE the supplemental brief filed by Defendant at Docket #269.

11.     Defendant's Ex Parte Motion for Leave to File a Supplement to Defendant's Motions for Summary Judgment (Docket #271) is DENIED.

12.   Defendant's Motion to Seal Docket Entry 193 (Docket #202) and Defendant's Motion to Seal Docket Entry 250 (Docket #254) are GRANTED.

IT IS SO ORDERED.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: December 3, 2014