# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  September 10, 2020

Mr. Mark Roy Bendure
Bendure & Thomas
15450 E. Jefferson Avenue, Suite 110
Grosse Pointe Park, MI 48230

Mr. Keith Childress
620 Georgia Avenue
Sewanee, TN 37375

Mr. Glenn E. Forbis
Mr. James Bradley Luchsinger
Harness, Dickey & Pierce
5445 Corporate Drive, Suite 200
Troy, MI 48098

Re:  Case Nos. 17-2175/17-2239/17-2416, *Dassault Systèmes, SA v. Keith Childress*
Originating Case No. : 2:09-cv-10534

Dear Counsel,

The Court issued the enclosed opinion today in these cases.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc:  Mr. David J. Weaver

Enclosure

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0530n.06

Nos. 17-2175, 17-2239, 17-2416

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| DASSAULT SYSTÈMES, SA, | ) |
| | ) |
|     Plaintiff-Appellee/Cross-Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| KEITH CHILDRESS, dba Practical Catia Training, | ) |
| | ) |
|     Defendant-Appellant/Cross-Appellee. | ) |
| | ) |
| | ) |
| _____ | ) |

```
FILED
Sep 10, 2020
DEBORAH S. HUNT, Clerk
```

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE: DAUGHTREY, GIBBONS, and MURPHY, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. This consolidated appeal arises from Dassault Systèmes's lawsuit against Keith Childress for alleged copyright and trademark infringement. Childress, an engineer who trained individuals in the Detroit area on the use of Dassault's copyrighted and trademarked CATIA software, responded to Dassault's complaint with a number of counterclaims, including abuse of process and tortious interference with business relationships. The district court dismissed all of Childress's counterclaims against Dassault, and the parties eventually proceeded to trial on Dassault's copyright and trademark infringement claims against Childress, with Childress proceeding *pro se*.

During a pre-trial conference, the district court imposed a ten-hour limit for each party to present evidence. After the close of evidence, the jury returned a verdict in favor of Dassault on the copyright claim but not the trademark claim. Soon afterwards, it came to light that, during deliberations, the jury allegedly received extraneous information regarding settlement negotiations

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

between Dassault and Childress along with erroneous information regarding Childress's salary. Childress moved for a new trial based on the time limitations imposed by the district court and the jury's alleged receipt of extraneous information. The district court denied Childress's motion for a new trial as well as his subsequent motion for reconsideration of that ruling. Childress also filed—and the district court denied—a motion seeking reversal of the district court's earlier denials of his motions for summary judgment. And the district court denied Childress's motion for reconsideration of that ruling. Meanwhile, Dassault filed a renewed motion for judgment as a matter of law on its trademark infringement claim, which the district court also denied.

Childress now appeals the following: (1) the district court's dismissal of his abuse of process counterclaim; (2) the district court's dismissal of his tortious interference counterclaim; (3) the district court's denial of his motion for reconsideration of the earlier ruling denying him a new trial; and (4) the district court's denial of his Federal Rule of Civil Procedure 60(b) motion to reverse the district court's earlier denials of his motions for summary judgment. Dassault cross-appeals the district court's denial of its Federal Rule of Civil Procedure 50 motion for judgment as a matter of law on the trademark claim.

For the following reasons, we: (1) reverse the district court's dismissal of Childress's abuse of process counterclaim; (2) reverse the district court's dismissal of Childress's tortious interference counterclaim; (3) reverse the district court's denial of Childress's motion for reconsideration of the ruling denying him a new trial; (4) affirm the district court's denial of Childress's Federal Rule of Civil Procedure 60(b) motion; and (5) affirm the district court's denial of Dassault's motion for judgment as a matter of law.

I.

Dassault Systèmes, SA ("Dassault") is a French corporation that developed a computer software design program known as CATIA (Computer Aided Three Dimensional Interactive Application).[1] CATIA is used by industrial manufacturers in automotive design and engineering. Dassault has held a registered trademark with the United States Patent and Trademark Office ("USPTO") on its CATIA mark since 1984. Dassault has also held a registered copyright on its CATIA Version 5 ("CATIA V5") software since 2003. IBM and its Business Partners handled all sales and licensing of CATIA software until 2005.

Keith Childress is an automotive design and engineering professional. In 1995, he and his family began operating a for-profit school ("the School") in the Detroit area that provided instruction in CATIA software. The School did business under the name "Keith Childress' Practical Catia Training" and operated a website with the address www.practicalcatia.com. The School trained students on CATIA and promoted the software on its website.

In order to operate the CATIA software on a computer, a license is required. In 2001, the School purchased two IBM workstations, containing CATIA V4 software with permanent licenses, from an IBM Business Partner which Dassault partially owned. While Childress trained students on CATIA V4, the School's website also promoted the newly released CATIA V5 software. In response to the School's promotion of CATIA V5, IBM offered the School a limited version of CATIA V5 for students to use at the school and on their home computers. In October 2001, the school accepted and purchased the CATIA V5 license, and it paid the annual charge for that license every year leading up to Dassault's lawsuit.

---

[1] Most of the facts in this section pertain to Childress's appeal of 12(b)(6) determinations; to the extent they concern these claims, therefore, the facts are taken from Childress's "First Amended Answer and Counterclaims," DE 101, and are presumed to be true.

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

In November 2001, soon after the School purchased the limited CATIA V5 software, the School entered into a "business agreement" with MSC Software—IBM's Business Partner which Dassault partially owned. Pursuant to the agreement, MSC and IBM provided the school with fully functional CATIA V5 software and temporary licenses, and, in exchange, the School allowed MSC to advertise on the School's website and market to its students. The School later entered a similar agreement with Dassault, pursuant to which Dassault advertised its "Global Certification Program" on the School's website, in exchange for providing the School with Global Certification exam vouchers.

In 2003, MSC set up a CATIA license server at the School, and IBM provided the school with a 15-user server license for use of CATIA V5. The School soon began to experience connectivity problems with the server. As a temporary solution, MSC allowed the School to install the 2001 CATIA V5 license that it had originally purchased onto each of its training computers. An MSC employee confirmed that, at least from 2001 to 2006, the School used the CATIA V5 software "with the full knowledge and consent of IBM, Dassault Systèmes, and MSC Software." DE 101, First Amended Answer and Counterclaims ("FAACC"), PageID 1220.

Childress contacted Dassault in 2003 to inquire about their new Education Partner Program ("EPP"). A Dassault employee explained to Childress that the EPP was created to provide CATIA V5 training materials to entities that provided CATIA training, and that it cost $40,000 to join. Childress told the employee about the School and its arrangement with IBM and MSC for CATIA software, and he explained how his career experience with CATIA obviated any need for training materials. The two agreed that it made little sense for the School to join the EPP, and Childress did not further pursue the matter.

4

In 2004, Dassault expanded its business to include CATIA training in the states, including in the Detroit area. It thus became a direct competitor of the School in the local CATIA-training market. Dassault also assumed management responsibility for IBM's network of Business Partners. Now, if entities wished to obtain CATIA licenses for training purposes, they had to join Dassault's EPP. Dassault published a list of prospective customers whom EPP participants could not solicit.

Soon after entering the CATIA-training market, Dassault filed a complaint with the Department of Justice accusing the School of infringing on its CATIA copyright. This led to a grand jury investigation which, in turn, resulted in a search warrant for the School. In 2006, the FBI executed the search warrant and raided the School, seizing its computers, training materials, and other equipment. Childress testified before the grand jury, presenting evidence of his agreements with Dassault and its agents, and the DOJ thereafter declined to prosecute Childress for his alleged copyright violations.

Childress then communicated with a Dassault representative regarding the School's admission to Dassault's EPP. Dassault insisted that the School join its EPP. Childress found the terms of the EPP to be prohibitively expensive for the School and asked to negotiate the terms, but Dassault never followed up on Childress's requests for negotiation. Dassault eventually contacted Childress to notify him that if the School did not join the EPP, Dassault would file a lawsuit against the School. Childress found this threatened lawsuit to be "an attempt to bully [the School] into joining the EPP." *Id.* at 1232. Childress, who could no longer afford an attorney, directly contacted Dassault's attorney to clear up the matter and explained that the School was offering CATIA training pursuant to agreements with Dassault's agents. Dassault's attorney suggested a

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

conference call between Childress and Dassault's headquarters to "straighten the matter out." *Id.* at 1235. But Dassault never followed up and the call did not happen.

In February 2009, Dassault filed suit against the School. Its complaint alleged that when Childress copied the software from his original CATIA V5 license onto other computers in the school, he (1) infringed on Dassault's copyright on the CATIA V5 software, in violation of 17 U.S.C. § 501; (2) engaged in unfair competition, in violation of 15 U.S.C. § 1125; (3) infringed on Dassault's federal "CATIA" trademark, in violation of 15 U.S.C. § 1114; and (4) violated the Michigan Consumer Protection Act, M.C.L. § 445.901.

After some procedural delays,[2] Childress, proceeding *pro se*, filed an answer along with a number of affirmative defenses and counterclaims. His counterclaims included: (1) a Sherman Act violation; (2) unfair competition in violation of Michigan law; (3) tortious interference with business relationship; (4) civil conspiracy; (5) intentional infliction of emotional distress; (6) malicious prosecution; (7) abuse of process; (8) negligence; (9) declaratory judgment based on laches, estoppel, or implied license; (10) declaratory judgment based on fair use; and (11) declaratory judgment based on trademark ownership. In addition to the allegations under each counterclaim heading, Childress's FAACC also presented a long list of "General Allegations" pertaining to all the counterclaims. *Id.* at 1202–49.

Dassault moved for judgment on the pleadings as to Childress's counterclaims. Fed. R. Civ. P. 12(c). The district court granted Dassault's motion with respect to every counterclaim except for Childress's abuse of process counterclaim. The judge assigned to the case, Judge Lawrence Zatkoff, died shortly thereafter, and Judge Marianne Battani took over the case.

---

[2] In July 2010, the district court entered default judgment in favor of Dassault, granted Dassault's motion for leave to subpoena the FBI, and closed the case. Childress appealed, and this court vacated the default judgment, affirmed the grant of Dassault's motion for leave to subpoena the FBI, and remanded.

6

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

Dassault then filed a motion for reconsideration of the district court's earlier decision. The district court granted the motion, resulting in the dismissal of Childress's abuse of process counterclaim—the only remaining counterclaim. Childress now appeals (1) the district court's first order dismissing his tortious interference counterclaim, and (2) the district court's second order on reconsideration dismissing his abuse of process counterclaim.

In 2017, Dassault and Childress went to trial on Dassault's claims of copyright and trademark infringement, with Childress still proceeding *pro se*. Before the trial commenced, the district court imposed ten-hour time limits on both parties to present their cases. Childress spent around nine hours cross-examining Dassault's witnesses and was therefore only left with around one hour to present his defense case. The jury returned a verdict finding Childress liable for copyright infringement but not trademark infringement.

After the jury returned its verdict, a juror contacted Childress to notify him of extraneous information the jury received. One juror had apparently heard that Childress turned down a settlement offer and, during deliberations, conveyed that information to the rest of the jury. Another juror had apparently claimed that Childress made $750,000 per year and could therefore withstand a verdict against him on one claim. Childress claims that both assertions were inaccurate.

Childress filed a Federal Rule of Civil Procedure 59 motion seeking a new trial. He argued (1) that the district court's imposition of ten-hour time limits was a prejudicial abuse of discretion, and (2) that the verdict was affected by extraneous information the jury allegedly acquired during deliberations. The district court declined to hold an evidentiary hearing on the latter argument and denied Childress's motion in full. Childress then filed a motion for reconsideration, which the

district court also denied. Childress now appeals the district court's denial of his motion for reconsideration.

Dassault, meanwhile, filed a renewed Federal Rule of Civil Procedure 50 motion for judgment as a matter of law on its trademark infringement claim, arguing that the jury's decision was against the weight of the evidence. The district court denied Dassault's motion. Dassault now cross-appeals the district court's denial of its motion for judgment as a matter of law.

In a separately docketed appeal (No. 17-2416), Childress also challenges the district court's denial of his motion for reconsideration of the court's earlier ruling denying his post-trial Federal Rule of Civil Procedure 60(b) motion to reverse the denials of Childress's earlier summary judgment motions.

## II.

Childress, now represented by counsel, raises five issues on appeal. First, Childress claims that the district court erred when, on reconsideration, it overturned the district court's earlier decision and dismissed his abuse of process counterclaim. Second, he claims that the district court erred when it dismissed his counterclaim of tortious interference with business relationship. Third, he argues that the district court erred in denying his motion for reconsideration of the ruling denying him a new trial based on the ten-hour time limit at trial, which Childress maintains was an abuse of discretion and resulted in insufficient time for him to present his case. Fourth, Childress claims that the district court erred in denying his motion for reconsideration of the same post-trial order's denial of an evidentiary hearing and new trial based on the jury's alleged receipt of extraneous information. Finally, Childress argues that the district court erred in denying his Rule 60(b) motion seeking reversal of the earlier denials of his motions for summary judgment based on his allegation that he filed those motions before Dassault produced discovery. Dassault,

meanwhile, raises one issue on cross-appeal, arguing that the district court should have granted its motion for judgment as a matter of law on its trademark infringement claim.  We address each claim in turn.

### A.  Abuse of Process Counterclaim

Childress's abuse of process counterclaim initially survived Dassault's Federal Rule of Civil Procedure 12(c) motion for judgment on the pleadings.  But the district court later granted Dassault's motion for reconsideration and dismissed the counterclaim.  Childress challenges the latter decision.

1.

Under Michigan law, a cause of action for abuse of process requires the plaintiff to show that the defendant "used a proper legal procedure for a purpose collateral to its intended use, and there must be some corroborating act that demonstrates the ulterior purpose."  *Alman v. Reed*, 703 F.3d 887, 905 (6th Cir. 2013) (citing *Bonner v. Chicago Title Ins. Co.*, 487 N.W.2d 807, 812 (Mich. Ct. App. 1992)).  The elements of an abuse of process claim are thus "(1) an ulterior purpose, and (2) an act in the use of process which is improper in the regular prosecution of the proceeding."  *Id.* (quoting *Friedman v. Dozorc*, 312 N.W.2d 585, 594 (Mich. 1981)).  The ulterior purpose "usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club."  *Id.* (quoting *Three Lakes Ass'n v. Whiting*, 255 N.W.2d 686, 690 (Mich. Ct. App. 1977)).

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is reviewed under the same standard as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 11 (6th Cir.

1987). Under this standard, a claim should be dismissed if it fails to allege facts that, if true, plausibly show that the claimant is entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). If the facts alleged in the complaint allow for competing inferences, the court must draw the inferences in favor of the non-movant. *Sw. Williamson Cnty. Cmty. Ass'n v. Slater*, 173 F.3d 1033, 1038 (6th Cir. 1999). Moreover, *pro se* pleadings are held "to less stringent standards than formal pleadings drafted by lawyers" and are to be "liberally construed." *Luis v. Zang*, 833 F.3d 619, 626 (6th Cir. 2016) (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)).

Under the Eastern District of Michigan's local rules, a motion for reconsideration may be granted only where the movant demonstrates "a palpable defect by which the court and the parties . . . have been misled" and "that correcting the defect will result in a different disposition of the case." E.D. Mich. L.R. 7.1(h)(3); *Witzke v. Hiller*, 972 F. Supp. 426, 427 (E.D. Mich. 1997). "A 'palpable defect' is a defect that is "obvious, clear, unmistakable, manifest or plain." *Witzke*, 972 F. Supp. at 427. "[T]he moving party must show that the Court made a mistake based on the record before it, and rectifying the mistake would change the outcome." *Southfield Educ. Ass'n v. Bd. of Educ. of the Southfield Pub. Sch.*, 319 F. Supp. 3d 898, 902 (E.D. Mich. 2018). "A party may not utilize a motion for reconsideration 'to introduce new legal theories for the first time, to raise legal argumentation which could have been heard during the pendency of the previous motion, or to present evidence that could have been adduced during the pendency of the original motion." *DiPonio Constr. Co. v. Int'l Union of Bricklayers, Local 9*, 739 F. Supp. 2d 986, 1004 (E.D. Mich. 2010) (quoting *Tkach v. Stonepath Logistics Servs.*, No. 04-74219, 2005 WL 1050280, at *5 (E.D. Mich. Apr. 18, 2005)); *see also In re Greektown Holdings, LLC*, 728 F.3d 567, 575 (6th Cir. 2013) ("[A]bsent a legitimate excuse, an argument raised for the first time in a

motion for reconsideration at the district court generally will be forfeited.") (quoting *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 331–32 (6th Cir. 2009)).

### 2.

 The district court initially declined to dismiss Childress's counterclaim alleging abuse of process because it found Childress alleged facts that sufficiently supported the claim. Specifically, the court found that Childress offered evidence supporting a finding that Dassault filed its lawsuit and contacted the DOJ/FBI with the ulterior purpose of putting Childress out of business. The district court also found Childress presented evidence of multiple "corroborating acts" that demonstrated an ulterior purpose, such as Childress's allegation that Dassault made false and misleading statements in its filings. These include: "(1) the conflicting statements on how/when [Dassault] learned of [Childress]'s alleged illegal activity/infringement, and (2) [Dassault]'s initial stated purpose in seeking leave from the Court to subpoena the FBI as compared to what [Dassault] actually sought from the FBI when [Dassault] served the subpoenas on the FBI."[3] DE 275, Order Mot. Dismiss, PageID 5601.

Dassault filed a motion for reconsideration pursuant to Local Rule 7.1(h), arguing that the district court should have dismissed Childress's abuse of process claim because, under Michigan law, putting a defendant out of business is not a cognizable "ulterior purpose." Dassault was correct. Under Michigan law, "the ulterior purpose alleged must be more than harassment,

---

[3] The district court observed the following regarding Dassault's leave to subpoena the FBI:
> The Court notes that: (a) in Plaintiff's motion for leave to subpoena granted by this Court and affirmed by the Sixth Circuit, Plaintiff represented that it was seeking to gain access only to "All computers, materials and documents that were seized [by the FBI] at [Defendant's] business Practical Catia" and not seeking access to "FBI investigative notes," but (b) Plaintiff's ultimate subpoenas to the FBI sought the production of "interview records, recordings or other documents that refer to or otherwise memorialize any interview of [D]efendant by the FBI, that were prepared by the FBI, or by its agents . . ., regarding the raid."

DE 275, Order Mot. Dismiss, PageID 5589 n.2.

defamation, exposure to excessive litigation costs, *or even coercion to discontinue business*." *Dalley v. Dykema Gossett*, 788 N.W.2d 679, 695 (Mich. Ct. App. 2010) (emphasis added) (citation omitted). Childress responded to Dassault's motion for reconsideration by claiming that Dassault forfeited its argument that putting Childress out of business did not constitute an "ulterior purpose" because it did not advance the argument in its earlier briefings. Alternatively, Childress argued that his FAACC alleged that Dassault's ulterior purpose was to coerce him into joining Dassault's EPP—not necessarily or exclusively to put him out of business.

The district court, on reconsideration, declined to consider Childress's argument that Dassault acted with the ulterior purpose of coercing Childress into joining the EPP because it found Childress forfeited the argument by not raising it in his responses to Dassault's motion for judgment on the pleadings and motion for summary judgment. At the same time, however, the district court entertained Dassault's argument that putting Childress out of business does not constitute an "ulterior purpose," even though Dassault did not advance this argument in its initial briefings for dismissal. Accordingly, the district court granted Dassault's motion and dismissed Childress's abuse of process counterclaim.

3.

Childress does not challenge the district court's decision to consider Dassault's argument that putting Childress out of business is not an actionable ulterior purpose, despite Dassault quite clearly forfeiting the argument by not presenting it in its earlier motion to dismiss Childress's counterclaims. Rather, Childress argues, the district court should have applied a similarly liberal standard to his *pro se* pleadings to conclude that he did, in his FAACC, allege the EPP-coercion theory of Dassault's ulterior purpose.

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

i.

As a threshold matter, the parties dispute the standard of review this court applies to the district court's decision. Childress contends that *de novo* review applies because his counterclaim was dismissed for failure to state a claim under the Rule 12(b)(6) standard. Dassault claims we should review the decision for abuse of discretion because, according to Dassault, Childress challenges the district court's "decision to *decline consideration* of his new argument that Dassault's purported 'ulterior purpose' was to force [Childress] to 'join the EPP.'" CA6 R. 23, Second Br., at 31–32.

It is generally well-settled that courts of appeal review a district court's *denial* of a motion for reconsideration for abuse of discretion, unless the underlying ruling involves a grant of summary judgment. *Evanston Ins. Co. v. Cogswell Props., LLC*, 683 F.3d 684, 691 (6th Cir. 2012); *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009); *Jaburek v. Foxx*, 813 F.3d 626, 630 (7th Cir. 2016); *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013); *but cf. Ability Ctr. Of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 903 (6th Cir. 2004) (applying de novo review to a district court's denial of a motion seeking reconsideration of a grant of summary judgment); *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 496 (6th Cir. 2006) (same). Childress has not presented any authority to suggest that the standard should be different when reviewing a district court's *grant* of a motion for reconsideration.

But our precedents appear to vary on the standard of review to apply when considering whether a district court should have considered an argument that was allegedly raised for the first time on a motion for reconsideration. On the one hand, we have reviewed for abuse of discretion where the specific issue before the panel was whether the district court should have considered an argument that was indeed raised for the first time on reconsideration. *Evanston Ins. Co.*, 683 F.3d

13

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

at 691–92; *see also Dyson v. District of Columbia*, 710 F.3d 415, 420 (D.C. Cir. 2013) ("The abuse of discretion standard ordinarily applies to a district judge's decision *whether to consider* a new theory raised on a motion for reconsideration.").

On the other hand, we applied *de novo* review in another case reviewing the district court's conclusion that the movant forfeited an argument by not raising it prior to the motion for reconsideration. *Huntington Nat'l Bank*, 574 F.3d at 331. Other circuits have recognized that *de novo* review of a motion for reconsideration may be appropriate in some circumstances, such as where the district court actually assessed the merits of the arguments presented to it, or where the district court's decision was based on an issue of law. *See Dyson*, 710 F.3d at 420 (applying *de novo* review to a district court's denial of a motion for reconsideration where the district court rejected the movant's arguments on the merits); *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 673 (3d Cir. 1999) ("[T]o the extent that the denial of reconsideration is predicated on an issue of law, such an issue is reviewed *de novo*.").[4]

Furthermore, Childress's broader argument is that the district court should not have dismissed his abuse of process counterclaim, which it did pursuant to the Rule 12(b)(6) standard and in the first instance on reconsideration. Unlike a *denial* of a motion for reconsideration, which merely leaves an existing decision intact, the district court's *grant* of Dassault's motion for reconsideration resulted in a new decision, on the merits, to dismiss Childress's abuse of process counterclaim. It would be anomalous to deny Childress any *de novo* review of the district court's 12(b)(6) dismissal simply because it occurred for the first time on reconsideration.

Accordingly, we review for abuse of discretion the district court's overarching decision to grant Dassault's motion for reconsideration. In doing so, however, we examine the subsidiary

---

[4] In other circumstances, such as when a district court's decision is based on a factual finding, the decision may be reviewed for clear error. *See Huntington Nat'l Bank*, 574 F.3d at 331; *Max's Seafood Café*, 176 F.3d at 673.

*legal issues* animating that ultimate conclusion—that is, whether Childress forfeited his EPP-coercion allegation and, relatedly, whether Childress failed to state a claim for abuse of process—under a *de novo* standard of review. *See Huntington Nat'l Bank*, 574 F.3d at 331.

ii.

We conclude that the district court erred in its finding that Childress forfeited his EPP-coercion theory and, accordingly, that it abused its discretion in granting Dassault's motion for reconsideration. It is true that there was a palpable defect in the first district court order: the district court found that Childress's alleged putting-out-of-business theory was a cognizable "ulterior purpose" under Michigan law. It was not. This error, however, was not necessarily fatal to Childress's counterclaim. A reasonable, liberal construction of Childress's FAACC shows that it also alleged an alternative, cognizable theory of Dassault's ulterior purpose: that Dassault sought to coerce Childress into joining its EPP.

While the district court on reconsideration recognized that it "broadly construe[d] Dassault's rather summary argument," it failed to apply the same liberal standard to Childress's *pro se* pleadings. DE 317, Order Mot. Reconsideration, PageID 8767. It did not consider Childress's complaint as a whole, instead limiting the contents of its review to (1) Childress's memorandum in response to Dassault's earlier motion to dismiss, and (2) Childress's allegations under the "abuse of process" counterclaim heading of his FAACC. The district court recognized that Childress alleged the EPP-coercion theory under the heading of his Sherman Act counterclaim, but it found that he forfeited the argument because "he failed to elucidate this theory in his counterclaim for abuse of process or bring this theory to the Court's attention at the dispositive motion stage." *Id.* This was an erroneous finding.

15

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

      Childress explicitly alleged, on numerous occasions throughout his FAACC, that Dassault acted with the purpose of coercing him into joining its EPP.[5]  These allegations appear not only under Childress's Sherman Act and Malicious Prosecution counterclaims, but also under the "General Allegations" portion of his FAACC.  And under his abuse of process counterclaim, Childress "repeat[ed] and incorporate[d] by reference the allegations contained" throughout the rest of his FAACC.  DE 101, FAACC, PageID 1259; *see Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) ("Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief'; they do not countenance dismissal of a complaint for imperfect statement of the *legal theory* supporting the claim asserted." (emphasis added) (citing Fed. R. Civ. P. 8(a)(2))).

      Had the district court applied the same standard to Childress's *pro se* pleadings as it applied to Dassault's pleadings, and had it considered all of Childress's FAACC allegations, it would have found that, on several occasions throughout the FAACC, Childress alleged that Dassault improperly used process in order to coerce Childress into joining the EPP.  Even if "[Childress's FAACC] could admittedly be clearer on this point, . . . we must construe [Childress's] pro se pleading liberally."  *Luis*, 833 F.3d at 641.  The district court was particularly unreasonable in faulting Childress for not raising the EPP-coercion theory in response to Dassault's earlier motion to dismiss because Dassault, in that motion, did not even question the cognizability of Childress's initial putting-out-of-business theory.

---

[5] *See, e.g.*, DE 101, FAACC, PageID 1232 ("Dassault's threatened lawsuit was an attempt to bully us into joining the EPP[.]"); *id.* ("[O]ur attorney received an email . . . saying that if we did not agree to join the EPP, Dassault intended to file a lawsuit against our school."); *id.* at 1242 ("Dassault used the threat of a lawsuit in an attempt to coerce our school into joining its EPP[.]"); *id.* at 1257 ("Dassault tried to coerce our school – under the threat of a lawsuit – into joining its EPP to extort exorbitant royalties from our school."); *id.* at 1251 ("Dassault has tried to seize control of the private CATIA training market by attempting to coerce private training organizations and schools – such as ours – into joining its EPP and/or by forcing them out of business.").

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

Although a reasonable interpretation of Childress's pleadings is that he claimed Dassault's ulterior purpose was to drive him out of business, this was not the only reasonable interpretation because Childress also alleged that Dassault sought to coerce him into joining its EPP. The competing inferences regarding Dassault's alleged ulterior purpose should be resolved in Childress's favor. The district court, therefore, erred in finding that Childress forfeited his EPP-coercion theory and abused its discretion in granting Dassault's motion for reconsideration on that basis.

Whether Childress sufficiently stated a claim for abuse of process based on the EPP-coercion theory is a closer question. One may fairly question whether Childress's allegation that Dassault sought to coerce the School into joining the EPP is one and the same as his allegation that Dassault sought to put the School out of business. In his FAACC, Childress claimed that "Dassault used the threat of a lawsuit in an attempt to coerce our school into joining its EPP, knowing that the terms of Dassault's EPP would bankrupt our school." DE 101, FAAC, PageID 1242. Even if Childress adequately alleged Dassault's ulterior purpose of coercing him into joining its EPP, Childress arguably concedes that such an effort was equivalent to an effort to put him out of business—which is not a cognizable ulterior purpose under Michigan law. Nevertheless, a liberal reading of the complaint reveals a distinct allegation of coercion. It may be that the alleged coercion to join the EPP is tantamount to an attempt to put the School out of business, and Dassault can present evidence to that effect on summary judgment or at trial, but it has yet to make such an argument and, here, we must accept the well-pleaded allegation as true.

Another question the parties have not briefed—and the district court did not consider—is whether Dassault's alleged goal of coercing Childress to join the EPP is in fact "collateral" to Dassault's lawsuit. *See Alman*, 703 F.3d at 905 (holding that an abuse of process claim requires

17

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

an allegation of a "collateral advantage, not properly involved in the proceeding itself" (quoting *Three Lakes*, 255 N.W.2d at 690)).  Although Dassault sought damages for copyright infringement, its lawsuit could, in effect, be characterized as an effort to compel Childress to join its EPP.  At the end of the day, if Childress wishes to obtain valid CATIA licenses for training purposes, the School must join Dassault's EPP.  This would not, however, be a direct or necessary result of Dassault's lawsuit which, again, sought only damages.  And Dassault has not disputed that its purported objective of coercing Childress to join its EPP would qualify as a "collateral" advantage.  The parties may brief this issue on remand, but because they have not addressed it on appeal, we decline to resolve it and hold that Childress has pled an ulterior purpose and, thus, has satisfied the first element of an abuse of process claim.

Regarding the second element of corroborating acts, the district court's initial order correctly found that Childress alleged and offered proof of corroborating "act[s] in the use of process which [were] improper" and aimed toward Dassault's alleged coercive purpose.  *Id.* (quoting *Friedman*, 312 N.W.2d at 594).  For example, Childress offered support for his allegations that Dassault improperly obtained secret grand jury information, improperly served a subpoena on the FBI without proper notice to Childress or court authorization, misled the court about the materials it sought and obtained from the FBI, and misled the court about how and when it learned of Childress's alleged infringement.  Taken together, Childress's FAACC shows improper acts that were allegedly "directed at the collateral, ulterior objective."  *Sage Int'l, Ltd. v. Cadillac Gage Co.*, 556 F. Supp. 381, 390 (E.D. Mich. 1982).

In sum, the district court abused its discretion in granting Dassault's motion for reconsideration and erred in finding that Childress failed to state an abuse of process counterclaim.

We thus reverse the district court's grant of Dassault's motion for reconsideration, vacate its dismissal of Childress's abuse of process counterclaim, and remand for further proceedings.

### B. Tortious Interference with Business Relationships Counterclaim

Childress also appeals the district court's dismissal of his counterclaim alleging tortious interference with business relationship or expectancy. Dassault filed a motion for judgment on the pleadings on Childress's counterclaims, pursuant to Federal Rule of Civil Procedure 12(c). The district court granted Dassault's motion and dismissed Childress's tortious interference counterclaim. Childress now appeals that ruling.

We apply de novo review to orders dismissing claims under Federal Rule of Civil Procedure 12(c). *Bullington v. Bedford County*, 905 F.3d 467, 469 (6th Cir. 2018). Under Michigan law, a cause of action for tortious interference requires a showing of: "(1) a valid business relationship or expectancy; (2) knowledge of that relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of that relationship; and (4) resulting damage to the plaintiff." *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715 (6th Cir. 2018) (quoting *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 286 (6th Cir. 2010)). Childress alleged in his counterclaim that: (1) he had business relationships and expectancies with clients of his school, (2) Dassault knew about those relationships, and (3) Dassault intentionally interfered with those relationships when it filed its complaint with the DOJ, thus (4) leading to a grand jury investigation and FBI raid of all of Childress's computer training equipment. The parties dispute only the third element—intentional interference.

"'Intentional' interference means that the defendant's purpose or desire is to cause an interference with a contract or business relationship." *Id.* at 716. Importantly, the interference

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

must not only be intentional but also improper. *Id.* "Improper" interference means that the conduct is either "(1) wrongful *per se*; or (2) lawful, but done with malice and unjustified in law." *Id.* (quoting *Warrior Sports, Inc.*, 623 F.3d at 287).

The district court dismissed Childress's tortious interference counterclaim because it found, without further discussion, that Dassault's lawsuit and filings with the DOJ were justified in law. Childress does not dispute that filing a criminal complaint and lawsuit are generally "lawful" acts. He instead argues that his counterclaim alleged two particular acts by Dassault that were "illegal, unethical, or fraudulent." CA6 R. 20, First Br., at 49–50. According to Childress, his counterclaim alleged that Dassault "initiated the seizure of computers on which [Childress]'s business relied" by (1) "falsely telling federal authorities [Childress] had not purchased any CATIA V5 licenses," and (2) "by failing to disclose the business agreement which provided multiple temporary licenses." *Id.* at 49.

Dassault responds that Childress forfeited these allegations because, according to the company, Childress did not earlier rely on them to support his tortious interference counterclaim. Childress did forfeit his first allegation—that Dassault falsely told federal authorities that Childress had not purchased any CATIA V5 licenses—because the allegation does not appear in Childress's FAACC. The district court thus did not err on this basis.

But Childress did not forfeit his second allegation: that Dassault's filings improperly omitted Dassault's alleged business agreement with Childress. Not only did Childress expressly allege this point in his FAACC, he also raised it in his brief in response to Dassault's motion to dismiss. The FAACC also presented witness affidavits attesting to the fact that Childress used the CATIA software in accordance with the consent of Dassault and its agents.

Dassault defends the second allegation by disputing that such a business agreement ever existed. But this is a factual issue that should have precluded dismissal at the pleadings stage. Childress adequately alleged facts, supported by other witness affidavits, showing that Childress operated CATIA software on the School computers and provided CATIA training pursuant to agreements with Dassault and/or its agents. If the allegations are proven true, showing that Dassault was aware of this agreement, Dassault's omissions of the agreement in its criminal complaint could be deemed a malicious interference with Childress's business. Moreover, the district court's finding that Childress did not allege improper acts with respect to his tortious interference counterclaim is inconsistent with its finding on the abuse of process counterclaim that Childress "alleged and offered evidence that [Dassault] has made false and misleading statements in filings made in this Court." DE 275, Order Mot. Dismiss, PageID 5600. These allegations, if proven true, demonstrate unlawful actions that support a plausible inference that Dassault improperly and intentionally interfered with Childress's business relations.[6] Accordingly, we reverse the district court's dismissal of Childress's tortious interference counterclaim.

## C.  New Trial

Childress also challenges the district court's denial of his motion for reconsideration of the district court's ruling denying him a new trial. Childress moved for a new trial based on (1) the ten-hour time limitations the district court imposed at trial, and (2) the jury's alleged receipt of extraneous information concerning Childress's salary and settlement negotiations with Dassault. We address each issue in turn.

---

[6] It would admittedly appear odd to reverse dismissal of Childress's tortious interference counterclaim where a jury verdict later vindicated Dassault's copyright infringement claim. But Childress does not argue that Dassault's claims themselves were unjustified in law; he alleges improper acts throughout Dassault's process of bringing those claims. Moreover, as we explain in Part II.C, Childress is entitled to a new trial on those claims.

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

### 1.  Time Limitations at Trial

During a pre-trial conference, Dassault recommended that the district court set time limits for the parties to present evidence.  The district court consulted with the parties and collaboratively estimated the time they required to question each witness.  The district court coaxed Childress to reduce his estimated time for defense witnesses to 11.5 hours, including five hours for the direct examination of Childress himself.  The district court then imposed a ten-hour time limit for each party to present its entire case, not including opening and closing statements.  At trial, Childress spent approximately nine hours questioning Dassault's witnesses on cross-examination, leaving him with a little more than an hour to present his defense.

Childress moved for a new trial after the verdict, pursuant to Federal Rule of Civil Procedure 59, claiming that the district court erred in restricting Childress's time to present his case.  The district court denied the motion for a new trial, finding that Childress agreed to and waived objections to the trial schedule and, alternatively, that the district court reasonably exercised its discretion to control the case.  Childress then filed a motion for reconsideration of that decision—again pursuant to Local Rule 7.1(h)—arguing that he consented to the time limits only with the understanding that they would be flexible and not apply to his time cross-examining Dassault's witnesses.  He argued that the time constraints prejudiced him at trial by limiting his ability to present key witnesses and documentary evidence.  The district court rejected these arguments and denied Childress's motion for reconsideration.  Childress now appeals the district court's denial of his motion for reconsideration.

We review the district court's denial of Childress's motion for reconsideration for an abuse of discretion.  *In re Greektown Holdings, LLC*, 728 F.3d at 573.  The district court on reconsideration had to assess whether its earlier order denying Childress a new trial contained a

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

"palpable defect" and whether "correcting the defect will result in a different disposition of the case." E.D. Mich. L.R. 7.1(h)(3); *Mich. Dept. of Treasury v. Michalec*, 181 F. Supp. 2d 731, 733–34 (E.D. Mich. 2002). We thus review the decision under a highly deferential standard.

"[A] district court has broad discretion to place limits on the presentation of evidence to prevent delay, waste of time, and needless presentation of cumulative evidence." *Sutkiewicz v. Monroe Cnty. Sheriff*, 110 F.3d 352, 361 (6th Cir. 1997) (citing *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 609 (3d Cir. 1995)). But there are limits to this discretion, as the district court must control a case "in a manner that is in harmony with the Federal Rules of Civil Procedure." *G. Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648, 652 (7th Cir. 1989) (en banc) (quoting *Strandell v. Jackson Cnty.*, 838 F.2d 884, 886 (7th Cir. 1988)). The Federal Rules of Civil Procedure "should be construed [and] administered . . . to secure the just, speedy, and inexpensive determination of every action," Fed. R. Civ. P. 1, and the Federal Rules of Evidence "should be construed so as to . . . eliminate unjustifiable expense and delay," Fed. R. Evid. 102.

Appellate courts rarely reverse a district court's imposition of time limits at trial. In *Ma v. American Electric Power, Inc.*, for example, this court found that the district court did not abuse its discretion in scheduling and enforcing an eleven-hour limit on trial time for each party. 647 F. App'x 641, 645 (6th Cir. 2016). That panel noted that the district court cited excessive and duplicative evidence as its basis for adhering to the allotted time, and that the district court had greater latitude in applying time limits because it was a bench trial, rather than a jury trial. *Id.* Similarly, in *Trepel v. Roadway Express, Inc.*, we found a district court acted within its discretion when it imposed a ten-hour time limit for each party to present its case. 40 F. App'x 104, 108 (6th Cir. 2002). *Trepel* noted that the time limits were equal for both parties, designed to prevent

23

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

repetitive expert testimony, and that only the narrow issue of damages—not the entire case—was being litigated. *Id.*

Dassault argues that the district court did not abuse its discretion in denying Childress's motion for three reasons: (1) Childress agreed to and waived any objection to the district court's ten-hour time limit; (2) even if Childress had not waived his objections, the district court acted within its discretion when it imposed the ten-hour time limit; and (3) Childress has not demonstrated the result at trial would have been different had the district court allotted him more time.

On the first point, Childress disputes that he knowingly agreed to the time limits. As proof of Childress's consent, Dassault highlights Childress's response of "[p]erfect" to the district court's conclusion that it "would give ten hours to each side." DE 469, Tr., PageID 13727. Childress claims that his "perfect" comment was based on an understanding that the ten hours would apply only to *direct* examination, for which the court estimated Childress would need 11.5 hours. But a closer look at the transcript reveals that the district court clarified that Childress's ten hours applied to both direct and cross examination:

> THE COURT: . . . . I would give ten hours to each side.
>
> MR. CHILDRESS: Perfect.
>
> THE COURT: Remember though, you've got – you have cross-examination that you want to include and so you have to keep time for cross-examination.
>
> MR. CHILDRESS: All right. So the ten hours we are talking about, Your Honor, is for direct and cross?
>
> THE COURT: Right.
>
> MR. CHILDRESS: But not rebuttal?
>
> THE COURT: It's everything.
>
> MR. CHILDRESS: It's rebuttal as well. Okay. So we have ten hours to present each case. Okay.

DE 469, Tr., PageID 13727.

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

Based on the above exchange, it was reasonable for the district court to determine that Childress consented to and waived objections regarding the allotted time.

Nevertheless, even though Childress did not object to the *imposition* of time limits, the district court's decision to rigidly *enforce* those time limits—on a *pro se* litigant trying a fairly complex case on two separate issues—was questionable. Unlike the district courts in *Ma* and *Trepel*, the district court here failed to cite any specific reasons for imposing or adhering to its time limits, such as the prevention of duplicative evidence or the narrowness of the issues. Although district courts have wide discretion to control a trial, they must exercise this discretion in a manner that ensures the "just" resolution of a case. Fed. R. Civ. P. 1. Given that Childress estimated needing five hours for direct examination of himself alone, the district court's inflexibility and failure to allow him more than one hour to present evidence deprived Childress of an adequate opportunity to present his case, and for no valid stated reason. Had Childress been able to present key witnesses and documentary evidence—which, according to his FAACC, included evidence of his agreements with Dassault's agents allowing his use of the copyrighted CATIA software—the outcome at trial might very well have been different. Ultimately, however, we need not decide whether the district court abused its discretion in this regard because, as the next section explains, a new trial is warranted based on the jury's alleged receipt of extraneous information.

## 2. *Jury's Receipt of Extraneous Information*

Childress also appeals the district court's denial of his motion for reconsideration of the district court's earlier ruling denying him a new trial based on the jury's alleged receipt of extraneous information. Soon after the jury returned its verdict, a juror named Donald Murphy contacted Childress regarding several pieces of extraneous information the jury allegedly received

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

and discussed during deliberations. The juror included the following allegations in his declaration filed with the court:

> A juror said they'd heard Dassault had been willing to drop its lawsuit if Mr. Childress would make a few minor changes to his website, but Mr. Childress refused. The juror said that if Mr. Childress wasn't so stubborn, none of us would be here. The juror's statement had a negative impact on the jury's attitude toward Mr. Childress and influenced the jury's deliberations.

> Two jurors used their personal experience as software developers to try to convince the jury that Mr. Childress infringed on Dassault's copyright.

> . . . .

> A suggestion was made that the jury split the verdict and find in Mr. Childress' favor on the trademark issue, and find in Dassault's favor on the copyright issue. Another juror said they'd heard Mr. Childress earns $750,000 a year, so splitting the verdict was not going to have a significant financial impact on Mr. Childress.

DE 453-3, Murphy Decl., PageID 12628–29.

Childress moved for a new trial based on the extraneous juror information. The district court declined to hold an evidentiary hearing because it concluded that the alleged extraneous information had no probability of influencing the jury's deliberations or verdict. Specifically, it found that the alleged information "apparently had no impact on Murphy himself, as he ultimately 'went along with' the verdict because he was 'under a great deal of pressure to reach a unanimous verdict so the jury wouldn't have to come back for a third week.'" DE 463, Op. & Order Denying Mot. New Trial, PageID 13190 (quoting DE 453-3, Murphy Decl., PageID 12629). It therefore found the alleged information did not warrant granting Childress's motion for a new trial. Childress later moved for reconsideration of the decision not to hold an evidentiary hearing, which the district court denied. He now appeals the district court's decision denying his motion for reconsideration.

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

We review the district court's denial of Childress's motion for reconsideration for an abuse of discretion. *In re Greektown Holdings, LLC*, 728 F.3d at 573. And the district court on reconsideration had to assess whether its earlier order, denying Childress an evidentiary hearing and new trial based on the alleged extraneous information, contained a "palpable defect," and whether "correcting the defect will result in a different disposition of the case." E.D. Mich. L.R. 7.1(h)(3); *Michalec*, 181 F. Supp. 2d at 733–34.

Generally, "a juror may not testify about any statement made or incident that occurred during the jury's deliberation; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b). A juror may, however, testify about whether "extraneous prejudicial information was improperly brought to the jury's attention." *Id.*; *see also In re Beverly Hills Fire Litig.*, 695 F.2d 207, 213 (6th Cir. 1982) ("[T]he [general] rule does not preclude inquiry into any extraneous influences brought to bear upon the jury in order to show what the influences were and whether they were prejudicial." (quoting *Womble v. J.C. Penney*, 431 F.2d 985, 989 (6th Cir. 1970))).

A juror's receipt of extraneous information "can rarely be viewed as harmless" and "requires that the verdict be set aside, unless entirely devoid of any proven influence or the probability of such influence upon the jury's deliberations or verdict." *In re Beverly Hills*, 695 F.2d at 215 (quoting *Stiles v. Lawrie*, 211 F.2d 188, 190 (6th Cir. 1954)). "While influence on a single juror may be enough to necessitate reversal and remand, [receipt of extraneous information] is particularly grievous [if] a unanimous verdict was required and the juror communicated his findings to other jurors." *Id.* (citation omitted). A district court must hold an evidentiary hearing to assess the alleged extraneous information "when there is a colorable claim of extraneous information that 'presents a likelihood of affecting the verdict.'" *United States v.*

*Gonzales*, 227 F.3d 520, 527 (6th Cir. 2000) (quoting *United States v. Frost*, 125 F.3d 346, 377 (6th Cir. 1997)); *see also United States v. Rigsby*, 45 F.3d 120, 124 (6th Cir. 1995) (explaining that a juror's alleged contact with extraneous information requires a hearing when there is "an obvious potential for improperly influencing the jury").

The two jurors' past experiences as software developers do not qualify as extraneous information. *See Warger v. Shauers*, 574 U.S. 40, 51 (2014) (explaining that extraneous information does not include "the general body of experiences that jurors are understood to bring with them to the jury room"). The district court thus did not err in its conclusion that this allegation did not warrant an evidentiary hearing.

It is unclear how the juror who erroneously declared Childress's income as $750,000 per year obtained that purported information. *See id.* ("[I]nformation is deemed 'extraneous' if it derives from a source 'external' to the jury."). But Murphy's declaration suggests that the juror obtained this information from an external source. *See* DE 453-3, Murphy Decl., PageID 12629 (recounting that "[a]nother juror said they'd *heard* Mr. Childress earns $750,000 a year" (emphasis added)). The juror then relied on this purported information to conclude that "splitting the verdict was not going to have a significant financial impact on [Childress]." *Id.* This alleged comment could reasonably indicate that the information concerning Childress's salary impacted the juror's vote by making him more amenable to "splitting the verdict." *Id.* The juror's comment, along with Murphy's allegations that "several jurors expressed an urgency to reach a verdict so the jury did not have to come back the following week," *id.* at 12628, and that the jury's verdict "was strongly influenced" by the claim regarding Childress's purported salary, *id.* at 12629, suggests the salary information had an "obvious potential for improperly influencing the jury," *Rigsby*, 45 F.3d at 124. While juries might speculate as to a litigant's ability to pay even without

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

extraneous information, and while such information could very well have not been prejudicial here, Murphy's allegation, at minimum, warranted an evidentiary hearing.  The district court's finding that the alleged information had no probability of impacting the jury was a "palpable defect," and it was an abuse of discretion to find otherwise on reconsideration.

Moreover, the district court's conclusion regarding the alleged settlement information— that it did not have any probability of influencing the jury's deliberations—was a "palpable defect" that warranted granting Childress's motion for a new trial.  It is hard to see how evidence of a settlement offer could be prohibited under Federal Rule of Evidence 408, but deemed non-prejudicial when leaked to a jury during deliberations.[7]  An allegation that an entire jury received extraneous evidence of settlement negotiations should have presented "an obvious potential for improperly influencing the jury." *Rigsby*, 45 F.3d at 124.  This inference is bolstered by Murphy's express allegation that the settlement information and ensuing discussion "had a negative impact on the jury's attitude toward Mr. Childress and influenced the jury's deliberations."[8]  DE 453-3, Murphy Decl., PageID 12628.  The district court, therefore, abused its discretion in denying Childress's motion for reconsideration.

Accordingly, we reverse the district court's decision denying Childress's motion for reconsideration.  Because the trial took place over three years ago, an evidentiary hearing at this

---

[7] Admittedly, the circumstances surrounding the alleged settlement information in this case do not align with the typical scenario envisioned by Federal Rule of Evidence 408(a).  Under that rule, evidence of settlement offers is inadmissible to the extent such information is used to "prove or disprove the validity or amount of a disputed claim." Here, the juror did not use Dassault's offer of a settlement to conclude that Dassault felt its copyright claim was weak. But the information did, nevertheless, allegedly negatively impact the juror's—and the rest of the jury's—attitude toward Childress.  Although finding Childress "stubborn" did not necessarily impact the juror's vote, Murphy's declaration reasonably suggests that it could have.  This was thus a matter appropriate for an evidentiary hearing.

[8] Contrary to the district court's assessment, moreover, Murphy's declaration did not indicate that his vote was unaffected by the alleged settlement information.  Murphy stated that he disagreed with the verdict but "went along with it because [he] was under a great deal of pressure to reach a unanimous verdict so the jury wouldn't have to come back for a third week."  DE 453-3, Murphy Decl., PageID 12629.  And the juror who revealed the settlement information plausibly added to that pressure by saying the reason the jury were all still there was because "Childress was[] so stubborn" in denying the settlement offer.

stage requiring jurors to recount their memory of deliberations would serve less value than it would have at the time of Childress's motion. Moreover, Murphy's declaration, on its own, warrants a new trial because of the nature of the extraneous information he cited and his explicit attestation that the information affected the jury. An evidentiary hearing at this point would be an inappropriate remedy, and we instead remand for a new trial. Although Childress seeks a new trial only on the copyright infringement issue, some of the extraneous information referenced in Murphy's declaration—specifically, Childress's salary and his purported ability to withstand a split verdict—had a probability of affecting the jury's verdict on both issues. We therefore remand for a new trial on both the copyright and trademark infringement claims.

### D. Rule 60(b) Motion

In a separately docketed appeal (No. 17-2416), Childress argues that the district court erred when it required Childress to file a motion for summary judgment before Dassault produced relevant discovery. After trial, Childress filed a Federal Rule of Civil Procedure 60(b) motion seeking reversal of the district court's earlier denials of his summary judgment motions. He now appeals the district court's decision denying his Rule 60(b) motion.

First, we review the relevant procedural history. After Childress filed his FAACC, the district court entered a scheduling order setting a September 2013 discovery cut-off date and an October 2013 summary judgment deadline. Childress served discovery requests on Dassault in March 2013, but Dassault declined to produce the discovery until the court entered a protective order. The district court—citing the already protracted nature of the litigation—denied Childress's motion to extend the summary judgment deadline. Childress moved for summary judgment and later moved to supplement his summary judgment briefings after Dassault produced the discovery it had been withholding. The district court denied Childress's motion to supplement the summary

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

judgment record and, in December 2014, entered an order denying Childress's motions for summary judgment.

Childress filed a motion for reconsideration, arguing that the district court should not have required Childress to submit summary judgment briefs and should not have decided the summary judgment motions prior to the close of discovery. The district court denied Childress's motion for reconsideration. It recognized that the case's procedural history had been "tortuous" and that "the ordinary course of discovery and dispositive motions ha[d] become somewhat derailed." DE 317, Order Mot. Reconsideration, PageID 8769. It nevertheless concluded that, "[a]lthough in certain respects the Court has put the cart before the horse by deciding motions for summary judgment before all discovery disputes were resolved," Childress was not prejudiced by the process. *Id.* It further found that all of Childress's counterclaims were dismissed pursuant to Rule 12(b)(6) for failure to state claims.

Childress again moved for summary judgment in 2016. The district court denied the motion because it found Childress challenged the same issues that the district court had previously considered in its 2014 denial of summary judgment. Childress then moved for reconsideration of that decision, arguing that the earlier summary judgment order decided the issues based on an incomplete record because the district court did not consider the discovery that Dassault only produced after the first summary judgment briefs were filed. The district court, once again, denied Childress's motion for reconsideration. Its reason for the denial was that Childress merely reiterated his argument regarding the incomplete record that he had presented to the district court in his 2014 motion for reconsideration and in his more recent 2016 motion for summary judgment.

After trial concluded, Childress filed a motion under Federal Rule of Civil Procedure 60(b)(1) requesting relief from the district court's 2014 and 2016 orders denying Childress

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

summary judgment. The district court denied Childress's motion because—once again—it found that Childress merely raised the same arguments the district court had previously rejected multiple times. Childress, undeterred, filed a motion for "clarification and/or reconsideration" pursuant to Local Rule 7.1(h), which the district court denied for the same reasons. Childress filed an amended notice of appeal to challenge the district court's last order denying his motion for reconsideration of the district court's denial of his Rule 60(b) motion. But it appears that the proper issue before us concerns the Rule 60(b) determination—not the later motion for reconsideration of that decision. Either way, Childress's argument lacks merit, and we affirm the district court's decision.

While we empathize with Childress's frustration, and it indeed appears that the district court made summary judgment determinations based on an incomplete record, the underlying summary judgment determinations are not at issue because Childress appeals only the denial of his Rule 60(b) motion and not the underlying summary judgment decisions. *See Hood v. Hood*, 59 F.3d. 40, 42 (6th Cir. 1995) ("[A]n appeal from denial of Rule 60(b) relief does not bring up the underlying judgment for review." (quoting *Browder v. Dir., Dep't of Corrs.*, 434 U.S. 257, 263 n.7 (1978))). And we afford substantial deference to the district court's decision.

The district court appropriately based its denial of Childress's motion for reconsideration of the Rule 60(b) ruling on the fact that Childress reiterated arguments that the court had previously rejected on a number of occasions. *See Johnson v. Unknown Dellatifa*, 357 F.3d 539, 544 (6th Cir. 2004) (finding that the district court did not abuse its discretion in denying a Rule 60(b) motion where the movant merely reiterated arguments that he previously made and that the district court had dismissed); *Erby v. Kula*, 98 F. App'x 405, 407 (6th Cir. 2004) (same). The later district court decisions did not disturb the earlier district court findings that the later-discovered evidence would not have affected the disposition of Childress's summary judgment motions. This was neither a

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

"palpable defect" that warranted granting Childress's motion for reconsideration, nor an error warranting relief under Rule 60(b).

### E. Trademark Infringement Claim

In its cross-appeal, Dassault claims that the district court erred in denying its Federal Rule of Civil Procedure 50 motion seeking judgment as a matter of law on its trademark infringement claim. At trial, Dassault argued that Childress impermissibly used its CATIA trademark in two ways: (1) as part of his website's domain name or URL, www.practicalcatia.com, and (2) in the name of Childress's business, "Keith Childress' Practical Catia Training," as presented on his website. The jury returned a verdict for Childress on the trademark infringement claim.

Dassault then filed a renewed Rule 50 motion for judgment as a matter of law, claiming that the jury's verdict on the trademark issue was against the manifest weight of the evidence. The district court denied the motion, finding that "the jury could reasonably have determined that Childress used the term 'CATIA' only to the extent necessary to describe the type of training he offered, and that such descriptive use was unlikely to create confusion among consumers." DE 463, Op. & Order Denying Mot. New Trial, PageID 13187.

"We review the district court's denial of a Rule 50 motion *de novo*." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 503 (6th Cir. 2013) (citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a); *see also Snyder v. Ag Trucking, Inc.*, 57 F.3d 484, 490 (6th Cir. 1995).

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

To state a claim for trademark infringement, a plaintiff must show that: "(1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing 15 U.S.C. § 1114(1)). The parties only dispute the third element—likelihood of confusion. The "ultimate question" in assessing likelihood of confusion is "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Interactive Prods. Corp. v. a2z Mobile Off. Sols., Inc.*, 326 F.3d 687, 695 (6th Cir. 2003).

Dassault claims that the district court erred in dismissing its motion by "focusing exclusively on [Childress's] use of CATIA as a part of the business name 'Keith Childress' Practical Catia Training' as used on his website," instead of also considering Childress's use of Dassault's CATIA mark "as part of his domain name www.practicalcatia.com." CA6 R. 23, Second Br., at 70 (citing DE 463, Op. & Order Denying Mot. New Trial, PageID 13187). Dassault argues that Childress's "practicalcatia" domain name would appear whenever someone searched "CATIA" in Google. Before clicking on the link, Dassault argues, a consumer would not see the webpage's identifying information that clarifies it is not affiliated with Dassault. Dassault characterizes this as a type of "initial interest" confusion that supports infringement. *See Audi AG v. D'Amato*, 469 F.3d 534, 546 (6th Cir. 2006).

Dassault's argument is unavailing. "Simply invoking the term 'initial-interest confusion' does not state a viable claim," let alone warrant judgment as a matter of law. *Groeneveld*, 730 F.3d at 519. Dassault fails to "explain why, assuming that such initial confusion were to take place, it would not be instantly dissipated without any harm" once the consumer clicks the www.practicalcatia.com link and enters the website—a website with numerous indicators that clarify it is not affiliated with Dassault. *Id.* Moreover, when www.practicalcatia.com is displayed

Nos. 17-2175/2239/2416, *Dassault Systèmes, SA v. Keith Childress*

in Google's search results, Childress suggests that even the preview of the site displays the disclaimer: "CATIA is a registered trademark of Dassault Systèmes and has no affiliation with Practical Catia Training."  CA6 R. 31, Third Br., at 50.

Dassault does not defend the merits of its position.  Instead, it focuses only on whether the district court's failure to consider Childress's use of CATIA in his domain name constituted clear error.  Regardless of whether the district court explicitly mentioned Childress's domain name in its order, the record supported a jury finding that www.practicalcatia.com was unlikely to cause confusion, making any alleged error harmless.  Therefore, we affirm the district court's denial of Dassault's motion for judgment as a matter of law.

III.

Based on the foregoing, we: (1) reverse the district court's grant of Dassault's motion for reconsideration of Childress's abuse of process counterclaim and vacate the district court's order dismissing the abuse of process counterclaim; (2) reverse the district court's dismissal of Childress's tortious interference with business relationships counterclaim; (3) reverse the district court's denial of Childress's motion for reconsideration based on the alleged extraneous information the jury received and remand for a new trial; (4) affirm the district court's denial of Childress's Rule 60(b) motion; and (5) affirm the district court's denial of Dassault's Rule 50 motion for judgment as a matter of law.