UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DASSAULT SYSTEMES, S.A.,

     Plaintiff,

v.

KEITH CHILDRESS,

     Defendant.

Case No. 09-cv-10534
Hon. Matthew F. Leitman

_____/

## ORDER GRANTING PLAINTIFF/COUNTER-DEFENDANT DASSAULT SYSTEMES, S.A.'s MOTION FOR PERMANENT INJUNCTION (ECF No. 759)

Plaintiff/Counter-Defendant Dassault Systemes, S.A. ("Dassault") is a French company that developed a computer design software program called CATIA. Dassault owns and federally-registered the CATIA mark.

In this action, Dassault alleged, among other things, that Defendant/Counter-Plaintiff Keith Childress committed trademark infringement when he used the CATIA mark in the name of his business ("Practical Catia Training") and in the URL (internet address) for that business ("practicalcatia.com").

The case was first tried to a jury in 2017. A different judge presided over that first trial. The result of the first trial was appealed to the United States Court of Appeals for the Sixth Circuit, and in 2020, the Sixth Circuit remanded for a new trial. This Court then presided over the second trial in March 2024.

1

The jury in the March 2024 re-trial found that Dassault had established all of the elements of its trademark infringement claim, but the jury found in favor of Childress on his fair use defense to that claim. (*See* Verdict Form, ECF No. 667, PageID.25046-25047.)   On that basis, the jury denied Dassault recovery on that claim.   Following the re-trial, Dassault filed a motion for judgment as a matter of law in its favor on Childress' fair use defense. (*See* Mot., ECF No. 663.)   The Court agreed with Dassault that the fair use defense failed as a matter of law, and it therefore granted Dassault's motion. (*See* Order, ECF No. 718.)   That ruling gave new life to the jury's finding that Dassault had established all of the elements of its trademark infringement claim, and it positioned Dassault to seek relief based upon that finding.

Dassault has now moved for entry of a permanent injunction barring Childress from using the CATIA mark in the name of his business or in any URL. (*See* Mot., ECF No. 759.)   Childress opposes the motion. (*See* Resp., ECF No. 762.)   He argues that Dassault is not entitled to a permanent injunction because Dassault has not shown, and cannot show, success on the merits of its trademark infringement claim and because the balance of the injunctive relief factors set forth in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), weigh against Dassault. (*See id.*, PageID.33201-33209.)   Childress' arguments are thoughtful and serious, and the Court has given them careful consideration.   But for the reasons explained in detail

below, the Court is persuaded that Dassault is entitled to permanent injunctive relief. The Court will therefore **GRANT** Dassault's motion for permanent injunction.

## I

The Lanham Act authorizes the Court "to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c) or (d) of section 1125 of this title." 15 U.S.C. § 1116(a).  As the party seeking a permanent injunction, Dassault must first show "actual success" on the merits of its trademark infringement claim. *Am. C.L. Union of Kentucky v. McCreary Cnty., Ky.*, 607 F.3d 439, 445 (6th Cir. 2010).  If Dassault clears that hurdle, it must further show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by the injunction." *eBay*, 547 U.S. 388 at 391.  The Court applies that standard below.

## II

### A

The Court begins with the first requirement for injunctive relief: that Dassault show actual success on the merits of its claim that Childress infringed its CATIA

3

mark when he used the mark in the name of his business and in the URL for his business.  Dassault has done so.  As the Court noted above, the jury in the March 2024 re-trial found that Dassault had established all of the elements of that claim, and the Court then ruled that Childress' fair use defense failed as a matter of law. Thus, at this point, the jury's finding of infringement is viable and operative.  That finding represents actual success by Dassault on the merits of its trademark infringement claim.

## B

Childress counters that for four reasons, Dassault should not be deemed to have actually succeeded on its trademark infringement claim.  Childress' four arguments are:

1. The jury did not actually find the essential element of likelihood of confusion.

2. In the alternative, if the jury did find a likelihood of confusion, it could only have done so based on a theory that was barred by the law of the case doctrine.  Thus, the jury's finding on that essential element cannot stand.

3. Dassault's trademark infringement claim is barred by the equitable defense of acquiescence.

4. Dassault's trademark infringement claim is barred by the equitable defense of unclean hands.

(*See* Resp., ECF No. 762, PageID.33201-33208.)

The Court respectfully disagrees with each of these contentions.

**1**

The Court begins with Childress' argument that as a factual matter, the jury did not find in favor of Dassault on the likelihood of confusion element of its trademark infringement claim. As the Court previously explained when Childress made a similar argument, the record makes clear that the jury *did* find that Childress' use of the CATIA mark created a likelihood of confusion:

> Childress' argument ignores that the jury was instructed that it could find in favor of Dassault on its trademark infringement claim only if it first found that Childress "used the term CATIA in a manner that is likely to cause confusion, mistake, or deception as to the source, origin, sponsorship, or approval of Mr. Childress' products or services." (03/22/2024 Trial Tr., ECF No. 707, PageID.26817.) The jury is "presumed to [have] follow[ed] the court's instructions." *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009). The Court can therefore safely conclude that when the jury found in favor of Dassault on its trademark infringement claim, the jury first necessarily found that Childress used the CATIA mark in a manner that was likely to cause confusion, mistake, or deception as to the source, origin, sponsorship, or approval of Childress' products or services. Simply put, contrary to Childress' contention, the jury did find a likelihood of confusion even though it was not asked to answer a specific question concerning that issue on the verdict form.

(Order, ECF No. 754, PageID.32969-32970.) For these same reasons, the Court again concludes that the jury did find that Dassault had established the likelihood of confusion element of its infringement claim.

**2**

The Court next turns to Childress' alternative argument that if the jury did, in fact, find a likelihood of confusion, it could only have done so based upon a theory that the Sixth Circuit foreclosed as a matter of law in its 2020 ruling.  More specifically, he says that the only type of confusion that the jury could have found to be likely was "initial interest confusion," and he says that under the law of the case doctrine, the Sixth Circuit's 2020 decision precluded Dassault from relying on that theory of confusion during the March 2024 re-trial.  Childress is incorrect.

As an initial matter, Childress has not established that the only type of confusion that the jury could have found was initial interest confusion.  The jury instructions were not limited to that theory of confusion (*see* 3/22/2024 Trial Tr., ECF No. 694, PageID.25975-25976), and Dassault did not strictly limit itself to that theory.  Thus, it is not obvious that the type of confusion found by the jury was initial interest confusion.

In any event (and more importantly), the law of the case doctrine did not preclude Dassault from presenting – or the jury from finding – initial interest confusion at the March 2024 re-trial because the Sixth Circuit did not squarely decide in its 2020 decision that Dassault's initial interest confusion theory must fail as a matter of law.   A review of the law the case doctrine and the Sixth Circuit's 2020 ruling confirms that point.

6

"Under the law of the case doctrine, findings made at one stage in the litigation [– including an earlier appeal –] should not be reconsidered at subsequent stages of that same litigation." *Dixie Fuel Co., LLC v. Dir., Off. of Workers' Comp. Programs*, 820 F.3d 833, 843 (6th Cir. 2016). Critically, "[a]pplication of this doctrine is limited to those questions necessarily decided in the earlier appeal." *Burley v. Gagacki*, 834 F.3d 606, 618 (6th Cir. 2016) (quoting *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997)). And "[t]he phrase 'necessarily decided' ... describes all issues that were 'fully briefed and *squarely decided*' in an earlier appeal." *Id.* (emphasis added) (quoting *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1071 (6th Cir. 2014) (citation in *Vander Boegh* omitted)).

The Sixth Circuit did not squarely decide in its 2020 ruling that Dassault's initial interest confusion theory failed as a matter of law. Indeed, that issue was not even presented to the Sixth Circuit.

Here is what happened. The jury in the 2017 trial (unlike the jury in March 2024 re-trial) found *against* Dassault on its trademark infringement claim. After that jury returned its verdict, Dassault moved for judgment as a matter of law on its trademark infringement claim and argued in that motion that the evidence of trademark infringement was so strong that it compelled a ruling in Dassault's favor on the infringement claim. *See Dassault Systemes, S.A. v. Childress*, 828 F. App'x 229, 250 (6th Cir. 2020). The then-presiding district judge denied Dassault's motion,

and Dassault challenged that ruling on appeal. *See id*.  In the Sixth Circuit, Dassault again argued that the evidence of infringement was so compelling that it was entitled to judgment as a matter of law in its favor on its trademark infringement claim. *See id*.  As part of that argument, Dassault contended that Childress' use of the CATIA mark created initial interest confusion as a matter of law. *See id*. The Sixth Circuit disagreed with that contention. *See id*. at 250–51.  It held that the jury reasonably could have rejected Dassault's initial interest confusion theory and reasonably have found that Childress' use of the CATIA mark was "unlikely to cause confusion." *Id*. at 251.  On that basis, it "affirm[ed] the district court's denial of Dassault's motion for judgment as a matter of law." *Id.*

As this procedural history shows, the only issue presented to, and actually decided, by the Sixth Circuit was this: was Dassault's evidence of trademark infringement – including its evidence of likelihood of confusion – so overwhelming as to compel judgment as a matter of law *in Dassault's favor* on its infringement claim?  The Sixth Circuit was not asked to decide, and did not decide, whether Dassault's evidence of likelihood of confusion – including its evidence of initial interest confusion – was so weak as to compel judgment *in Childress' favor*.  Simply put, the Sixth Circuit did not squarely decide that Dassault's initial interest confusion theory failed as a matter of law.  Thus, the law of the case doctrine did not prevent Dassault from presenting that theory to the jury in the March 2024 re-trial.

To be sure, as Childress highlights, the Sixth Circuit was somewhat critical of Dassault's initial interest confusion theory.[1]   But the Sixth Circuit offered those comments in the course of explaining its holding that Dassault was not entitled to judgment *in its favor* on that theory.   So, while the Sixth Circuit's comments admittedly express skepticism concerning Dassault's initial interest confusion

---

[1] The Sixth Circuit said:

> Dassault argues that Childress's "practicalcatia" domain name would appear whenever someone searched "CATIA" in Google. Before clicking on the link, Dassault argues, a consumer would not see the webpage's identifying information that clarifies it is not affiliated with Dassault. Dassault characterizes this as a type of "initial interest" confusion that supports infringement. *See Audi AG v. D'Amato*, 469 F.3d 534, 546 (6th Cir. 2006).
>
> Dassault's argument is unavailing. "Simply invoking the term 'initial-interest confusion' does not state a viable claim," let alone warrant judgment as a matter of law. *Groeneveld*, 730 F.3d at 519. Dassault fails to "explain why, assuming that such initial confusion were to take place, it would not be instantly dissipated without any harm" once the consumer clicks the www.practicalcatia.com link and enters the website—a website with numerous indicators that clarify it is not affiliated with Dassault. *Id.* Moreover, when www.practicalcatia.com is displayed in Google's search results, Childress suggests that even the preview of the site displays the disclaimer: "CATIA is a registered trademark of Dassault Systèmes and has no affiliation with Practical Catia Training." CA6 R. 31, Third Br., at 50.

*Dassault Systemes*, *S.A.*, 828 F. App'x at 250–51.

theory, those comments do not constitute law of the case that barred Dassault from presenting the theory during the March 2024 re-trial.[2]

### 3

The Court next takes up Childress' contention that Dassault cannot prevail on the merits of its trademark infringement claim because that claim is barred by the equitable doctrine of acquiescence. The Court previously ruled that it, rather than the jury, should decide that equitable defense. The Court now concludes that Childress has not established the defense.

### a

The Court begins with some background concerning the acquiescence defense. As the Court previously explained:

> Acquiescence is an "affirmative and equitable defense[]" to a claim of trademark infringement. *Times Mirror Mags., Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 395 (2d Cir. 2002). Where the defense is established, it "may estop a trademark owner from obtaining injunctive and monetary remedies for trademark infringement." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir.

---

[2] As Childress accurately notes, the Court has treated one portion of the Sixth Circuit's ruling on initial interest confusion as law of the case. The Court ruled that under the law of the case doctrine, it was bound by the Sixth Circuit's formulation of the legal test for initial interest confusion. (*See* 3/21/2024 Trial Tr., ECF No. 716, PageID.27511-27514.) That portion of the Sixth Circuit's ruling is properly treated as law of the case because it was a necessary part of the Sixth Circuit's actual holding and analysis: the Sixth Circuit stated the legal standard and then applied it to Dassault's argument that it was entitled to judgment as a matter of law on its initial interest confusion theory. Simply put, the Court treated as law of the case a matter that the Sixth Circuit actually decided.

2016). Acquiescence "requires a 'finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant.'" *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569 (6th Cir. 2000) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)). *See also* 4 McCarthy on Trademarks & Unfair Competition § 31:41 (5th ed.) (explaining that acquiescence involves "cases where the trademark owner, by *affirmative* word or deed, conveys its implied consent to another" to use a trademark) (emphasis in original). The Seventh Circuit has helpfully summarized the acquiescence defense as follows:

> Generally speaking, acquiescence is an equitable doctrine that permits the court to deny relief in an action for trademark infringement if the evidence shows that the owner of the mark has, through his words or conduct, conveyed his consent to the defendant's use of the mark. The defense prevents the trademark owner from impliedly permitting another's use of his mark and then attempting to enjoin that use *after* the junior user has invested substantial resources to develop the mark's goodwill.

*Hyson USA*, 821 F.3d at 940 (internal citations omitted) (emphasis in original).

(Order, ECF No. 754, PageID.32971-32972.)

Like the Seventh Circuit, the Sixth Circuit has stressed that an acquiescence defense requires a showing that the trademark holder's "unreasonable delay" in "pursuing litigation" has "materially prejudiced the alleged infringer." *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569 (6th Cir. 2000). Such "prejudice in the context

of acquiescence inherently must involve reliance on the [mark holder's] affirmative act or deed, and such reliance must be reasonable." *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Est. Educ., Inc.*, 621 F.3d 981, 986 (9th Cir. 2010).

It is axiomatic that where an alleged infringer asserts an acquiescence defense, the infringer must show that the mark holder knew of the infringing use. That is because a holder obviously cannot acquiesce in an infringing use of which it is unaware. Where a mark is held by an individual, demonstrating the required knowledge of infringement is often straightforward and uncomplicated. But the knowledge showing becomes much trickier where, as in this case, a mark is held by a large company with many employees. How does an alleged infringer prove that a large corporation knew of an infringing use? Must the alleged infringer show that a high-level corporate officer knew of the infringing use? Is it enough to show that a managerial level employee knew of the use?

Courts have taken two approaches to answering these questions where an alleged infringer has asserted an acquiescence defense against a large corporate mark holder. Some courts have applied the general rule in trademark cases that "[i]n order to impute an agent's knowledge to a principal, it must be shown that the agent had duties with respect to trademark matters, although the agent need not have acquired his knowledge in connection with those duties." 4 *McCarthy on Trademarks and Unfair Competition* § 31:39 (5th ed. Sep. 2025). Those courts have

12

required the alleged infringer to show that his infringing use was known by an employee of the corporation who had a duty to "report" or "investigate" trademark infringement. *Deere & Co. v. FIMCO, Inc.*, 302 F.Supp.3d 837, 901–02 (W.D. Ky. 2017) (quotation omitted) (rejecting acquiescence defense because alleged infringer failed to persuade the court "that [the] representatives [of the mark holder] who were actually chargeable with the enforcement of the [mark holder's] trademarks learned of the infringing use" during the period of alleged acquiescence), *injunction modified* at 301 F.Supp.3d 704 (W.D. Ky. 2018); *Gruma Corp. v. Mexican Restaurants, Inc.*, No. 4:09-cv-488, 2013 WL 12134147, at *10 (E.D. Tex., Sep. 27, 2013) (rejecting acquiescence defense where defendant "ha[d] not produced any evidence that [corporate mark holder's retail sales manager who engaged in the alleged-acquiescing conduct] had any duties with respect to trademark matters."). Other courts have taken a slightly broader approach and have suggested that an employee's knowledge of an infringing use may be imputed to a corporate mark holder where the employee's role "require[s] sensitivity to [the corporation's] mark." *Off. Airline Guides, Inc. v. Churchfield Pub., Inc.*, 756 F. Supp. 1393, 1404 (D. Ore. 1990). *See also Georgia-Pacific v. Great Plains Bag Co.*, 614 F.2d 757, 759 (C.C.P.A. 1980) (holding that knowledge of infringement may be imputed to corporate mark holder where that knowledge was held by a "professional

salesperson" who is "present in the marketplace and cognizant of the various factors that effect [sic] present and future sales.").

Finally, because acquiescence is an affirmative defense, the party asserting the defense bears the burden of establishing its elements. *See, e.g.*, *Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 284 (6th Cir. 2018) (explaining that "as the party asserting the affirmative defenses, [the moving party] bore the burden of proof" on those defenses). And because the defense involves "a fact-based analysis," the ultimate decision as to whether it should bar a mark holder's claim rests with the "sound discretion" of the Court. *Piper Aircraft Corp. v. Wag–Aero, Inc.,* 741 F.2d 925, 932–33 (7th Cir. 1984).[3]

### b

Before the Court turns to an analysis of Childress' acquiescence defense, it pauses for a moment to address the nature of much of the evidence that Childress cites in support of that defense in his current briefing. In that briefing, he relies almost exclusively on evidence that was *not* presented at the March 2024 re-trial over which this Court presided. He highlighted his reliance on the non-trial evidence

---

[3] *See also Seller Agency Council, Inc.*, 621 F.3d at 986 ("Similarly, while the question appears to be one of first impression in our circuit, we join our sister circuits in concluding that the application of the equitable doctrine of acquiescence is within the discretion of the trial court and also is reviewed for abuse of discretion."); *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1558 (11th Cir. 1991) (holding that "[b]ecause acquiescence is an equitable defense, it will be reviewed for an abuse of discretion").

in the introductory comments to the factual background section of his opposition to

Dassault's motion for a permanent injunction:

> The established facts are cited in the "Factual
> Background" and elsewhere in Judge Zatkoff's December
> 2014 opinion and order on the parties' 2013 Rule 56
> dispositive motions (DE 275). A summary of the facts are
> also set out in the "Background" section of Judge Battani's
> post-trial order (DE 463). A more detailed version of the
> facts is cited in Childress' November 2017 declaration
> citing materials in the record (DE 567-10).

(Resp., ECF No. 762, PageID.33176.)

In assessing Childress' acquiescence affirmative defense, the Court did not

find the "cold" record on which Childress relies to be nearly as persuasive as the

testimony that was presented during the March 2024 re-trial.  The Court found the

trial testimony to have substantially more evidentiary value than the declarations on

which Childress relies because the Court had the opportunity to observe the

demeanor of the witnesses and to assess how they stood up under cross-examination.

Likewise, the Court found the trial testimony to be more persuasive than the factual

recitation in Judge Zatkoff's earlier summary judgment ruling because he gleaned

those facts from a cold record.  And Judge Battani described the evidence that was

presented at an earlier trial whose result has since been vacated.

Focusing on the evidence from the March 2024 re-trial, as the Court does here,

is fair to both sides because the parties conducted that trial on the understanding that

the acquiescence defense would be decided by the jury.  (It was only after trial that

the Court determined that it would decide the defense and explained why it would do so. (*See* Order, ECF No. 754, PageID.32970-32974.))  Thus, both sides had a strong incentive to present their strongest evidence on the acquiescence defense during the trial.

For all of these reasons, while the Court did review and consider all of the evidence cited by Childress, it places more reliance on the record of the March 2024 re-trial.

**c**

The Court now turns to Childress' theory of acquiescence.  That theory is that Dassault acquiesced in his use of its CATIA mark when Dassault and two of its business partners, International Business Machines ("IBM") and MSC Software ("MSC"), engaged in a lengthy period of "sustained cooperation" with him to promote the CATIA software in conjunction with his use of the CATIA mark. (*See* Sur-Reply, ECF No. 765, PageID.33344.)  This period of purported cooperation began in 1998 and lasted until roughly 2006.  Childress says that during that time frame, IBM, MSC, and Dassault all worked together with him in a manner that led him to believe that they approved of his use of the CATIA mark.

This theory of acquiescence is plausible.  Indeed, the leading treatise on trademark law explains that acquiescence may exist where a mark holder "engaged in continuous business dealings" with the alleged infringer and "impliedly

16

encouraged" the alleged infringer's "use of the mark over a long period" of dealings. 4 *McCarthy on Trademarks*, *supra*, § 31:42 (5th ed. Sept. 2025). *See also Dwinnell-Wright Co. v. White House Milk Co.*, 132 F.2d 822, 825–26 (2d Cir. 1943) (precluding mark holder from enforcing mark where mark holder, with knowledge of alleged infringing use, had suggested joint sales under the mark, had jointly advertised with infringer, and had encouraged the growth of the infringer's business for 16 years before filing suit).

But while Childress' theory of acquiescence is plausible, it was not persuasively supported by the evidence presented at the March 2024 re-trial. As described in detail below, the evidence presented at that trial did not show that Childress, IBM, MSC, and Dassault engaged in an extensive level of "sustained cooperation" with respect to the promotion of CATIA software through Childress' business and website. Moreover, Childress' evidence on the prejudice element of his acquiescence defense fell short. For these reasons, the Court rejects Childress' acquiescence defense.

### i

Childress had separate interactions with IBM, MSC, and Dassault during the period of alleged sustained cooperation underlying his acquiescence defense. He first dealt with IBM, then with MSC, and finally with Dassault directly. The Court begins with his dealings with IBM.

17

Childress first interacted with IBM in connection with the CATIA software in or around 1998. At that time, IBM was handling the marketing and licensing of the CATIA software to Dassault's customers in the United States. Childress says that his contact with IBM started when Dassault launched what it called "V5" of the CATIA software. He says that V5 was "radically different" than Dassault's earlier CATIA software and that it was "slow to catch on." (Resp., ECF No. 762, PageID.33184.) According to Childress, because of the challenging launch, "IBM turned to [him] to help promote CATIA V5." (*Id*.) IBM did that, he claims, by "providing him a CATIA V5 demo for use on his website [which had CATIA in its URL]" and by "displaying a CATIA V5 banner on [his] website." (*Id*.) Childress says that "IBM also provided [him] and his students with 'hobbled code,'" which permitted them to perform limited operations on the CATIA V5 software as a means of sampling its functionality and performance. (*Id*., PageID.33185.) He notes that he "promoted" the hobbled code on his website and displayed a banner on the website "promoting" an IBM CATIA offer. (*Id*.) And Childress says that an IBM employee named Pam Barton was "all for" his promotion of the CATIA software on his website. (3/20/24 Trial Tr., ECF No. 705, PageID.26490.) All of this conduct by IBM, Childress argues, led him reasonably to believe that IBM acquiesced to his use of the CATIA mark.

But the evidence presented at the March 2024 re-trial did not persuasively support Childress' position.  Notably, Childress did not call a single witness from IBM.  Instead, he presented his own testimony about his dealings with IBM, and during that testimony, he also referenced certain correspondence with IBM employees that, he suggested, further supported his view that IBM accepted his use of the CATIA mark.  And that evidence fell short.

For instance, Childress' trial testimony did not support his claims as to how IBM initiated contact with him and turned to him early on to promote CATIA V5 on his website.  At trial, he testified that he first reached out to IBM about promoting the CATIA software, not that IBM contacted him about that type of promotion. (*See* 3/20/24 Trial Tr., ECF No. 705, PageID.26488.)  He then testified that in response to his outreach, "somebody at IBM" gave him "some materials" about the software, including a "demo," and that he then added those materials to his website. (*Id.*)  However, he did not identify the "somebody" in his testimony.  More importantly, he did not provide any information in his testimony concerning that "somebody's" job title or duties, nor did he say that the "somebody" knew of, or approved, his placement of the materials on his website.  Simply put, Childress' testimony offered no basis on which to impute to IBM, itself, any knowledge of, or approval for, his early involvement with the CATIA software.

Nor did Childress persuasively establish at trial that IBM manager Pam Barton implicitly approved his use of the CATIA mark. As an initial matter, Childress has not presented any evidence that Barton had any duties with respect to trademarks or trademark enforcement. The absence of such evidence may well preclude him from relying on her conduct to establish that IBM knew of, or acquiesced in, his use of the CATIA mark. (*See* Section (II)(B)(ii)(a), *supra*.)

In any event, even if Childress could rely on Barton's conduct to support his acquiescence defense – on the basis that she was a manager with some responsibilities for promoting the CATIA software (*see id.*) – his effort to show IBM's acquiescence through her actions would still fall short. That is because, in the Court's view, the limited nature of Barton's interactions with Childress did not show that she implicitly communicated to Childress that she approved his use of the CATIA mark.

Barton appears to have had two sets of circumscribed interactions with Childress. The first occurred over a single 24-hour period in June of 2001. On June 25 of that year, Barton contacted Childress, said that she had seen his website, and raised a concern that he was using the CATIA software in his classes without the required licenses. (*See* Dassault Trial Ex. 47, ECF No. 722-35, PageID.28140.) The same day that she sent that email, Childress called her to explain that "we teach our class on CATIA V4 workstations that our School [sic] rents from design and

engineering firms." (Childress Aff., ECF No. 567-10, PageID.17781.)   The next morning, Childress sent Barton an email saying that he had been using a CATIA V5 "demo" in his class and that the demo was "a big hit" among his students. (Childress 6/25/2021 email, ECF No. 567-10, PageID.17782.)   That same morning, he sent another email to Barton asking "if Dassault and IBM would release a student version of Catia V5." (*Id*.)   Also that same morning, Barton responded: "Thanks for your response and for demoing V5.   There is a new CD coming out that is called hobbled code.   You won't be able to print or save drawings, but you can do most other things in CATIA.   If you're interested, I can send you one when they're available." (Barton email, ECF No. 567-10, PageID.17783.)   Three hours later, Childress responded that he was interested in receiving the hobbled code and that it was his "honor and pleasure to help spread the word" about CATIA V5. (*Id*.)   It appears that at some point thereafter, Barton provided the hobbled code to Childress.

In the Court's view, Barton did not express or imply in these limited communications with Childress that she approved of his use of the CATIA trademark or that she intended to enter into a sustained marketing relationship with Childress. Instead, the Court views her statements as merely supporting both his use of the CATIA demo software in his class and his efforts to teach his students how to use CATIA V5.   And there is a significant difference between encouraging the use of a

*product*, as Barton did here, and encouraging the use of a trademark, which Barton did not do.[4]

Likewise, the Court does not believe that Barton implied to Childress that he could use the CATIA mark when she offered to send him the hobbled code. She did not push him to take the code, did not urge him to use it in any particular way, and did not ask him to promote it. She simply said that she would send the code "if" he was "interested." And there is no evidence that she ever initiated any contact with Childress after she sent him the code. While Childress, himself, proceeded to promote the code on his website after he received it (*see* Childress Aff., ECF No. 567-10, PageID.17784-17785), the Court is not persuaded that Barton was a meaningful participant in that promotion.

Childress had a second email exchange with Barton in August 2002. At that time, Childress emailed Barton to inquire about the possibility of becoming an IBM training partner. (*See* Dassault Trial Ex. 66, ECF No. 722-42, PageID.28166.)

---

[4]   It is true that Barton emailed Childress at the email address keith@practicalcatia.com and that Childress later emailed Barton from the same address. It is also true that Childress included the web address "practicalcatia.com" after his name in his email to Barton. It does not appear that Barton raised a concern about the term CATIA appearing in Childress' email address or website address. But the Court is not persuaded that Barton's silence under those limited circumstances amounts to an implied assurance that Dassault and IBM approved of Childress' use of the CATIA mark. Notably, Childress has not cited any case in which any court has held that a failure to raise an objection to the use of a mark under these circumstances rises to the level of acquiescence.

Barton responded that there were no such training programs for companies that were not already IBM business partners. (*See* Barton email, ECF No. 567-10, PageID.18028.)  Nothing about that brief email exchange suggests that Barton approved Childress' use of the CATIA mark or intended to enter into a period of sustained marketing cooperation with Childress.

For the reasons explained above, Childress has failed to persuade the Court that his interactions with IBM show that IBM expressed (or implied) approval for his use of the CATIA mark or extensively cooperated with him to promote the CATIA software on his website.  Those interactions thus do not support Childress' acquiescence defense.

### ii

The Court next turns to Childress' contention that he engaged in sustained cooperative marketing and promotional efforts with MSC and that that cooperation led him reasonably to conclude that MSC approved his use of the CATIA mark.

MSC came onto the scene after Childress' dealings with IBM (described above).  IBM had engaged MSC to serve as its "business partner" in the marketing of the CATIA software in the United States.  MSC's primary role was to market CATIA V5 to smaller customers in the United States.

Childress contends that MSC implicitly approved of his use of the CATIA mark when, in 2001, MSC employee Nathan Haller entered into a "business

arrangement" with him (the "Alleged MSC Business Arrangement"). (Resp., ECF No. 762, PageID.33187.)    He says that as part of the Alleged MSC Business Arrangement, MSC agreed to provide him with temporary licenses to use the CATIA software in his business, and he, in turn, agreed to allow MSC to place banner advertisements on his website, to distribute MSC's business cards to his students, and to provide MSC with leads for potential sales of CATIA V5. (*See id*.)  He says that MSC then proceeded to place its advertisements on his website – and that it did so without raising a concern that both the website address and the name of his company included the CATIA mark.  All of this, Childress says, led him reasonably to believe that MSC accepted his use of the CATIA mark.

The Court cannot accept this theory because the evidence presented at trial did not persuade the Court that MSC actually entered into the Alleged MSC Business Arrangement.  While the evidence showed that Nathan Haller may have entered into an agreement with Childress that included placing advertisements on Childress' website and the exchange of sales leads, for the reasons explained below, the Court concludes that Haller had no authority to enter into that agreement on behalf of MSC and that he did so without MSC's knowledge.  Thus, even if Haller entered into the Alleged MSC Business Agreement with Childress, Haller's conduct – including his alleged knowledge and approval of Childress' use of the CATIA mark – cannot be imputed to MSC.

Haller's testimony showed that his job duties at MSC had nothing to do with trademarks and very little to do with sales and marketing of the CATIA software.[5] (*See* 3/18/2024 Trial Tr., ECF No. 690, PageID.25894.)  Instead, his primary "job responsibilities were technical in nature," including "support" and software "installations." (*Id*., PageID.25890.)   Haller nonetheless seemed to believe that he had the authority to enter into the Alleged MSC Business Arrangement with Childress.

However, Haller's superior at MSC, Roger Gudobba (who was in charge of CATIA sales for the central district of MSC), made clear at the March 2024 re-trial that Haller had no such authority. (*See* 3/19/2024 Trial Tr., ECF No. 704, PageID.26430-26431.)  Indeed, Guddoba testified that MSC had policies preventing "side deals with customers" just like the Alleged MSC Business Arrangement. (*Id.*, PageID.26429.)  And Guddoba stressed that he did not know that Haller had entered into the Alleged MSC Business Arrangement with Childress. (*See id*., PageID.26430.)   Guddoba added that if he had known about the Alleged MSC Business Arrangement, he "would have fired" Haller. (*Id.*, PageID.26435.)   The

---

[5] Standing alone, the fact that Haller's duties had nothing to do with trademarks may be fatal to Childress' claim that MSC acquiesced in his use of the CATIA mark through Haller's conduct. (*See* Section (II)(B)(ii)(a), *supra*.)  But even if that is not the case, the Court's finding above that Haller exceeded the scope of his authority at MSC and acted without MSC's knowledge precludes Childress from relying on the Alleged MSC Business Arrangement in support of his acquiescence defense.

Court found Guddoba's testimony to be credible, and the Court rejects as not credible any contrary testimony from Haller.[6]   Based on Guddoba's testimony, the Court concludes that Haller did not act on behalf of MSC when he entered into the Alleged MSC Business Arrangement with Childress and that MSC did not enter into that arrangement.   Thus, the Court rejects Childress' contention that the Alleged MSC Business Arrangement supports his acquiescence defense.

For all of these reasons, the Court concludes that Childress' interactions with MSC do not support his acquiescence defense.

### iii

Next, the Court turns to Childress' contention that Dassault, itself, established a business relationship with him that implicitly signaled that it approved his use of the CATIA mark.   The Court rejects that contention.

### (A)

Childress' claim that Dassault directly acquiesced in his use of the CATIA mark rests primarily upon his interactions in 2004 with Dassault employee Cedric

---

[6] The Court recognizes that Guddoba is now employed by Dassault, but it nonetheless found his testimony on the points outlined above to be far more credible than Haller.   Guddoba came across as a very believable witness.   His answers to counsel's questions were direct, immediate, crisp, and given without hesitation. Moreover, Guddoba's testimony that the Alleged MSC Business Arrangement was inappropriate was corroborated by another former MSC employee named Timothy Guddoba. (*See* 3/19/2024 Trial Tr., ECF No. 704, PageID.26414.)   Haller had a far less assured demeanor when testifying and was simply not as believable as Guddoba on the matters outlined above.

Simard. (*See* Resp., ECF No. 762, PageID.33188; 3/20/2024 Trial Tr., ECF No. 705, PageID.26583.)  Those interactions began in October of 2004.  At that time, Simard, who claimed to be "in charge of worldwide marketing and communication" for an educational unit of Dassault, contacted Childress directly by email (at Childress' email address of Keith@practicalcatia.com) about cooperation related to the CATIA V5 software. (*See* email chain, Dassault Trial Ex. 86, ECF No. 722-44; 3/20/2024 Trial Tr., ECF No. 705, PageID.26492.)  In that email, Simard proposed a deal: he would give Childress two vouchers that would enable Childress and his son to take a CATIA certification exam and, in exchange, Childress would place two Dassault banner advertisements on Childress' website "for some months." (Email, Dassault Trial Ex. 86, ECF No. 722-44, PageID.28181-28182.)  Simard pitched his proposal as a "win-win situation" for "both" Childress and Dassault. (*Id.*)  Childress and Simard then corresponded about the details of Simard's proposal, and they eventually reached an agreement (the "Childress/Simard Agreement").   The Childress/Simard Agreement called for Dassault to give Childress ten vouchers and for Childress to permit Dassault to place two banner advertisements on his website for at least one year. (*See id*., PageID.28180; 3/20/2024 Trial Tr., ECF No. 705,

PageID.26586.[7])  Pursuant to the Childress/Simard Agreement, Dassault proceeded to place its advertisements on Childress' website.

Simard's dealings with Childress are Childress' best evidence that Dassault acquiesced in his use of the CATIA mark.  It could be argued that Simard's decision to advertise on Childress' website – which used the CATIA mark in its URL and which identified Childress' business as "Practical CATIA Training" – implicitly conveyed that Dassault did not object to Childress' use of the CATIA mark at that time.  But for at least two reasons, Simard's interactions with Childress are not sufficient to sustain Childress' acquiescence defense.

---

[7] There is a dispute between the parties as to the length of time that Dassault would be permitted to advertise on Childress' website under Childress/Simard Agreement. Dassault says that the agreement allowed it to advertise for one year. In support of that contention, Dassault cites a statement in an email Simard sent to Childress in which Simard says that while Childress initially offered to permit Dassault to advertise on his website for an unlimited period of time, he (Simard) responded that he sought only to advertise on the site for one year. (*See* email, ECF No. 722-44, PageID.28180.)  Childress, however, testified that his negotiations with Simard "evold[ed]" and concluded with the agreement allowing Dassault to advertise on his site for an unlimited period of time. (3/20/2024 Trial Tr., ECF No. 705, PageID.26585-26586.)  As support for that position, Childress cites an email written by Dassault employee Michel Recan, who appears to be Simard's boss, in which Recan seems to express his apparent understanding that Dassault would be permitted to advertise on Childress' website for an "indeterminate" period of time. (Email and translation, ECF No. 497.)   The Court need not resolve this dispute because, for the reasons explained above, Childress has failed to show any prejudice arising out of his dealings with Simard, and the length of time the banner advertisements would have appeared on his website is not material to the Court's analysis.

First, Childress has not presented any evidence that Simard's duties related in any way to trademarks or trademark enforcement.  Nor has he presented any evidence that Simard's duties required him to be sensitive to Dassault's trademarks. While Simard appears to have had some marketing duties, his title suggests that those duties related to Dassault's educational/training services, and Childress has not identified any evidence that those duties would require a sensitivity to the CATIA mark.  The absence of evidence connecting Simard's duties to Dassault's trademarks may preclude Childress from relying on Simard's actions and knowledge to establish acquiescence by Dassault. (*See* Section (II)(B)(ii)(a), *supra*.)

Second (and much more importantly), Childress has not shown that he suffered any "material[] prejudice" as a result of the delay between the time that he and Simard entered into the Childress/Simard Agreement, on one hand, and the time Dassault filed this lawsuit, on the other hand. *Kellogg Co*., 209 F.3d at 562 (identifying prejudice from such delay as an essential element of an acquiescence defense).  As noted above, in order to establish that prejudice, Childress had to prove that (1) he "reli[ed] on" Simard's purported approval of his use of the CATIA mark between the time that Simard conveyed that approval and the time that Dassault filed this lawsuit and (2) that his "reliance [was] reasonable." *Seller Agency Council, Inc.*, 621 F.3d at 986.  Childress did not even attempt to make that showing when he set forth his acquiescence defense in his response to Dassault's motion.

And the Court does not believe that he could have made such a showing based upon the record at the March 2024 re-trial.  He did not introduce any evidence at the re-trial that he took any steps in reliance on the Childress/Simard Agreement between the time that he entered into that agreement in 2004 and the time that Dassault filed this lawsuit in 2009.  For instance, he did not present any evidence that during that five-year period he actually made any business decisions or expended any funds or efforts based upon his belief that Simard had approved of his use of the CATIA mark.  Moreover, the evidence showed that Childress named his business and chose his website address *before* he entered into the Childress/Simard Agreement (*see, e.g.*, 3/20/2024 Trial Tr., ECF No. 705, PageID.26480, 26486, 26489), and it is thus clear that he did not name his business or choose his website address in reliance on that agreement.  Likewise, the evidence at the re-trial showed that he invested substantial time and energy marketing his business and building up interest in his website *before* he and Simard entered into the Childress/Simard Agreement.  For example, he testified that long *before* he entered into the Childress/Simard Agreement, he authored significant articles that positioned him as an industry leader, and, more importantly, that due to his hard work and stellar reputation, his website had become the "top" result for CATIA training on Google *before* the agreement. (*Id.*, PageID.26489.)  For all of these reasons, Childress has failed to persuade the Court that he relied on, or was prejudiced by, the passage of

30

time between the time he entered into the Childress/Simard Agreement and the time that Dassault filed this lawsuit. The Court therefore rejects his acquiescence defense to the extent that it rests on Simard's conduct and the Childress/Simard Agreement.

Childress counters that he did not need to present evidence of actual prejudice to prevail on his acquiescence defense because, under the facts and circumstances of this case, the Court must "presume" that he suffered prejudice as a result of his interactions with Dassault and its business partners. (Sur-Reply, ECF No. 765, PageID.33350-33351.)  And he says that Dassault failed to rebut the presumption. His entire argument on this issue was as follows:

> Judge [Lawrence] Zatkoff [who presided over this case between 2009 and February 2015] held that each claim, including trademark infringement, is governed by a three-year statute of limitations and "accrues when a plaintiff knows of the infringement or is chargeable with such knowledge," citing *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 421 (6th Cir. 2006) (DE 275, PgID.5609). Delay beyond that period is presumptively prejudicial; the burden shifts to the plaintiff to rebut the presumption. *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 321–23 (6th Cir. 2001); see also *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 409 (6th Cir. 2002). Dassault has not done so.

(*Id.*)  Childress seems to suggest that prejudice may be presumed here because Dassault knew or should have known that he was using the CATIA mark as early as 1998 – when he began dealing with IBM – yet Dassault waited far longer than three years to file this action (in 2009).

31

This argument is flawed because it measures the relevant delay from the wrong point. In the context of an acquiescence defense, the relevant delay is not measured from the date that Dassault first learned of, or should have known of, his alleged infringement. That is how delay is measured for purposes of a *laches* defense – which Childress has not presented in opposition to Dassault's motion. For purposes of an acquiescence defense, the relevant delay is measured from the date that the trademark holder expresses its approval of the alleged infringer's use of the mark. *See Times Mirror Mags., Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 395 (2d Cir. 2002) (identifying the relevant period of delay for purposes of an acquiescence defense as "the delay between the [mark holder's] active representation [that the alleged infringer could use the mark] and [the mark holder's] assertion of the right or claim"); *Seller Agency Council, Inc.*, 621 F.3d at 989 (same). Thus, assuming arguendo that a presumption of prejudice may arise in the context of an acquiescence defense, such a presumption would not arise here based upon Childress' contention that Dassault waited more than three years to file suit after it learned that Childress was using the CATIA mark.

The Court recognizes, however, that it may nonetheless be appropriate to presume prejudice here when the period of delay is measured from the proper starting point. Here, that point is Simard's purported approval of Childress' use of the CATIA mark in 2004. Since Dassault waited more than three years after that

approval to file this action (in 2009), it may be proper to apply a presumption of prejudice. But if and to the extent that prejudice may be presumed on *this* basis, Dassault has rebutted that presumption to the Court's satisfaction. As Dassault notes, Childress admits that his business was effectively destroyed by an FBI raid in 2006.[8] (*See* Reply, ECF No. 763, PageID.33257.) That raid occurred *less* than three years after Simard's interactions with Childress in late 2004. Because Childress' business was wiped out *within* three years of Simard's dealings with Childress, Childress could not have been prejudiced by the fact that Dassault filed this action more than three years after Simard's dealings with him.

For all of these reasons, the Court concludes that even if Simard's dealings with Childress are tantamount to approving his use of the CATIA mark, Childress' acquiescence defense based upon those dealings fails because Childress has failed to satisfy the prejudice element of that defense.

**(B)**

Childress also suggests that other Dassault employees implicitly approved his use of the CATIA mark, but he has failed to persuade the Court that that actually happened or that he relied to his detriment on any such approvals. Childress first

---

[8] The question may arise: why did Dassault sue Childress in 2009 if Childress' business was destroyed by the FBI raid in 2006? The answer is that Childress continued to use the CATIA mark even after the raid. Dassault apparently concluded that even though his business operations may have been wiped out by the raid, the confusion caused by his use of its mark continued.

directs the Court to his communications with Michel Recan, a Dassault executive. He claims to have had two sets of communications with Recan.  He says that in the first set of communications (which occurred in 2002), he asked Recan about taking a CATIA certification test, Recan told him that he (Recan) would let Childress "know when the tests [were] available," and then, in a later e-mail, "he did." (Resp. ECF No. 762, PageID.33190; 3/20/2024 Trial Tr., ECF No. 705, PageID.26501.) Childress seems to suggest that that email exchange with Recan supports his acquiescence defense because (1) he (Childress) used his Keith@practicalcatia.com email address to communicate with Recan, (2) his email to Recan listed the name of his business (Practical Catia Training), and (3) Recan did not object to Childress' website address or business name. (*See* 3/20/2024 Trial Tr., ECF No. 705, PageID.26491-26492.)  The Court disagrees.  The Court does not regard Recan's alleged failure to object under those circumstances as rising to the level of an implicit approval of Childress' use of the CATIA mark.  Who knows if Recan even noticed the email address or business name?  Or focused on it?  Or personally reviewed and responded to the email (as opposed to having an assistant respond under his name)? Childress has not presented any evidence that could answer any of those important questions.  In any event, even if Recan had noticed Childress' email address and/or business name, the Court would not regard his passive failure to raise an objection

in an isolated email exchange as implicitly approving Childress' use of the CATIA mark.

Next, Childress says that he communicated with Recan again in 2003 to inquire about a Dassault training program. (*See* Resp. ECF No. 762, PageID.33190.) And in his post-trial briefing, Childress claims that during that time frame, he told Recan that IBM and MSC were advertising on his "top-ranked website." (*Id.*) But Childress did not testify to that fact at trial. And the Court is not convinced that Childress told Recan about any advertising on his website. The Court therefore concludes that Childress' second set of communications with Recan also provide no support for his acquiescence defense.

Finally, Childress says that his communications with another Dassault employee named Len Turner support his acquiescence defense. (*See id.*, PageID.33189-33190.) He testified that Turner asked him to investigate whether certain companies were improperly using limited-purpose CATIA training licenses for unallowed purposes. (*See* 3/20/2024 Trial Tr., ECF No. 705, PageID.26597-26598; 3/18/2024 Trial Tr., ECF No. 695, PageID.26056.) But he did not testify to any particular details of his communications with Turner, nor did he testify that he and Turner had any specific communications about his (Childress') use of the CATIA mark in his business name or website URL. The Court is not persuaded that this set of limited-purpose communications between Childress and Turner may reasonably

35

be interpreted as including Turner's implicit approval of Childress' use of the CATIA mark.

**iv**

For all of the reasons explained above, the Court concludes that Childress is not entitled to prevail on his acquiescence defense.

**4**

Next, the Court turns to Childress' argument that Dassault cannot show success on the merits because Dassault's trademark infringement claim is barred by its unclean hands. (*See* Resp., ECF No. 762.)   The Court disagrees with that argument.

Childress presented an unclean hands defense to the jury at the March 2024 re-trial, and the jury rejected it. (*See* Verdict Form, ECF No. 667, PageID.25047.) While the Court may now make its own independent assessment of that defense,[9] Childress has not persuaded the Court that there is any reason to depart from the

---

[9] As the Court explained in an earlier order, Childress' equitable defenses – including unclean hands, laches, and acquiescence – were presented to the jury for decision at the March 2024 re-trial even though, as the Court realized after the trial, those defenses should have been ruled on by the Court. (*See* Order, ECF No. 754, PageID.32985.) As noted above, the jury rejected Childress' unclean hands defense. But, for reasons further explained in the Court's earlier order, the jury did not reach his laches and acquiescence defenses.   The Court told Childress that he could raise those defenses in opposition to Dassault's now-pending motion for permanent injunction.   He raised the acquiescence and unclean hands defenses, but he has not raised a laches defense.

jury's rejection of the defense.  Indeed, he does not suggest that the jury erred in its evaluation of the evidence related to this defense that he presented at the re-trial. Instead, he says that the jury had an "incomplete record because key communications [between and among Dassault employees and agents] were withheld under claims of privilege." (Sur-Reply, ECF No. 765, PageID.33352.)  But since he has never seen the privileged materials, he has no basis for his assertion that they would have supported his unclean hands defense.  More importantly, Childress' challenges to Dassault's assertions of privilege were previously resolved against him in this action. (*See*, *e.g.*, Orders, ECF Nos. 300, 316, 566; 10/25/2021 Hr'g Tr., ECF No. 558; 1/28/2022 Hr'g Tr., ECF No. 573.)  Thus, the jury was not deprived of documents that were wrongly withheld on the basis of privilege.  For all of these reasons, Childress has failed to persuade the Court that he should prevail on his unclean hands defense.

## 5

For all of the reasons explained above, the Court rejects Childress' arguments that Dassault should not be deemed to have prevailed on the merits of its trademark infringement claim.  The Court concludes that Dassault has shown that it prevailed on the merits of that claim and has therefore made the first showing required for permanent injunctive relief.

## III

The Court now turns to the next injunction factor: whether Dassault has shown that it would suffer an irreparable injury absent permanent injunctive relief. It has.

Where, as in this case, a defendant is found to have infringed a trademark, the Lanham Act provides that "in the case of a motion for a permanent injunction" the trademark owner "shall be entitled to a rebuttable presumption of irreparable harm." 15 U.S.C. § 1116(a). Furthermore, as the Sixth Circuit has recognized, "irreparable injury 'ordinarily follows when a likelihood of confusion or possible risk to reputation appears' from infringement or unfair competition." *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999) (quoting *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991)). "Thus, a court need only find that a defendant is liable for infringement or unfair competition for it to award injunctive relief." *Id.*

Here, based on the jury's finding of infringement at trial, Dassault is entitled to a rebuttable presumption of irreparable harm, and Childress has not overcome that presumption. In his initial response brief, Childress addressed the irreparable harm factor in just a single sentence: "Any presumption of irreparable harm is overcome by the fact that Dassault knowingly profited from advertising on Childress's website for years—only objecting once it launched a competing training business." (Resp., ECF No. 762, PageID.33208.) But he did not cite any evidence that Dassault

38

actually profited from any advertising on his site.  Moreover, as explained above (*see* Section (II)(B)(3)(c)), he has overstated the extent of his business relationship with Dassault and its business partners.  Finally, the fact that Dassault now directly competes with Childress in the CATIA training market underscores that it *would* suffer irreparable harm if Childress used the CATIA mark going forward.  Indeed, Childress' emphasis on Dassault's placement of advertisements on his website years ago focuses on the wrong time frame.  The question before the Court is whether Dassault would face irreparable harm *today* from Childress' ongoing use of the CATIA mark.  Thus, whether Dassault may have thought it was a good idea to place banner advertisements on Childress' website in 2004 – more than 20 years ago and before Dassault began directly competing with Childress – does not meaningfully rebut the presumption that Dassault will suffer irreparable harm from Childress' current and ongoing use of its mark.

Finally, Childress' admitted insolvency and his inability to pay any judgment issued against him is another factor that seems to weigh in favor of a finding that Dassault would suffer irreparable harm without permanent injunctive relief.  Courts in this circuit have recognized that where there is "an insolvent defendant," then "financial injury [could] be sufficient [to establish] irreparable harm." *Williams v. Churchill Mortg. Corp.*, No. 24-12905, 2025 WL 1560139, at *2 (E.D. Mich. June 2, 2025); *see Salita Promotions Corp. v. Ergashev*, 500 F. Supp. 3d 648, 655 (E.D.

Mich. 2000) (finding irreparable harm where "the evidence before the [c]ourt suggest[ed] … damages might not be recoverable" because the defendant "might not be financially able to satisfy a large damages award"). *See also* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2020) ("Even if a loss is fully compensable by an award of money damages, however, extraordinary circumstances, such as a risk that the defendant will become insolvent before a judgment can be collected, may give rise to the irreparable harm necessary" for an injunction).

For all of these reasons, the Court concludes that the irreparable harm factor favors granting a permanent injunction in Dassault's favor.

## IV

The next factor that the Court must consider is whether Dassault has an adequate remedy at law.  For many of the same reasons that the Court just discussed, this factor also favors Dassault.  Indeed, Childress' admitted insolvency makes it likely that absent an injunction, Dassault will be left without any remedy for Childress' infringement of the CATIA mark.  Moreover, as Dassault correctly points out, the harms caused by the likelihood of confusion under these circumstances are inherently difficult to calculate, and so long as Childress remains able to use the CATIA mark, "there [is the] potential for future harm." *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (finding that "there was no adequate remedy at law"

40

where infringing defendant used the trademark owner's "trademarks in its domain name" for its website because "so long as" that website remained online with that website address, "there was potential for future harm").

Childress addressed this factor in just two sentences in his initial response to Dassault's motion: "Dassault waived damages on its trademark claim to avoid an erroneous [jury] instruction. That tactical decision does not prove damages were inadequate; it simply confirms equity is unnecessary." (Resp., ECF No. 762, PageID.33208.) Thus, Childress contended, "[h]aving declined the very remedy that would have compensated any proven harm, Dassault cannot contend that legal relief is insufficient." (Sur-Reply, ECF No. 765, PageID.33356.) But the Court does not regard Dassault's decision to forego seeking damages for Childress' infringement as a concession that such damages could be reasonably calculated or that Dassault had an adequate remedy at law. Instead, that decision represented a sensible decision not to continue to pursue a difficult-to-prove damages amount against an uncollectible defendant and to focus, instead, on seeking relief (an injunction) that could provide real protection.

For all of these reasons, the Court concludes that this factor favors granting Dassault's requested injunction.

**V**

Next, the Court turns to the balance of harms. The Court concludes that this factor also favors Dassault. As the jury found, Dassault would suffer harm from Childress' continued wrongful use of its CATIA mark in the form of customer confusion caused by that use. And as the Sixth Circuit has explained, an infringing party like Childress "faces no hardship in refraining from willful trademark infringement." *Audi AG*, 469 F.3d at 550.

Childress countered in his responses to Dassault's motion that he has "invested twenty-eight years in building" equity and goodwill in the name of his school and his website address (Sur-Reply, ECF No. 765, PageID.33357), and he insisted that it would be "catastrophic" to that "long-standing" business if he was forced to change the name of his school and/or website. (Resp., ECF No. 762, PageID.33209.) The Court disagrees. Childress' insistence that changing the name of his school and website would be catastrophic to him today is substantially undermined by his testimony that the FBI's raid of his business *in 2006* "destroyed" his business and "destroyed" his "reputation" and "credibility" in the industry.[10]

---

[10] The Court further notes that in a motion Childress filed in this case in 2017, he told the Court that "[b]ecause this lawsuit consumes all my time, I haven't earned a penny from CATIA training or from any other source during the past seven years." (Childress Mot., ECF No. 453, PageID.1258 at n.3.) Childress has not presented any evidence in response to Dassault's injunction motion that he currently derives any meaningful income from his website and/or CATIA training school.

(3/20/2024 Trial Tr., ECF No. 688, PageID.25866.)  Moreover, an injunction would not bar Childress from operating his website or school, nor would it prevent him from promoting the fact that he offers training for the CATIA software.  He simply would not be able use the CATIA mark in the name of his business or website.  And Childress has not persuaded the Court that he would be unduly harmed by such a prohibition.

Finally, the balance of harms favors Dassault here because for many years Childress used the CATIA mark in the name of his website and school with knowledge that it may cause confusion.  In 2003, Childress sought a trademark arising out of the name of his school, "Practical Catia Training," and the United States Patent and Trademark Office denied that application. (*See* ECF No. 722-12, PageID.27735-27737.)  When it did so, it told Childress that the name of his business caused a likelihood of confusion with Dassault's CATIA mark. (*See id.*) Nonetheless, Childress chose to use the CATIA mark in the name of his school and business.  Childress' decision in the face of the denial of his trademark application weighs against a finding that the balance of the harms favors him.

For all of these reasons, this factor favors Dassault's requested injunction.

## VI

Finally, the Court turns to the public interest factor.  "It [is] in the public's interest to issue [an] injunction in order to prevent consumers from being misled."

*Audi AG*, 469 F.3d at 550.  As explained above, the Court's ruling here would not prevent Childress from operating his school or website or from offering training services on the CATIA software.  It would simply eliminate any potential for consumer confusion by barring him from using Dassault's CATIA mark when doing so.  The public would benefit from eliminating that confusion. *See Ford Motor Co. v. InterMotive, Inc.*, No. 4:17-CV-11584, 2024 WL 3848313, at *6 (E.D. Mich. Aug. 15, 2024) (granting injunction and explaining that "[a] permanent injunction [would] benefit the public interest by preventing further confusion" and "restoring [the injured party's] rightful control over its registered" trademark).

## VII

For all of these reasons, Dassault has prevailed on the merits of its trademark infringement claim, and each of the *eBay* factors favor granting a permanent injunction in favor of Dassault.  Dassault's motion for a permanent injunction (ECF No. 759) is therefore **GRANTED**.   From this point forward, Childress is **PERMANENTLY ENJOINED** from using the CATIA mark in:

(1) the name of any business that he operates;

(2) the name of any course that he teaches; and

(3) in any website URL that he uses.

Childress shall also deactivate the website http://www.practicalcatia.com within fourteen days of this Order.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  February 6, 2026


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 6, 2026, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126